UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARTHURETTA L. HOLMES-MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 07-2128 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| Department of Health and Human | ) |
| Services, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email:rlswick@swickandshapiro.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II    Martin's Supervisor Strips Her of Her Duties and Gives Them to a White Male . 3

    III.    Ridgley Favors Her White Male Special Assistant over Ms. Martin . . . . . . . . . . 5

    IV.    Martin Endures a Course of Abuse And Hostility By Her Supervisor . . . . . . . . 5

    V.    DHHS Thwarts Martin's Efforts to Transfer Her to a Non-Hostile Supervisor . . 7

    VI.    Humiliation and Harassment Wrecks Martin's Mental and Physical Health . . . . 8

    VII.    Ridgley Delays Martin's Worker's Compensation Application. . . . . . . . . . . . . . 11

    VIII.    Ridgley Terminates Martin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    This Court Should Not Dismiss Ms. Martin's Complaint Because It
        Sufficiently States a Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    Legal Standard for Summary Judgment in the Title VII Context. . . . . . . . . . . . 13

    III.    Summary Judgment Is Precluded on Ms. Martin's Race Discrimination and
        Retaliation Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    A Reasonable Jury Could Conclude That DHHS Substantially
             Diminished Martin's Responsibilities Based on Her Race. . . . . . . . . . . . 14

            1.    The Substantial Reduction In Martin's Duties Is Actionable. . . . . 15

            2.    Martin Has Presented Sufficient Evidence To Raise An
                Inference of Race Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    This Court Should Not Enter Summary Judgment on Ms. Martin's
             Hostile Work Environment Claims Because Defendant Did Not
             Address Those Claims in Its Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.    A Reasonable Jury Could Find that Ridgley Terminated Ms. Martin
      Based on Her Race And Protected Activity. . . . . . . . . . . . . . . . . . . . . . . .  18

D.    Martin's Claims Survive Summary Judgment Because A Reasonable
      Jury Could Find that One or More of DHHS' Reasons Are Pretext for
      Discrimination and Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

      1.    A Jury Could Reasonably Conclude that Defendant's Claim
            that It Did Not Strip Ms. Martin of Her Duties is Untrue and
            Therefore Pretextual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

      2.    A Jury Could Reasonably Conclude that Defendant's Claim
            that It Fired Martin Because She Was Unable to Perform her
            Duties is Pretextual  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

      3.    A Reasonable Jury Could Find that DHHS's Statement that
            Leaving Martin's Position Open Would Cause an Undue
            Hardship to the Office is Untrue. . . . . . . . . . . . . . . . . . . . . . . . . . .  26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

## INTRODUCTION

Arthuretta Martin, an African-American, has been the subject of a campaign of harassment and abuse. Her former supervisor, Debbie Ridgley, a white female, spent nearly three years trying to get rid of Ms. Martin. First, Ridgley hired a white male and gave him Ms. Martin's duties and told the white man to help Martin find another job. Then, she isolated Martin and humiliated her in front of her colleagues. She harassed her about her travel vouchers, a travel overpayment, how she communicated with her, and gave her deadlines she knew were impossible to meet. She held her to much tougher standards than her white coworker. When Ms. Martin could finally take no more, Ridgley used Martin's deteriorating mental health as a pretext to terminate her employment. What's more, she proposed her removal just two months after Ms. Martin engaged in protected EEO activity.

Defendant has now moved to dismiss or for summary judgment on Ms. Martin's hostile work environment claims. Defendant's Motion to Dismiss or in the alternative for Summary Judgment argues that Ms. Martin's allegations, as articulated at the administrative level, are not actionable adverse employment actions. However, it does not address whether the near-complete removal of Martin's substantive duties is an adverse employment action. Rather, defendant simply disputes whether Ridgley did, in fact, remove Martin's substantive duties. Such a disputed fact precludes summary judgment.

On Ms. Martin's termination claim, defendant argues that Ms. Martin's claim fails because she can not point to a white person with her illness who was not terminated – a theory that the D.C. Circuit has repeatedly rejected since 2005. *See, e.g., Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002). Rather, Ms. Martin need only present facts sufficient for a reasonable jury

to infer discrimination. Because the evidence, when viewed in the light most favorable to Ms.

Martin, supports such a jury finding, Defendant's motion must be denied. There are issues of

fact regarding whether (1) DHHS stripped Martin of most of her job responsibilities; (2) DHHS

terminated Martin without considering whether it could accomodate her mental needs; (3)

DHHS's claim that it was undue hardship to leave Martin's position unfilled while she finished

her treatment was pretextual; (4) whether Ridgley treated Martin differently from a white

coworker because of race discrimination; and (5) whether Ridgley treated Martin differently in

retaliation for filing EEO complaints. Similarly, a reasonable jury could infer retaliation from

the evidence of pretext as well as the close proximity in time between Ms. Martin's termination

and her last protected activity: just two months. Accordingly, summary judgment must be denied

on Ms. Martin's termination claims.

## STATEMENT OF FACTS

**I.      Background.**

Plaintiff, Arthuretta Holmes-Martin, an African-American female, has been employed the

federal government since 1979. In January 2000 she began her employment with the Department

of Health and Human Services (DHHS). In 2004, while she was serving as the Grade 14,

Deputy Director, Office of Small and Disadvantaged Business Utilization ("OSDBU"), Office of

the Secretary, her first line supervisor was Debbie Ridgley, Director, OSDBU. Mark Weisman

was her second line supervisor until the office was reorganized in May of 2005. Her primary

duty was to manage procurement. During the course of her employment as DHHS, she has filed

three EEO complaints.

**II.     Martin's Supervisor Strips her of her Duties and Gives them to a White Male.**

In the fall 2004, Ms. Ridgley created a position in her office for Clarence Randall, a Caucasian male. Ms. Ridgley made Mr. Randall a GS-15 Special Assistant. Ms. Ridgley assigned Ms. Martin's substantive responsibilities to Mr. Randall. PX 1 at 2; PX 3 at 11. When Martin returned to work, Ridgley told Randall to help Martin get another job. PX 4 (Martin Affidavit, July 31, 2007) at 6. When Martin inquired about Randall's role at DHHS, she was told that he was there to handle budget and personnel issues. *Id.* However, Ridgley constantly assigned Randall procurement duties, which were Martin's responsibility, to the point where Martin's coworkers inquired about whether she had been fired. *Id.* Indeed, Martin, a GS-14 manager, was relegated to clerical work while Randall took over many of her former responsibilities. *Id.*; PX 3 (Request for hearing and March 24, 2005 EEO Complaint) at 11-12. Randall was assigned to work as the NAWPAW conference coordinator and put on the Strategic Plan project, each of which was formerly Martin's responsibility. PX 5 (Martin Affidavit, August 22, 2007) at 3. Ridgley gave Martin only menial tasks, and set unrealistic deadlines for their completion. PX 1 (Martin Affidavit, June 12, 2007) at 4. When lower level employees did not want to do specific tasks, Ridgley made Ms. Martin do them. *Id.* at 2. Ridgley refused to treat Martin as her Deputy Director and instead consistently assigned Martin tasks equal to or less than lower-graded staff members and placed her on committees subordinate to small business specialists. *Id.*

Ms. Martin's responsibilities were systematically reassigned to lower-ranked staff of DHHS. PX 5 at 5. For instance, the Climate Assessment project, the Newsletter, the Veteran's

Business Program, and the Vendor Outreach Sessions were all taken from Ms. Martin and reassigned to other staff. *Id*; *see also* PX 2 (Email response from Curtis Bryant, June 7, 2007) (stating "some tasks were supported by member's of the Director's immediate staff; Ms. Debra Peters, Procurement Analyst, HHS Service Disabled Veteran-Owned Small Business Advocate, and Ms. Teneshia G. Alston, Small Business Analyst- Agency Coordinator, Electronic Subcontracting Reporting Systems (eSRS)"). Additionally, Ridgley so micro-managed Martin's management of the Women's Business Program, the 8(a) program, the Service Disabled Business Program, and the Disadvantaged Business Program, that Martin was relegated to steering businesses to the monthly outreach sessions. PX 5 (Martin Affidavit, August 22, 2007). Ms. Martin was no longer given the task of reviewing the Small Business Review Forms, which meant she could no longer evaluate or even identify procurement opportunities for small business. *Id.* at 2. Since Martin did not have access to the agency's procurements, acquisition strategy, or future requirements, she was severely limited in what she could do to assist the businesses she did continue working with. *Id.* at 4.

When Martin came up with project ideas and recommendations, Ridgley regularly reassigned these to other staff members as well. *Id.* at 2. For instance, Martin attempted to arrange matchmaking sessions with program offices, however, when she arranged a match making session between the Veterans' Businesses and the Information Technology office, Ridgley reassigned the program. *Id.* Martin recommended the creation of an HHS newsletter, which Ridgley reassigned to a lower-ranked staff member. Martin suggested the Small Business Climate Assessment which was also reassigned. *Id.* When she recommended the development of a small business desk manual, Ridgley micro-managed every aspect of the manual until

-4-

Martin's role was diminished to mere clerical tasks. *Id.* Martin recommended the Strategic Plan development, but shortly after she began working on it, Ridgley reassigned it and completely shut Martin out of the initiative. *Id.* Finally, Martin had worked hard to build on the Veteran's business program and develop strategies to improve contracts awarded to Veteran Businesses. *Id.* As soon as the project became a success, Ridgley reassigned it to another staff member. *Id.*

### III. Ridgley Favors Her White Male Special Assistant over Ms. Martin.

Reassignment of her duties was not the only manner in which Ridgley treated Randall more favorable than Martin. For example, Ridgley would not meet with Martin unless she had an appointment, but she allowed Randall open-door access. PX 1 at 4. She took Randall with her to attend meetings outside of the office, leaving Martin behind. *Id.* And when she did allow Martin to attend routine meetings, Ridgley required that Randall go with her, thereby creating the impression Martin was not trusted to attend these meetings herself. *Id.* at 2.

### IV. Martin Endures a Course of Abuse And Hostility By Her Supervisor.

In the fall of 2004, Ridgley discontinued almost all person-to-person contact with Martin, despite the close proximity of their offices. Instead of talking to her, Ridgley began relying almost solely on email. PX 1 (Martin Affidavit, June 12, 2007). On the rare occasion that Ridgley would provide oral direction, she would later change her mind and criticize the way Martin completed the assignment. PX 5 at 5; *see also* PX 3 at 11. The emails from Ridgley to Martin became part of Ridgley's campaign of harassment against Ms. Martin; Ridgley sent Martin a series of hostile and threatening e-mails at work. PX 6 (EEO Complaint, April 24, 2006) at 7.

Ridgley also diminished Martin's responsibilities to the point that Ms. Martin had nothing to do seventy-five to eighty percent of the workday. PX 1 at 2. When Martin informed Ridgley of this, she was either ignored or given a menial task, such as forwarding emails. *Id.* To add insult to injury, Ridgley made a point of asking Ms. Martin about what she was working on in a staff meeting. Defendant's Exhibit ("DX") 37 (Clyde Martin Worker's Compensation letter) at 7. When Ms. Martin responded that she had no work, Ridgley ridiculed her in front of her colleagues. Notably, Ridgley confirms this occurrence in the supervisor's portion of Ms. Martin's workers' compensation application. *See* DX 38 (Response to Martin Allegations for Worker's Compensation Claim) at 8. Ridgley actually states that, "Ms. Martin actually embarrassed herself by stating that she had no work to report,' (*Id.*) thus implying that Ms. Martin brought the shame on herself instead of acknowledging that she had systematically removed Ms. Martin from her previous assignments until she had barely any work to do.

Ridgley found other ways to isolate Martin. She ordered the SBA procurement center representative to stop communicating with Ms. Martin. PX 1 at 7; PX 3 at 11. Because Martin was responsible for procurement within her office, Ridgley's order impeded Ms. Martin's ability to perform her job. *Id.* She also excluded Martin from all meetings other than the weekly staff meeting. PX 1 (Martin Affidavit, June 12, 2007) at 4. Later, Ridgley changed the locks on Ms. Martin's door at the office and prevented her access to her voicemail and e-mail. *See* DX 37 (Clyde Martin Worker's Comp. Letter) at 5.

Ridgley also manipulated Ms. Martin's performance evaluations for Fiscal Years 2005 and 2006. For FY 2005, Ridgley failed to provide Ms. Martin with a performance plan until August 30, 2005, then requested that Ms. Martin backdate the performance plan and sign it – a

-6-

year after the fact. PX 1 (Martin Affidavit, June 12, 2007) at 9. Ms. Martin declined to

improperly backdate the performance plan. That year, she received no mid-year or annual

performance evaluation. DX 37 at 4. Then, in FY 2006, Ridgley established unrealistic goals,

and refused to discuss the proposed performance plan with Ms. Martin. *Id.* Frustrated, Ms.

Martin requested the name of Ridgley's supervisor, so that she could talk to him or her. Ridgley

refused to provide the name. *Id.*; PX 5 (Martin Affidavit, August 22, 2007) at 2.

## V.    DHHS Thwarts Martin's Efforts to Transfer Her to a Non-Hostile Supervisor.

In response to Ridgley's abuse, Ms. Martin sought assistance and intervention of various

officials at DHHS – all to no avail. As an early example, Ms. Martin consulted an Employee

Assistance Program (EAP) counselor after Ridgley gave her a letter of reprimand. PX 1 at 2-3;

PX 5 at 4. The counselor told Ms. Martin that she had no right to EAP services for issues

relating to employment matters. PX 5 at 4.

Ms. Martin then pursued the possibility of filing EEO complaints against Ridgley in order

to put an end to the discriminatory treatment. The EEO office, however, repeatedly delayed or

ignored Ms. Martin's requests for help. Ms. Martin first contacted the EEO office on January 14,

2004. PX 3. The EEO put Ms. Martin off for over a year; she was prevented from filing a

formal complaint until March 24, 2005. *Id.* Though it appears that the EEO office interviewed

Ms. Martin and Ridgley, the office never produced a complete Report of Investigation (ROI)

despite the EEOC Order requiring them to produce an ROI within 15 days or be subject to

possible penalties. See DX 15 (Order to Produce ROI). Even more than three years after the

discrimination took place, no one at DHHS had bothered to look into Ms. Martin's complaint,

nor did she have an Administrative Judge assigned to her case despite her request for a hearing regarding her claim. *See* PX 3 at 1; DX 31.

Because Ridgley continued to retaliate against her and continued sending hostile and threatening e-mails to her, Ms. Martin again complained to the Department's EEO office. *See generally* PX 6 (EEO Complaint, April 24, 2006). Ms. Martin specifically requested a transfer so that she would no longer have to work for Ridgley. *Id.* The EEO office merely processed paper this time, conducting no real investigation (other than to record briefly that Ridgley summarily denied Ms. Martin's allegations). *Id.* In fact, although the basis for Martin's complaint were threatening and hostile emails, no documents were reviewed by the investigator. *Id.* at 8. Again, there is no ROI regarding this EEO complaint. Ms. Martin filed this complaint with the EEOC on April 24, 2006. PX 1 (Martin Affidavit, June 12, 2007) at 2-3.

Finally, on July 6, 2006, Ms. Martin e-mailed David Shorts, the EEO Director, seeking to lodge another EEO complaint against Ridgley. PX 8 (Email from Martin to Shorts, July 6, 2006). This time, the Department's office simply ignored her request and never even assigned her an EEO counselor. *See* PX 1 (Martin Affidavit, June 12, 2007) at 2-3; PX 5 (Martin Affidavit, August 22, 2007) at 1. After Ms. Martin's repeated attempts in getting her complaints heard were unsuccessful, Ms. Martin's husband, Clyde Martin, wrote a letter to Secretary Leavitt on July 10, 2006, about the mistreatment of his wife and inaction by DHHS officials. DX 31. Once again, Ms. Martin received no response from the Department.

## VI.    Humiliation and Harassment Wreck Martin's Mental and Physical Health.

Eventually, Ms. Martin began to feel entirely hopeless and unable to perform her work under Ridgley. DX 37 (Clyde Martin Worker's Comp. Letter) at 4, 8, 10; PX 9 (Letter from Dr.

Holland, June 16, 2006). Throughout the mistreatment, she suffered from sleep problems, insomnia, forgetfulness, mood swings, mental lapses, hives, and acne cysts. PX 10; PX 11; PX 12; DX 37 at 9. However, she suppressed many of the problems in order to appear strong at work. DX 37 (Clyde Martin Worker's Comp. Letter) at 9. Ms. Martin increased her use of sick leave and had to take leave without pay. *Id.* Over time, as Ridgley's harassment worsened and it became increasingly clear to Ms. Martin that the Department would take no action to address the situation, her symptoms grew more severe and ultimately led to the point where Ms. Martin could no longer function as Ms. Ridgley's deputy. PX 10 (Letter from Dr. Holland, June 16, 2006).

Ultimately, Dr. Frances Holland, a licensed clinical psychologist, wrote to Ridgley, recommending that Ms. Martin take an extended leave of absence due to episodes of Major Depression and Generalized Anxiety Disorder. PX 10 (Letter from Dr. Holland, June 16, 2006). In that letter, Dr. Holland informed Ridgley of the cause of her illness – the hostile work environment:

> Ms. Martin is experiencing a tremendous amount of stress in her current work position. She reports consistently that she feels ostracized, alienated, marginalized, and demeaned. While Ms. Martin has developed coping skills to endure a tremendous amount of work place stress, I believe what has made the current situation intolerable is her feeling of hopelessness. She believes that she has no venue either within or outside the agency that will address her concerns.
>
>       *             *             *
>
> [S]he has informed me that she is constantly subjected to manipulation of the work environment such as withholding needed information, setting unreasonable deadlines, excluding her from critical meetings, not responding to her requests for assistance and information, receiving trivial demands and virtually isolating her, i.e., communicating with her via email only.

-9-

*Id.* Dr. Holland concludes by stating, "I am concerned that she has reached her breaking point," and recommending a leave of at least 30-45 days. *Id.* Notably, Ms. Martin's treating physician, Dr. Alton Tucker, concurred with Dr. Holland's assessment, diagnosing Ms. Martin as suffering from Major Depression and Generalized Anxiety Disorder, and recommending continued medication and psychotherapy. PX 13 (Records from Dr. Tucker).

      Dr. Holland followed up with another letter on July 26, 2006, informing Ridgley that while Ms. Martin exhibited some improvement, "any discussion of [her] work situation during psychotherapy sessions consistently induces visible agitation, restlessness, acceleration of speech patterns, and on several occasions, inconsistent speech content." PX 11. Accordingly, Dr. Holland recommended an extension of sick leave. *Id.*

      On November 7, 2006, Dr. Holland again updated DHHS on Ms. Martin's condition. She informed DHHS that Ms. Martin still suffered from "pronounced symptoms" whenever her work situation is discussed. PX 12. Dr. Holland concluded, "[i]n my professional opinion, it would be detrimental to Ms. Martin's mental and physical health for her to return to her professional work in the Department of Health & Human Services at this time." *Id.* Dr. Holland's letters demonstrate both the severity of Ms. Martin's health condition as well as its cause – the hostile work environment created by Ridgley combined with her feeling of hopelessness due to the Department's repeated refusal to assist her in ending the harassment (or even investigating it). However, despite the severity of Ms. Martin's condition after the continuous harassment and discrimination she faced at DHHS, her treating physician certified on May 3, 2007 that, "it maybe possible for Ms. Martin to return to a position within DHHS in a part time capacity in 6-8 months; i.e. late September or early October if her current level of progress continues." DX 40.

VII.    **Ridgley Delays Martin's Worker's Compensation Application.**

Ms. Martin's depression and anxiety disorder grew so severe that they completely debilitated her from performing her job under Ridgley. Having received no other redress from the Department, and now unable to work due to the effects of the hostile work environment, she filed a claim for workers' compensation due to her severe emotional injuries. *See generally* DX 37. Ms. Martin provided DHHS with this claim on November 15, 2006. *Id.* However, Ridgley unconscionably delayed the processing of Ms. Martin's claim – and its submission to the Department of Labor – by waiting until January 8, 2007 to fill out and sign the supervisory portion of Ms. Martin's application. *See* PX 38 (Ridgley's Worker's Comp. Response).

VIII.    **Ridgley Terminates Martin.**

Ms. Martin's treating physician certified on May 3, 2007 that she could return to work, under another supervisor, in October 2007. DX 40 (Frances Holland Letter, May 3, 2007). Rather than allowing Ms. Martin to finish her treatment and return in a few months, Ridgley proposed her termination. PX 14. Ridgley premised her decision on Ms. Martin's "inability" to perform her duties, without considering any proposed accomodation. *Id.* She also stated that she needed someone to perform the duties of her position on a full-time basis, although this was not the case when Ms. Martin was able to work as Ridgley left her without work for eighty percent of her work day. In the notice of proposed removal, Ridgley references several of Ms. Martin's efforts to engage in protected activity. *See* PX 14 (referring to her physician's letters and her husband's letters, all of which emphasized the hostile work environment created by Ridgley). Indeed, Ridgley proposed Ms. Martin's removal just two months after receiving a complaint of discrimination from Mr. Martin. *Id.*

-11-

# ARGUMENT

**I.     This Court Should Not Dismiss Ms. Martin's Complaint Because It Sufficiently States a Cause of Action.**

Defendant's motion to dismiss should be denied because Ms. Martin's complaint states a cause of action. The purpose of a motion to dismiss is not to test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. *Glymph v. District of Columbia*, 180 F.Supp.2d 111, 113 (D.D.C. 2001). Thus, dismissal is appropriate only if defendant demonstrates that the plaintiff, "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *accord Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987) (citations omitted). In determining whether Ms. Martin has properly stated a claim, the allegations in the complaint must be presumed true and liberally construed in her favor. *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979)(*citing Miree v. DeKalb County, Georgia*, 433 U.S. 25, 27 n. 2 (1977)).

To be sufficient, all her complaint needs to say is that she suffered damages at the hand of her employer based on her membership in a protected class. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000) (explaining that "'I was turned down for a job because of my race' is all a complaint has to say to survive a motion to dismiss under Rule 12(b)(6).") (internal citation omitted); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). Ms. Martin has so alleged. *See* Complaint at ¶ 15 ("management at that Department discriminated against her because of her race (African-American) and then retaliated against her for having complained about such race-based discrimination by creating a hostile working environment for her . . . reassigning to others her meaningful job responsibilities and finally terminating her

-12-

employment and removing her from the federal service when her discrimination caused

incapacity."). Accordingly, Defendant's Motion to Dismiss must be denied.

## II.    Legal Standard for Summary Judgment in the Title VII Context.

Summary judgment requires the Court to evaluate all of the evidence in the light most

favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (holding that where

the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the

motion for summary judgment cannot be granted.) Indeed, the evidence presented must always

be construed in favor of the party opposing the motion for summary judgment, and it is that party

who is also to be accorded the benefit of all favorable inferences that can be drawn from the

record evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Disputes over facts

which might affect the outcome of the suit under the governing law, will preclude the entry of

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, the

moving party must demonstrate that there is an absence of evidence to support the nonmoving

party's case. *Celotex,* 477 U.S. at 323.  If, and only if, the moving party meets this burden, then

the burden passes to the nonmoving party to establish the existence of a disputed factual element

essential to his case with respect to which he bears the burden of proof. *Id.*

In discrimination and retaliation cases, the Court evaluates the case using the *McDonnell*

*Douglas* burden-shifting paradigm. *McDonnell Douglas Corp. v. Green*,  411 U.S. 792 (1973).

This provides that a plaintiff establish a *prima facie* case by presenting evidence that her

employer took an adverse action against her under circumstances that raise an inference of

discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). "If the

-13-

plaintiff establishes a prima facie case, a presumption then arises that the employer unlawfully discriminated against the employee." *Pierce v. Mansfield*, __ F.Supp.2d __, 2008 WL 101709 (D.D.C. 2008).

Then, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). "Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Pierce*, ___ F.Supp.2d ___ , 2008 WL 101709 (D.D.C. 2008); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000). The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *Reeves*, 530 U.S. at 147-48 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

III.    **Summary Judgment Is Precluded on Ms. Martin's Race Discrimination and Retaliation Claims.**

   A.    **A Reasonable Jury Could Conclude That DHHS Substantially Diminished Martin's Responsibilities Based on Her Race.**

To establish a *prima facie* case of race discrimination, a plaintiff may present evidence that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). It is undisputed that Ms. Martin is a member of the protected

class of African-Americans.  For the reasons that follow, plaintiff has also met her burden on the other two elements.

### 1.  The Substantial Reduction In Martin's Duties Is Actionable.[1]

It is settled law that whether a diminution in duties constitute an adverse employment action is a jury question, and is not to be decided on summary judgment.  *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007).  The court may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly different responsibilities.  *Forkkio v. Powell*, 306 F.3d 1127, 1131  (D.C. Cir. 2002) (noting that 'reassignment with *significantly* different responsibilities' . . . generally indicates an adverse action.");  *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006).

---

[1]      In its introduction to the brief, defendant suggests that the Court does not have subject matter jurisdiction over some of plaintiff's claims because they do not amount to adverse actions. Plainly, this Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331 and § 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* because Ms. Martin exhausted her administrative remedies.  *Artis v. Greenspan*, 474 F.Supp.2d 16, 17 (D.D.C. 2007) (noting that Title VII conveys subject matter jurisdiction over federal employees' claims of discrimination upon exhaustion of administrative remedies). Whether these claims amount to adverse actions has no bearing on whether this Court has subject matter jurisdiction.

Defendant also argues that "Plaintiff's allegations concerning her December 2004 performance appraisal, alleged delay in processing a waiver regarding a salary overpayment, leave usage in October and November 2004, alleged management delays in responding to requests in 2004 and 2005, and management undermining ability to perform job responsibilities, . . . are [not] actionable adverse personnel actions."  Def.'s Motion for Summary Judgment at 2. It appears that defendant has mistaken some of the incidents that Ms. Martin mentioned at the administrative level (which form the basis of her hostile work environment claim) for allegations of discrete adverse employment actions.  In her complaint before this Court, Martin claims only that the substantial reduction in her duties and her termination constitute adverse employment actions.  Accordingly, defendant's entire argument on the adverse action issue is irrelevant.

-15-

Here, Ms. Martin alleges that DHHS removed most of her duties and left her with almost

no work to do. PX 3 at 11. She lost all project responsibility, procurement duties, responsibility

for a newsletter, reviewing the Small Business Review Form and coordinating the Veteran's

Business Program and the Vendor Outreach Sessions. Ms. Martin, a GS-14 Deputy Director of

an important office of the DHHS, was left with only clerical tasks to perform. *Id.* at 11-12. Such

a "precipitous reduction in the complexity of her work" constitutes an adverse employment

action. *Holcomb*, 433 F.3d at 902-03.

### 2.    Martin Has Presented Sufficient Evidence To Raise An Inference of Race Discrimination.

Ms. Martin has put forth evidence that Ridgley took Ms. Martin's substantive

responsibilities from her and gave them to a white male, who was hired without competition to a

newly created position. PX 3 at 11. She has also put forth evidence that Ridgley held her to a

different standard than white employees and that Ridgley told her white subordinate to get Martin

another job. *See* Statement of Facts §§ II and III; PX 4 (Martin Affidavit, July 31, 2007) at 6.

These facts are sufficient for a reasonable jury to find that Ridgley was motivated by race

discrimination.

Defendant argues that plaintiff's case should be dismissed because Martin cannot

"present evidence that an employee outside of her protected class, who was also medically unable

to perform her duties, was not removed." Def.'s Mem. at 2. "This is not a correct statement of

the law." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *see also U.S. Postal Serv. Bd.*

*of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("the prima facie case method established in

McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic."). In the District

-16-

of Columbia, a discrimination plaintiff need not point to a similarly situated person outside of her

protected class who was treated better in order to raise an inference of discrimination. *Czekalski*,

475 F.3d at 365-66 (finding that the district court incorrectly granted summary judgment based

on the plaintiff's inability to show a similarly situated person outside her protected class who was

treated better). Although this is "[o]ne method by which a plaintiff can satisfy the third prong of

[the prima facie] test . . . this is not the only way." *Id.*; *see Mastro v. Electric Power Co.*, 447

F.3d 843, 850-51 (D.C. Cir. 2006); *Stella v. Mineta*, 284 F.3d 135, 146 (D.C. Cir. 2002). Rather,

as long as the plaintiff presents evidence from which a reasonable juror could infer

discrimination, that evidence need not take any particular form. *See Int'l Bhd. of Teamsters*, 431

U.S. at 358. Ms. Martin has done just that. *See generally* Statement of Facts §§ II, III and IV.

> **B.    This Court Should Not Enter Summary Judgment on Ms. Martin's Hostile
> Work Environment Claims Because Defendant Did Not Address Those
> Claims in Its Motion.**

Defendant has not moved this Court for summary judgment on either Ms. Martin's hostile

work environment claims based on race or retaliation. Accordingly, this Court may not order

summary judgment on these claims. *See Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117

(D.C. Cir. 2007) (reversing district court's grant of summary judgment to defendant because

defendant had not moved for summary judgment on the grounds it was granted by the district court);

*McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 800 F.2d 1208, 1211-12 (D.C. Cir. 1986)

(reversing summary judgment in libel suit where district court found that plaintiff had not shown

actual malice because defendant had not argued that theory in its summary judgment motion); *see

also Celotex*, 477 U.S. at 326 (noting that district courts may only grant summary judgments *sua

sponte* if "the losing party was on notice that she had to come forward with all of her evidence.").

### C.    A Reasonable Jury Could Find that Ridgley Terminated Ms. Martin Based on Her Race And Protected Activity.

To establish a *prima facie* case of unlawful retaliation, a plaintiff must show only that: (1) she engaged in statutorily protected activity; (2) her employer took an action against her, which might have dissuaded her from engaging in the protected activity if she had known it would be the consequence of her activity; and (3) a causal connection exists between the protected activity and the negative action or actions. *Burlington Northern and Santa Fe Ry. Co. v. White*, ____ U.S. ___, 126 S.Ct. 2405, 2415 (2006). "At the prima facie stage of a retaliation claim, a plaintiff's burden is not great; [she] merely needs to establish facts adequate to permit an inference of retaliatory motive." *Holcomb*, 433 A.3d at 903.

Here, there is no doubt that Ms. Martin engaged in protected activity when she filed and pursued her claims of race discrimination and reprisal. Nor can there be any dispute that her termination is an adverse employment action. Ms. Martin has also established the third element of her *prima facie* case of retaliation.

A plaintiff may satisfy the third element of a *prima facie* case of retaliation by, "showing the employer had knowledge of the employee's protected activity, and ...the adverse personnel action took place shortly after that activity." *Holcomb*, 433 A.3d at 903. Temporal proximity between protected activity and a subsequent adverse personnel action is sufficient to raise an inference that there is causal connection between the protected activity and the adverse personnel action. *Gleklen v. Democratic Congressional Campaign Committee*, 199 F.3d 1365, 1368 (D.C. Cir. 2000). In fact, "this circuit has held that a close temporal relationship may alone establish the required causal connection." *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003).

-18-

Defendant's argument that there is no causal connection because, "Plaintiff's removal was a year and three months after her last EEO complaint was filed" must be rejected under this Circuit's ruling in *Singletary*. In *Singletary*, the D.C. Circuit held that in considering whether there was sufficient temporal proximity to establish retaliation, the Court must take into account all forms of protected activity, including actions taken in support of complaints of discrimination. *Singletary,* 351 F.3d at 524-25. For instance, activities such as writing a letter inquiring about the status of the complaint constituted protected activity because it established the "plaintiff's ongoing pursuit of protected activity." *Id.* (concluding that the district court erred when it considered only the "original protected activity" -- the filing of the complaints of discrimination and retaliation --when concluding there was insufficient temporal proximity between the defendant's alleged retaliatory actions and the protected activity).

In this case, there is evidence that Ridgley proposed Ms. Martin's removal just two months after Ms. Martin engaged in protected activity. On November 14, 2006, Ms. Ridgley received a letter from Ms. Martin's husband, complaining about the hostile work environment created by Ridgley and the mishandling of Ms. Martin's EEO complaint. DX 37 ("To date, neither [Arthuretta] or I have heard anything from Mr. Short nor anyone from the HHS EEO office. Will HHS continue to delay the investigation of my wife's complaints? Are the lines no longer open?"); PX 14. Ridgley then proposed Ms. Martin's termination on January 12, 2007. PX 14. Thus, Ridgley proposed Martin's termination within two months of her "ongoing pursuit of protected activity." *Singletary*, 351 F.3d at 524-25.

Moreover, Ms. Martin's termination was effected just seven days after Plaintiff's counsel

-19-

wrote a letter to James L. Hubbard regarding Martin's EEO Complaint which accompanied additional documentation for him to review. PX 16 (Letter from Nicholas Lewis to Hubbard, June 15, 2007). This letter alone is sufficient to constitute protected activity under District of Columbia law. *See Singletary*, 351 F.3d at 524-25 (ruling that activities such as writing a letter inquiring about the status of the complaint constituted protected activity because it established the "plaintiff's ongoing pursuit of protected activity concluding that the district court erred when it considered only the "original protected activity"). Accordingly, Ms. Martin has established the requisite causal connection between her protected activity and her termination.

**D.    Martin's Claims Survive Summary Judgment Because A Reasonable Jury Could Find that One or More of DHHS' Reasons Are Pretext for Discrimination and Retaliation.**

The Supreme Court has unanimously held that a plaintiff may survive a motion for summary judgment solely by offering evidence that the reason articulated by the defendant was false. *Reeves*, 530 U.S. at 146-147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511-12 (1993) ("rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, '[n]o additional proof of discrimination is required.'"). *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (*en banc*). Here, defendant has offered false explanations for both terminating Ms. Martin and for stripping her of her duties. Accordingly, a reasonable juror could find both discrimination and retaliation.

      1.      **A Jury Could Reasonably Conclude that Defendant's Claim that It Did Not Strip Ms. Martin of Her Duties is Untrue and Therefore Pretextual.**

The only explanation defendant offers for stripping Ms. Martin of her duties is that it did not do so. Because Ms. Martin has presented ample evidence that her duties were systematically removed from her and that she was left with very little work to perform, a reasonable jury could conclude that Ridgley is lying when she says she did not remove Ms. Martin's responsibilities. From that fabrication, a reasonable jury could conclude that Ridgley is covering up her discriminatory and retaliatory motives. *See Reeves,* 530 U.S. at 146-147 ("trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

Indeed, Ridgley claims that she only removed "a single task (the report for the Small Business Regulatory Enforcement Fairness Act)" from Ms. Martin and that she retained the remainder of her duties. DX 2 at 3. Ms. Martin has presented evidence that she did not retain these duties. She notes that the Climate Assessment project was assigned to Annette Owens-Scarboro, the Newsletter was reassigned to Lisa Purnell, and the Veteran's Business Program and the Vendor Outreach Sessions were both reassigned to Debra Peters. *Id; see also* PX 2 (Email response from Curtis Bryant, June 7, 2007) (stating that "some tasks" were reassigned to other members of the Director's immediate staff). A reasonable jury could find Ms. Martin's testimony and the documentary evidence supporting her statements more credible and therefore conclude that Ridgley fabricated her testimony to cover up her unlawful actions.

      2.      **A Jury Could Reasonably Conclude that Defendant's Claim that It Fired Martin Because She Was Unable to Perform her Duties is Pretextual.**

DHHS claims that Martin was "unable to perform the duties of [her position]." *See e.g.,* PX 14 (Decision to Remove, June 22, 2007). However, this is false. The Agency was aware, through

the claims of plaintiff's counsel in its response to the January 12, 2007 Notice of Proposed Removal, (PX 13) that Ms. Martin was able to return to work if given a reasonable accommodation, which would include working for a non-hostile supervisor. DX 42 (Plaintiff's Written Reply, February 20, 2007). "Reasonable accommodations" under the Rehabilitation Act include job restructuring, modified work schedules and transfers. *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007)

Case law suggests that summary judgment is inappropriate in cases where the plaintiff offers evidence disputing the employer's claim that there was no reasonable accommodation that would have permitted the plaintiff to accomplish her required tasks. *See Breen v. Dep't of Transportation*, 282 F.3d 839, 843 (D.C. Cir. 2002) (reversing the District Court's ruling of summary judgment in favor of the employer because the plaintiff raised a genuine issue of material fact regarding the unavailability of any reasonable accommodation that would have allowed the plaintiff to do her job). Here, Martin has put forth evidence that she could have performed the duties of her job, as she has successfully done in the past (*see e.g.* PX 8 (Martin's Performance Appraisals)) if the Department had provided her with a simple reasonable accommodation, completion of her treatment plan by her psychotherapist, along with a transfer away from Ridgley's harassment. As Dr. Holland's letters indicate, Ms. Martin's condition has improved over time, and she was expected to be able to return to work part time in September or October of 2007. PX 11 (Letter from Dr. Holland, November 11, 2007). Allowing Ms. Martin to complete her therapy and then permitting her to return to work with a new supervisor would have addressed both the harassment and feelings of hopelessness that Ms. Martin experienced.

Another accommodation that could have been made was to allow Martin to go on detail, as Ridgley had suggested to Martin during her 2004 Performance Evaluation. See DX 17 (2004

-22-

Performance Evaluation); DX 5 (Plaintiff email, October 5, 2004) at 2 ("In my midyear review you recommended that I pursue a detail in another office like the Office of Women's Health. I agreed with you and I planned to pursue that avenue"). When Martin sent in her request to go on a six-month detail in the Office of Minority Health beginning in September of 2005, Ridgley denied the request. DX 25 (Plaintiff Detail Request, July 29, 2005); DX 26 (Ridgley Response to Plaintiff Detail Request, August 4, 2005).

These accommodations are more than reasonable and would not have caused DHHS undue hardship. DHHS could have retained Ms. Martin while she continued to receive the treatment she needed and filed for a vacant FTE slot if needed. After the completion of her therapy, DHHS could have simply transferred her FTE to her new position, or allowed her to remain Deputy Director reporting to someone other than Ridgley. At the very least, because Ms. Martin requested a reasonable accommodation, DHHS was required to engage in an "interactive process" to determine what precise accommodations were necessary. *See* 29 C.F.R. § 1630.2(o)3) and § 1630 App., § 1630.9. If DHHS had truly wished to engage in such a process, instead of simply requesting her medical records, they could have had consulted with Ms. Martin's doctor and psychotherapist or Ms. Martin could have presented them additional documentation regarding the continuation of her treatments and what types of accommodations were necessary. In fact, in the June 22, 2007 "Decision to Remove," DHHS states that the Department wished to review Martin's medical records "to better understand" her condition and "ability to return to work," but they could not do so because Clyde Martin refused the Department access to the plaintiff's medical records. PX 14 (Decision to Remove, June 22, 2007). However, in the next line, the Department states that, "subsequently, additional medical information has been provided; however, the inability of our contract physician

-23-

to properly review the medical information requires me to solely rely on the information from your medical provider." *Id.* This statement alone raises an issue of fact about whether DHHS's statement that Ms. Martin was terminated because, "the preponderance of the evidence supports a conclusion that [she was] unable medically to perform the duties of [her] position" was pretextual. *Id.*

Defendant relies on *Duncan v. Harvey* in making the argument that DHHS was justified in terminating Martin for her work-induced disability. However, the facts of *Duncan* are distinguishable from the facts of this case. First, after the plaintiff in *Duncan* was injured on the job, the defendant offered plaintiff another position as a library technician as a reasonable accommodation. *Duncan v. Harvey*, 479 F.Supp.2d 125, 128 (D.D.C. 2007). The plaintiff's physician had approved the library technician position, however, the plaintiff refused this offer. *Id.* The employer in *Duncan* again reached out to the plaintiff again to discuss whether the plaintiff wished to come back to her former position or take an alternative position. *Id.* After this meeting, the plaintiff wrote the employer a letter requesting accommodations that were unreasonable and costly to the employer and again refused the offer of the library technician position. *Id.* at 128-29, 133. The Court in *Harvey* ruled in favor of the employer because the plaintiff in that case failed to present any evidence that the defendant's stated reasons for terminating her were pretextual. *Id.* at 134. Unlike *Harvey*, the defendant in this case has not offered Ms. Martin a physician-approved accommodation including the detail that Ridgley had suggested during her 2004 performance evaluation. Furthermore, Martin has presented evidence that the reasons proffered by the employer for its actions were pretext for discrimination and retaliation.

The Defendant also relies on *Smythe v. Potter*, a Missouri case, to prove that Martin's termination was justified. However, *Smythe* is also distinguishable. In *Smythe,* two of plaintiff's

physicians certified that they believed that the plaintiff would not be able to work again. 2007 WL 1231690 (E.D.Mo. 2007). When the USPS was informed of the doctors' prognosis, they invited the plaintiff to meet and discuss his health care providers' opinions and to provide information regarding his ability to return to work with the USPS. *Id.* At this meeting, the plaintiff and his attorney did not contend that the doctors were mistaken in their opinions. *Id.* After USPS determined that there was no chance the plaintiff could return to work at USPS, he was terminated. *Id.* The Court in *Smythe* focuses on the fact that the plaintiff's doctors said he was permanently disabled and never going to be able to return to work at USPS. *Id.* All the cases cited by the Court in *Smythe* to support its ruling involved situations where doctors had found that the plaintiff was never going to be able to return to work. *Id.* In contrast, Martin's doctor gave her professional opinion that by September or October of 2007, Martin could have returned to work part time. DX 40 (Frances Holland Letter, May 3, 2007). Under the law, it would have been a reasonable accommodation for Martin to be allowed to come back to work part time. *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir.1994) ("Reasonable accommodation may include, but shall not be limited to: (I) Making facilities readily accessible to and usable by individuals with handicaps; and (ii) Job restructuring, part-time or modified work schedules").

DHHS did not entertain any of Ms. Martin's requests, even when it became clear that she was suffering severe and continuous pain and anxiety as a result of working for Ridgley. Given the requirements of the Rehabilitation Act and DHHS's refusal to even consider accommodating Martin or allowing her to come back to work part time, there is sufficient evidence for a reasonable jury to find that DHHS's claim that she was "medically unable" to perform the duties of her position is not true and that DHHS knew it was not true.

### 3.    A Reasonable Jury Could Find that DHHS's Statement that Leaving Martin's Position Open Would Cause an Undue Hardship to the Office is Untrue.

DHHS also tries to excuse its termination of Ms. Martin by claiming that "leaving [her] position vacant and holding [her] position open for another six to eight months would cause an undue hardship on the office. The Office of Small and Disadvantaged Business Utilization has been severely understaffed and operating beneath its expected level for eleven months during your absence." PX 14 (Decision to Remove, June 22, 2007). This claimed hardship is in direct conflict with the evidence that DHHS gave Ms. Martin virtually no duties and responsibilities while she was at work. PX 1 (Martin affidavit, June 12, 2007) at 2. Thus, a reasonable jury could find DHHS's claim that it could not afford to hold Martin's position open because of the workload of the office disingenuous. If DHHS was concerned about under staffing in Martin's office, why did it allow her to spend up to eighty percent of her work day with no duties before she went on leave?

### CONCLUSION

As the evidence has established, there are numerous questions of material fact regarding Ms. Martin's claim of race discrimination, retaliation, and hostile work environment. Therefore, this case must proceed to a jury trial to appropriately determine the true motivation for DHHS's actions against Ms. Martin. As such, the plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment.

Respectfully submitted,

_Richard L. Swick (EKR)_

Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: rlswick@swickandshapiro.com
*Attorneys for Plaintiff*

## Plaintiff's List of Exhibits

| Plaintiff's Exhibit | Description |
| --- | --- |
| 1 | Martin Affidavit, June 12, 2007 |
| 2 | Email responses from Scarboro, Bryant, and Randall |
| 3 | Request for Hearing and March 24, 2005 EEO Complaint |
| 4 | Martin Affidavit, July 31, 2007 |
| 5 | Martin Affidavit, August 22, 2007 |
| 6 | EEO Complaint, April 24, 2006 |
| 7 | Ridgley Interview, June 4, 2007 |
| 8 | Martin Performance Appraisals, 2000-2004 |
| 9 | Email from Martin to Shorts requesting 3rd EEO Complaint, July 7, 2006 |
| 10 | Letter from Dr. Holland, June 16, 2006 |
| 11 | Letter from Dr. Holland, July 26, 2006 |
| 12. | Letter from Dr. Holland, November 7, 2006 |
| 13. | Records from Dr. Tucker |
| 14. | Notice of Proposed Removal, January 12, 2007 |
| 15. | Decision to Remove, June 22, 2007 |
| 16. | Letter from Lewis, June 22, 2007 |

Exhibit 1

Affidavit of Arthuretta Holmes-Martin

Affidavit

Washington, DC

District of Columbia

     I, Arthuetta Leonal Holmes-Martin, do hereby make the following statement freely and voluntarily to James E. Hubbard who has identified himself to me as a Contract EEO Investigator retained by JDG Associates, Inc., to investigate an allegation of employment discrimination filed against the U.S. Department of Health and Human Services (DHHS), Washington, DC. Knowing this statement may be used in evidence, I understand this statement is not confidential and may be shown to any interested parties (those with a right to know). I hereby solemnly swear or affirm:

**Question 1: State your full name, your official position of record when the issues in this complaint were accepted for investigation, your organization and its location, your grade and series then and now, your sex, color and race and the names of your supervisors.**

     Answer: Arthuretta Leonal Holmes-Martin, Deputy Director, GS-1102-14, Office of Small and Disadvantaged Business and Utilization, Office of the Secretary, Department of Health and Human Services, 200 Independence Ave SW Washington, DC. My first line supervisor is Debbie Ridgely, my second and third level supervisors are unknown.

**Question 2: How long you have worked for the federal government and state the length of time you have worked for DHHS.**

     Answer: Since 1979 with a one year break in service and I have worked for DHHS since January 2000.

**Question 3: Provide the names of your first and second level supervisors when you filed this complaint against the agency.**

     Answer: 1st Debbie Ridgley and 2nd Mark Weisman

**Question 4: Describe in detail citing times, places and witnesses, how the issues accepted by the agency for investigation are discriminatory and directly related to your sex, your race, your color, and your prior EEO activity?**

     Answer: The issues accepted by the agency are not in totality. HHS officials did so much to me I would have to write a book to list it all. One example is the manner in which the EEO issues were accepted. It took 2 and one half years for an investigator to beassigned. I believe the agency did this to me because of my race, gender, prior EEO activity and color. Of the issues not accepted, the agency has not dismissed nor acted upon them

Page 1 of 10

Exhibit ___8___
Page _1_ of _11_

(Initials)

Affidavit of Arthuretta Holmes-Martin

Of the issues accepted for investigation, they are discriminatory because the white and male females under Debbie Ridgely's management and the Blacks who have not had prior EEO activity are not treated in such cruel and insidious manner as she has treated me..

From November 2005 until I left on extended leave, Debbie ostracized me. She would primarily speak to me through email although I was less than a few feet from her desk. Everyone in our immediate office witnessed this activity – especially Ruth Lewis, the administrative assistant.

In public meetings – especially the one held in Atlanta, Ga. August 2005, Debbie would acknowledge everyone on her staff but me. Every individual on her staff witnessed this.

Debbie would assign me tasks like everyone else – making the quality of my work equal to or less than lower graded staff members. She refused to treat me as the Deputy Director of the office.

When I proposed challenging work, she would reassign it to lower graded staff members – always devising a "non-discriminatory reason" why she had to reassign even those projects I recommended.

She relegated me to low level clerical duties at best such as forwarding emails. I had no contact with officials within HHS. Although I did work on an intra governmental task group to implement the subcontracting program, Mark Weisman, Debbie and other management officials at HHS would make decisions about that project and not tell me – thus placing me in the position of appearing not competent. When lower level employees did not want to do specific tasks, she would direct me to do their work. She would place me on committees subordinate to small business specialists. Then when Clarence Randall came on board, he became her Special Assistant, confidant, Deputy Director. I was totally excluded. She and Clarence would have meetings and make decisions and I was not a party to any of it. I don't know how he was able to be brought on board when the position never existed before he came. The position was created and he showed up. Every small business specialist and staff person witnessed Debbie's relationship with me and Clarence. When I would ask Debbie to clarify Clarence's role, she would say "…he is to handle personal and budget issues and you procurement…." Yet she would require that any meeting I attended – even if it was out of the office, he attend too. It felt like she didn't even trust me to go to the bathroom without her or his approval.

I was trapped in the cubicle with nothing to do 75 – 80% of the time. I would constantly tell her I had nothing to do. She would either ignore me or assign a menial task.

This demeaning working environment discredited me professionally and harmed my ability to get other employment at a comparable level.

I was the Deputy Director in name only.

Adding insult to the injury is the way that the entire agency circled the wagons. The EEO office would not assign counselors or investigate my complaint, the personnel office delayed the processing of my request for the waiver of an administrative overcharge and then, without

Page 2 of 10

Exhibit ___8___
Page _2_ of _11_    (Initials)

Affidavit of Arthuretta Holmes-Martin

notifying me, attacked my character, and Debbie approved it. The Office of General Counsel permitted Mark Weisman to abuse his position as ethics officer by refusing to properly process my request for outside activities. Even the Employee Assistance Office (EAP) refused me counseling after they spoke to Debbie. I felt hopeless and trapped. To the point that I was unable to sleep and developed other stress related disorders.

**Question 5: Identify by name, the Caucasian male who replaced you and identify by name, race, color and sex the other managers who harassed you?**

Answer: Mr. Clarence Randall, Caucasian.

**Question 6: Identify the manager or managers whom you believe created a hostile working environment for you?**

Answer: Debbie Ridgley and Mark Weisman and other collaborating agency officials whose names are unknown. Answer provided in responses to question below.

**Question 7: Cite specific examples of the hostile working environment in your unit or chain of command and its impact on you?**

Answer: Federal Career ruined, reputation ruined, health adversely impacted. Co-workers shunned me.

I've filed three EEO complaints. None have been processed by HHS officials in accordance with law and regulation. I've sought assistance from labor relations by HR and at HHS and my concerns were ignored by HHS management officials. I've raised concerns to the acting deputy secretary and general counsel about the mishandling of ethics documents and those concerns were ignored. I've raised concerns about the mishandling of Debbie Ridgley's administrative error of over paying me in October 2004. Those concerns were ignored. I've sought relief from every management official I knew to go to and they were all non responsive. I even went to the Employee Assistance Program for assistance. After she spoke with Debbie Ridgley, she refused me counsel for work related stress.

**Question 8: Can you provide a brief description of your relationship with your supervisor, Ms. Ridgely, before the practices that you alleged to as discriminatory began to surface?**

Answer: Cordial at times; strained at other times.

**Question 9: Regarding your performance evaluation or appraisal in 2004, in your email message to Samuel Merrill on Tuesday, July 2006, you stated you were accused of not being a "team player" by Ms. Ridgely, who during that time, undermined your ability to perform your job and subsequently took away your responsibilities as described in your position of record. Provide examples of how this was accomplished and explain why you have described this action as a technical demotion.**

Exhibit _8_
Page _3_ of _11_    (Initials)

Affidavit of Arthuretta Holmes-Martin

Answer: Without public notice or competition, HHS created the position of senior advisor for Debbie Ridgeley at a GS 15 level and placed in that position Clarence Randall from Centers for Disease Control, where he was previously employed. The decision to create this position and place Clarence Randall in it was made by management officials in personnel and labor relations within the Office of the Secretary. I had to take Family Medical Leave to take care of my disabled son in September 2004 and October 2004. Upon my return, Debbie Ridgley practically assigned all of my responsibilities to Mr. Randall. While he had an open door access to her; I had to make appointments. He would attend all out of office meetings with her and I was left in the office to do nothing. I was barred from all internal meetings. On one occasion, during HHS Katrina preparations, I was not able to attend an internal meeting without Debbie and Clarence to monitor me. I questioned Debbie numerous times about clarifying mine and Clarence's roles. Her response was always that he handled budget and personnel and I handled procurement. Yet she consistently assigned him procurement duties to the point that co-workers and outside customers all asked me whether I had been fired. From the time Clarence came on board until I left the agency on extended sick leave, Debbie had relegated me to clerical duties at best, but primarily nothing at all.  She communicated with me via email though our desks were five feet apart.

I did not nor have I ever stated that the 2004 performance appraisal was a technical demotion. I filed a complaint because Ms. Ridgley refused to define what she meant by my not being a team player. We held mediation. As a result of mediation she provided an explanation that was convoluted and ambiguous. It took almost six months to obtain that explanation. HHS EEO office refused to process this EEO complaint, and subsequent events have occurred since this initial complaint and two other EEO complaints have been filed, neither EEO or HHS has processed these according to regulation.

**Question 10:  What was your performance rating for the performance cycle in 2004?**

Answer: Fully successful with the caveat "I needed to be a better team player", but without definition.

**Question 11:  Describe the specific circumstances leading up to the agency withholding $25.00 per month from your paycheck and state how this could be accomplished without your permission and/or concurrence and state how long this practice lasted and who authorized this action?**

Answer: While out on Family Medical leave, Debbie Ridgley and the time keeper apparently paid me for a holiday even though I was on leave without pay. The amount was approximately $200.00. I did not notice this in my checking account because I have direct deposit, and it was during the time when my focus was on my family, not monitoring my pay. I did not receive pay stubs at my home. They were handed out at work. When I returned to work in November, I saw the pay stubs; I brought it to the attention of Management. See attached email correspondence for a chronology of the many attempts I made to resolve this matter. Since I filed this complaint in 2004, additional events have occurred on this matter exacerbating an already ugly situation. Debbie Ridgley and other officials at HHS colluded to defame my

Page 4 of 10

Exhibit ____8____
Page _4_ of _11_

(Initials)

Affidavit of Arthuretta Holmes-Martin

character, document slanderous statements and withheld this information from me for five months. For example, though I was trying to obtain a waiver of the overpayment through appropriate procedures, Debbie Ridgely not only denied my request, but stated in a January 2006 memo that I was "not acting in good faith not repaying this money." I found out what she and the other officials did in May of 2006, directly affecting my health and contributing to my present illness. See attached documents.

**Question 12:  Describe the circumstances leading up to your leave usage, particularly, your statement that Ms. Ridgely would approve your leave and then retaliate against you when you exercised your leave privileges?**

Answer:  Death of my grandson, Victory Spencer in January 2004; illness of my son Justin Spencer with staff infection resistant to penicillin both required that I take a great deal of leave in 2004. Debbie approved leave for both instances. However, she failed to sympathize with or support me during my troubles. Instead, upon my return, Ridgely gave me only menial tasks (yet set unrealistic deadlines for their completion), reassigned my more important tasks to others, placed significant restrictions on my employment, and otherwise created the hostile work environment described above.

**Question 13:  During the year 2004, were you ever accused of abusing your leave and subsequently placed on leave restrictions?  At the end of fiscal year 2004, do you remember if you had a balance of sick and annual leave?**

Answer: No. I was never accused of abusing my leave.  At the end of year 2004, I had a significant balance of sick and annual leave.

**Question 14:  What were the circumstances leading up to your application for Family Medical Leave, and what in your opinion, do you believe motivated Ms. Ridgely to limit her day-to-day direct communications with you during that time?**

Answer: See response to question 12. I have no idea. I am not a mind reader.

**Question 15:  Provide an example of the verbal directions given to you by Ms. Ridgely that resulted in her disciplining you when you attempted to carry them out?**
Answer: This is difficult to respond to because I filed this complaint in 2004. HHS did not accept any issues until 2007.

**Question 16:  In your e-mail statement referenced above, you stated the following: "On several occasions Ms. Ridgely excessively delayed responses to your requests for information and assistance and clarification on personnel and work related matters." Explain how she failed to respond or responded inappropriately to your requests for supporting documentation on your performance appraisal, your request for your personnel folder in 2004, and most recently, delaying your request for outside activities?**

Answer: See attached email correspondence.   I had been selected to speak for the American Society of Public Administrators, Conference of Minority Administrators, in Dakar,

Exhibit  8
Page 5 of 11    (Initials)

Affidavit of Arthuretta Holmes-Martin

Senegal. I submitted my request for outside activities in April of 2005. Debbie Ridgley and Mark Weisman refused to process my request for outside activities in violation of agency regulation. See attached email correspondence.

Note: This matter was included in my second EEO complaint, not yet accepted by the agency. It was referenced in my July 5, 2005 note to Samuel Merrill, EEO Counselor, prior to filing my second EEO complaint.

**Question 17: What were the outside activities that you mentioned above and how could your supervisor impact this function?**

Answer: As stated above, Debbie Ridgley was my first level supervisor and responsible for reviewing and making a recommendation to approve or disapprove my requests. To date, I have not received a response for my request from my 2005 request for outside activities.

**Question 18: Had your request for outside activities been approved, would it have interfered with your ability to perform the essential functions of your position of record or created an ethics problem or a conflict of interest for you?**

Answer: I do not believe it would have interfered with my job or created an ethics problem. However it is not my position to make that decision, it is management's responsibility to make that decision.

**Question 19: Identify the SBA Procurement Center Representative who was instructed by your supervisor to discontinue all direct communications with you on work related matters and state why you believe that action was taken?**

Answer: Malda Brown. I am not reading anybody's mind to know why they do what they do. I think it was irresponsible and unprofessional. Perhaps her calling me a non- team player had something to do with it.

**Question 20: In your opinion, why did your supervisor assign your responsibilities to lower grade employees and to Mr. Clarence Randall?**

Answer: I don't know but perhaps taking Family Medical Leave is not being a team player. I can only guess. Her actions make no sense to me. HHS' disregard for the law and regulations make no sense to me. I don't have an opinion about that.

**Question 21: Other than Ms. Ridgely, can you identify any other management officials as the Responsible Management Officials in your complaint?**

Answer: Marc Weisman; other unknown individuals who approved the creation of Clarence Randell's position.

**Question 22: Regarding the position that is currently encumbered by Mr. Randall, given your grade, your position in the agency, and your experience, can you identify the**

Exhibit ___8___
Page _6_ of _11_

(Initials)

Affidavit of Arthuretta Holmes-Martin

**manager who is senior to Ms. Ridgely in the chain of command who had approval authority for establishing this position? If a vacancy didn't already exist, wouldn't creating such a position for Mr. Randall require an established vacancy, an allocating of funds, and the development of a position description for his position?**

Answer: At the time I believe the senior official above Ms. Ridgely would have been Mr. Weisman. Above him it should have been Deputy Secretary Alex Azar or Deputy Secretary Claude Allen. There are personnelists who actually process or authorize the paperwork but the requesting official would have had to have been Mr. Weisman. However management kept a significant amount of information from me – including the chain of command. With regard to the second half of your question concerning the creation of a position, given my grade, experience, and knowledge of personnel, the answer is yes, there should have been a vacancy, an announcement, funding etc. To my knowledge they simply created the position and transferred him into it from the Centers for Disease Control. I have no additional information about how this position was filled. I can tell you again that I was not provided the opportunity to compete for the position – it would have been a promotion.

**Question 23: What remedy or remedies are you requesting from management to resolve your discrimination complaint?**

Answer: What price is reasonable, when your life as you knew it was taken away by cruel, insidious Management officials?

When I filed this complaint in 2005, I only wanted a reassignment. Other agencies would not respond to my applications. I am now ill, taking several medications and unable to do some of the simplest tasks. I've developed a phobia to anything related to the federal government. I'm working on desensitizing myself, but it's a challenge.

**Question 24: Can you identify a medical authority who can attest to the statement you made in Question 23 above so that he/she may be contacted for a general statement about your present medical condition?**

Answer: Yes, Dr. Fran Holland. 5691 Columbia Pike, Suite 200, Falls Church, Va. 22041.

**Question 25: Identify any other witnesses whom you wish to have me interview in this investigation and provide, if you can, their telephone numbers and e-mail addresses?**

Answer: I do not have any witnesses that I wish you to interview. Because federal agencies retaliate and abuse EEO witnesses, even those who are retired, I do not want to subject anyone to what I've gone through.

**Question 26: During the past five years have you been issued performance appraisals that were less than satisfactory and if so, when and by whom?**

Exhibit  8
Page  7  of  11

(Initials)

Answer: No. I've never been issued a negative performance appraisal in my entire 27 years with the federal government.

**Question 27: During the past five years have you been notified that you would be issued a notice of proposed adverse action and during that same time-frame, have you received an accommodation, cash awards, or recognition from management for the quality of your performance?**

Answer: I was never *notified* that I would be issued a notice of proposed adverse action. On January 12, 2007, however, I received a notice of proposed removal due to my medical condition. I have replied both in writing and orally to that proposed removal. I have not yet been informed of a decision.

I've received cash awards for performance. I've also received letters of commendation from customers. Ironically, even though Debbie Ridgley stated in my performance appraisal that I was not a team player, she issued me two letters of reprimand for communicating and participating in office team building sessions.

**Question 28: Please review the additional information for accuracy and respond no later than June 6, 2007.**

**In your initial one-on-one interview with the Investigator in the presence of your Representative on May 29, 2007, the Investigator suspended the interview after a brief discussion when you indicated this session was becoming too stressful and traumatic for you. The Investigator also observed your discomfort when you began to respond to questions about the identity of your second level supervisor. You stated your second level supervisor had been Mr. Marc Weisman and after he left you didn't know the true identify of your second level supervisor from that point on. You then said when you would ask Ms. Ridgely for clarity in this regard, you were told by her identity of your second level supervisor was in flux. The Investigator then asked if you thought Ms. Ridgely was being evasive and if this may have been a tactic she used to keep you off guard. You responded you didn't know what her motives were and stated the following:**

**"I know the reporting of the Director to the Head of the Agency created some issues that Congress was interested in and HHS played a lot of word games with members of Congress to make it look like she was reporting to the Head of the Agency or the Deputy Secretary when in fact she was taking directions from Marc Weisman."**

**The Investigator then asked if you would raise your head and speak louder and directly into the speaker/recorder that sat between you and the Investigator because your responses to the Investigator's questions were barely audible. At this point you said, "I am sorry and one of the problems for me is like my brain is erasing information." You said having to respond to questions about things that are happening to you was stressful and one of your disabilities was like someone erased your brain. You said you have lost words to express or talk about what was happening to you and you struggled each time you have to touch papers or see persons associated with this complaint. You said you have shingles, have**

Page 8 of 10

Exhibit ___8___
Page _8_ of _11_

(Initials)

Affidavit of Arthuretta Holmes-Martin

passed out and have difficulty sleeping.  Finally, you said, a lot of different things have evolved as a result of your complaint against HHS.

Answer:

Note:  The Investigator then suggested that rather than subject you to more stress by having you continue to participate in the one-on-one interview, you could respond to a set of interrogatories without the presence of the Interviewer/Investigator.   You and your Representative accepted this suggestion agreeing that you would respond to a set of additional questions to be reviewed by your Representative and subsequently forwarded to the Investigator via e-mail by Friday June 1, 2007.

On Friday June 1, 2007, when you provided your draft affidavit for review, you suggested to the Investigator the following issues should be discussed with the RMO and her responses included in her affidavit.

1)  Debbie Ridgely requested that I back date standards in 2005 and when I refused, she reprimanded me;
2)  Debbie Ridgley would require that I only travel the routes using Map quest, while not placing that condition on other employees;
3)  Debbie placed terms and conditions on me as they related to flex time that she did not place on other employees;
4)  Debbie Ridgley developed standards that were over and above my grade; and,
5)  Despite my request for consideration, she instituted the elements anyway, making it impossible for me to achieve the elements.

**Question 29:  You stated that your present employment status is indefinite sick leave.  Are you stating or suggesting that your present medical status is directly related to the issues in your allegations that are being investigated?  Secondly, has your present medical status been verified by a medical authority within or outside the agency?  Please provide a response for the record.**

Answer:  I am out sick but I'm on indefinite leave without pay pending the processing of my workman's comp claim.  Yes, my present medical status is directly related to the issues and allegations that are being investigated. HHS created such a hostile working environment that it has caused me to become ill.

My present medical status has been verified by my psychologist, my psychiatrist, and my medical doctor.  My doctors have sent several letters to HHS.  A Dr. Holland (not my doctor) from inside the agency called and verified the diagnosis from Dr. Fran Holland.
No other contact from a medical contact from HHS has been made.  HHS has made open-ended requests for medical information.  I've stated that if they make a request for specific information from specific physicians, I will facilitate.  I will not prove the agency total and open access to my medical records.

Exhibit ___8___
Page _9_ of _11_

(Initials)

Affidavit of Arthuretta Holmes-Martin

I have reviewed this statement consisting of _13_ pages and hereby solemnly swear _✓_ affirm ___
that it is true and complete to the best of my knowledge and belief. I understand that the
information I have given will not be held confidential and may be shown to interested parties as
well as made a permanent part of the record.

_(signature)_                                    _6/12/07_
(Signature of Deponent )                         (Date)

Signed before me at (Street ~~and~~ City) ___Springfield___

On this _12_ day ~~Jur~~ of ___June___, 2007

_(signature)_
(Signature of Investigator/Witness)

County Court __Fourfax__
Commonwealth of Virginia
Subscribed and sworn to before me, in my presence,
this __12__ day of __June__, __2007__
by __Arthuretta Holmes-Martin__
__Shruti Banga__ Notary Public
My commission expires __31 Oct, 2010__

Exhibit __8__
Page _10_ of _11_

(Initials) (

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *DHHS* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Failure to furnish the information may result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____                    _____
Signature of Interviewer                      Signature of Complainant

                                              Date: 6/14/07

                                              Place: Washington, D.C.

Exhibit   8
Page 11 of 11

# Exhibit 2

**James E. Hubbard**
**Contract EEO Investigator**
**JDG Associates, Inc.**
**8007 Steve Drive**
**Forestville, MD 20747**
**(301) 350-8114 Voice – (301) 350-6447 Fax**
**Hubbard10@verizon.net**

**June 14, 2007**

To:         Nick Lewis, Esq.
            Swich & Shapiro, P.C.

Telephone:  (202) 842-0300  (Voice)
            (202) 842-1418

From:       James E. Hubbard
            Contract EEO Investigator
            JDG Associates, Inc.

Subject:    **FYI (Arthuretta Martin)**

---

MESSAGE:

As per my e-mail, information of Ms. Scarboro, Mr. Bryant and Mr. Randall.

No. of pages including fax sheet: (5)

Number of pages including fax sheet: (5)

**James and Theresa Hubbard**

| | |
|---|---|
| **From:** | "Bryant, Curtis L. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **To:** | "James and Theresa Hubbard" <hubbard10@verizon.net> |
| **Sent:** | Thursday, June 07, 2007 1:07 PM |
| **Subject:** | RE: Complaint of Discrimination of Arthuretta Martin - DHHS |

Mr. and Mrs. Hubbard:

As requested:

My email address: Primary ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .

Question 1: Provide your full name, your position title and grade, your organization and its location, your sex, color and race, and indicate if you have prior EEO activity as either a complainant or witness.
Answer:   Curtis L. Bryant, Small Business Specialist supporting the Centers for Disease Control and Prevention (CDC) in Atlanta, GA; GS-14; Male, Black, African-American; no prior EEO activity.

Question 2: How many years of federal service do you have and how many of those years were served with DHHS?
Answer:   25 years of federal service of which 13 year with DHHS.

Question 3: Do you know Ms. Martin, Complainant, and Ms. Debbie Ridgely, Complainant's supervisor, and if so, how did you come to know them?
Answer:   Yes, I know Ms. Martin and Ms. Ridgely. I know them as the Deputy Director and Director, respectively, of the HHS Office of Small and Disadvantaged Business Utilization (OSDBU), the office I am assigned to.

Question 4: If you are familiar with any of the seven issues that were accepted for investigation in this complaint, identify the issue or issues, and provide whatever information that you feel is relevant to this investigation.

1) Complainant's performance appraisal - I have no knowledge of this issue.

2) management delayed processing her waiver request regarding overpayment - I have no knowledge of this issue.

3) controversy associated with her leave usage in October and November 2004 - I have no knowledge of this issue.

4) management's delay in responding to her requests for performance appraisal documentation (December 2004-2005) - I have no knowledge of this issue.

5) an allegation that management undermined Complainant's ability to perform her job responsibilities - I have no knowledge of this issue.

6) management's alienation of Complainant from her co-workers and the reassignment of her tasks to others in the office. To my knowledge, Ms. Martin retained the ability and latitude to interact with the staff members from the position of the Deputy Director of the OSDBU. During her absence, some tasks were supported by member's of the Director's immediate staff: Ms. Debra Peters, Procurement Analyst, HHS Service-Disabled Veteran-Owned Small Business Advocate and Ms. Teneshia G. Alston, Small Business Analyst - Agency Coordinator, Electronic Subcontracting Reporting System (eSRS).

7) management allegedly retaliated against Complainant for openly opposing employment discrimination - I have no knowledge of this issue.

Comment: I am one of several Small Business Specialists that are physically collocated with the HHS agencies that we support. Most of the Small Business Specialists are in the metro Washington DC area but not in the OSDBU office space in the HHS headquarters building. I am physically located in Atlanta, GA.

Thank you,

*Curt Bryant*
*Small Business Specialist supporting*
*Centers for Disease Control and Prevention*
*HHS, Office of Small and Disadvantaged Business Utilization*
*2920 Brandywine Road*
*Atlanta, GA  30341*
*Phone:  (770) 488-2806*
*Fax:     (770) 488-2828*
*Email:  cbryant1@cdc.gov*

**James and Theresa Hubbard**

| | |
|---|---|
| From: | "Owens-Scarboro, Annette <span style="background:black">     </span> |
| To: | "James and Theresa Hubbard" <hubbard10@verizon.net> |
| Sent: | Friday, June 08, 2007 5:24 PM |
| Subject: | RE: Complaint of Discrimination of Arthuretta Martin - DHHS |

The following responses address Questions 1-4 to the subject Complaint:

Question 1: Annette Victoria Owens-Scarboro, Small Business Specialist, GS-14-2, OS/OSDBU – co-located at the National Institutes of Health, Bethesda, Maryland, Female, Black and African-American, no.

Question 2: I have 34 years Federal Services and have been employed with the DHHS my entire Federal career.

Question 3: I know Ms. Martin as a co-worker in the HHS Small Business Office serving as the HHS OSDBU Deputy Director. Ms. Debbie Ridgley is the HHS OSDBU Director for the Small Business Program. October 1, 2004 Ms. Ridgley became the immediate supervisor for all the small businesses at the HHS. Prior to the execution of the consolidation (10/1/04) of the small business program, the small business specialists reported to their individual operating divisions under the umbrella of HHS.

Question 4: Unfortunately, I can not really address any of the issues accepted for investigation in much detail for several reasons: I was and continue to be co-located at the NIH in Bethesda, MD and I only interacted with both ladies via email, telecom, during joint meeting, conference, state and local business fairs, and/or at our Monthly Vendor Outreach Sessions. The attached email from Ms. Martin is all I have that provided the duties assigned to her. I am unaware of any duties that were reassigned to other co-workers until after Ms. Martin was absent from the office for a few months. My duties changed after the OSDBU consolidated the small business offices in the OPDIVs and again when a former co-worker retired from the organization in January 2006.

### James and Theresa Hubbard

**From:** "Randall, Clarence █████████████████████████
**To:** <hubbard10@verizon.net>
**Sent:** Thursday, June 07, 2007 1:29 PM
**Subject:** background

Good afternoon Mr. Hubbard.

In response to your questions regarding my position here at the Department of Health & Human Services, I am a career employee presently serving as Senior Advisor to the Director, Office of Small and Disadvantaged Business Utilization (OSDBU). Formerly, I was at one of the Department's Operating Divisions (Centers for Medicare and Medicaid Services) where I was the Director of Business Operations holding responsibility for budget, HR and policy related matters. I came to the Small Business Program in October of 2004 under an inner agency agreement between CMS and the Department. OSDBU was under going a re-organization and my assignment and direction focused on budget and HR matters. As part of the overall re-organization of the Small Business function, I was permanently realigned to OSDBU in May of 2005 where my duties continue to involve business operations matters including budget, HR and related concerns.

I trust this information is helpful and certainly please feel free to call me with any questions.

Clarence B Randall Jr.
Senior Advisor
OSDBU
200 Independence Ave S.W.
Washington D.C. 20001


6/7/2007

# Exhibit 3

October 19, 2005

Equal Employment Opportunity Commission
Washington Field Office
1400 L. ST, NW., Suite 200
Wash DC  20005

    Re: Arthretta Martin v. Secretary Department of Health and Human Services

## REQUEST FOR A HEARING

Dear Sir or Madam:

    As the representative for Ms. Arthretta Martin (Complainant) I am requesting an

EEOC Hearing pursuant to Title 29, Code of Federal Regulations (CFR), Section

1614.108(g) on the matter of Martin  v.  Secretary of Health and Human Services. The

Complainant contacted an EEO Counselor on January 14, 2004 and a Formal Complaint

was filed on March 24, 2004. The agency has blatantly violated the applicable provisions

of 29 CFR 1614 and MD-110 by not conducting a formal investigation on this matter.


                           Sincerely,

                           Howard L. Wallace
                           Representative

2005 OCT 25  AM 11:08

1

Certificate of Service

I hereby certify that on this _20th_ day of October 2005, the complainants request for a EEOC Hearing was faxed and or mailed, postage pre-paid, to the following.

Equal Employment Opportunity Commission
Washington Field Office
1400 L. ST, NW., Suite 200
Wash DC  20005

EEO Manager
EEO Office
Department of Health and Human Services
Room 709-D, HHH Building
200 Independence Avenue, S.W.
Washington, D.C. 20201

Sincerely,

Howard L. Wallace
901 Cheswold Ct
Bel Air Md 21014
410-893-6912 Voice
410-913-1300 Cell
603-963-8011 Fax
hwallace@prodigy.net

2005 OCT 25  AM 11:08

Opportunity Network
(EEON)

PO Box 465
Bel Air, MD 21014

EEO Manager
EEO Office
Dept of Health and Human Services
Room 709-D, HHH Bldg
200 Independence Ave, S.W.
WASH DC

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                                   Office of the Secretary

APR 11 2005

Washington, D.C. 20201

CERTIFIED-RETURN RECEIPT REQUESTED

Mr. Sam Wright, Jr.
President
Federal Employees Against Discrimination, Inc.
168 Peyton Road
Sterling, Virginia 20165

                              Re: Arthuretta Martin
                              Complaint Number: OSH-014-05

Dear Mr. Wright:

I acknowledge receipt of your client's formal discrimination complaint, which was filed on
March 24, 2005, against the Office of the Secretary, Headquarters, involving the Office of the
Assistant Secretary for Administration and Management, Office of Small and Disadvantaged
Business Utilization, Washington, D.C.

The purpose of this letter is to inform you that your client's formal complaint will be held in
abeyance until informal counseling has been completed. The record shows that your client's
informal complaint was assigned to Susan Grimes, Susan Grimes Associates, Inc., a contract
EEO Counselor, on March 15, 2005 to conduct counseling.

Upon completion of informal counseling, your client's complaint will be processed pursuant to
the Equal Employment Opportunity Commission's Complaint Regulations outlined in Title 29
Code of Federal Regulations, Part 1614.

If you need information about the status of your informal complaint, you may contact Ms.
Christine Smith on (202) 619-1564 or by e-mail at Christine.Smith@hhs.gov. For the formal
complaint process, you may contact Ms. Ann Garrett on (202) 619-1564 or by e-mail at
Ann.Garrett@hhs.gov. If you prefer to write, our address is 200 Independence Avenue, S.W.,
Room 709D, Hubert H. Humphrey Building, Washington, D.C. 20201.

                              Sincerely,

                              David Shorts
                              EEO Manager
                              Office of the Secretary

cc: Arthuretta Martin
    Susan Grimes, Susan Grimes Associates, Inc.

4

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Office of the Secretary

_____

Washington, D.C. 20201

NOV 10 2005

CERTIFIED RETURN RECEIPT REQUESTED

Mr. Dana Hutter
Acting District Director
Equal Employment Opportunity Commission        Arthuretta Martin
Washington Field Office                          (OSH-014-05)
1801 L Street, N.W., Suite 100                   EEOC No. 100-2006-
Washington, D.C. 20507-1002                              0069X

Dear Mr. Hutter:

Pursuant to the Equal Employment Opportunity Commission's
Order, the entire file on the above discrimination complaint is
enclosed for appointment of an Administrative Judge to conduct
a hearing.  The request for hearing has been timely filed and
is enclosed.

An investigation had not been conducted by the time Ms.
Martin requested a hearing.  However, the complaint
file contains the EEO counseling report, formal complaint,
and related correspondence.

There is no Report of Investigation because the Complainant's
formal complaint, which was filed on March 24, 2005, was being
held in abeyance until completion of informal counseling.
Informal counseling was completed on September 1, 2005.  On
October 11, 2005, I sent a letter to Mr. Sam Wright, Jr., Ms.
Martin's representative, requesting additional information for
further processing of Ms. Martin's complaint (See Tab 1.)  Mr.
Wright did not respond to my October 11, 2005 letter.  Ms.
Martin notified me by e-mail on October 19, 2005 that she had
retained a new Representative, Howard L. Wallace.  Mr. Wallace
requested a hearing for his client in a letter, dated
October 19, 2005.

Since we have responsibility for coordinating the hearing, it
is important that we receive the scheduling notices and related
correspondence.  Please send a copy of all applicable correspondence
pertaining to the hearing to: David Shorts, EEO Manager, EEO Office,
Office of the Secretary, Department of Health and Human
Services, Room 709-D, Hubert H. Humphrey Building, 200
Independence Avenue, S.W., Washington, D.C. 20201 and to the
Management Representative, who will be designated later.

5

Page 2 - Arthuretta Martin

Please send the acknowledgement to Ms. Christine Smith, Hearing Coordinator.

At the conclusion of the hearing, the transcript, and the decision should be returned to:

Mr. Joe W. Ellis
Assistant Secretary for Administration
 and Management
Room 309-F, Hubert H. Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C.  20201

If you need any further information, please call me or Ms. Christine Smith, Hearing Coordinator on (202) 619-1564.

Sincerely,

David Shorts
EEO Manager, EEO Office
Office of the Secretary

Enclosures

Arthuretta Martin                    None
Complainant                          Representative


To be designated later               _____
Management Representative            Phone Number

Christine Smith                      (202) 619-1564
Hearing Coordinator                  Phone Number

cc:  Arthuretta Martin ✓
     Debbie Ridgely
     Marc Weisman
     Lisa Barsoomian

6

DEPARTMENT OF HEALTH AND HUMAN SERVICES
EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR'S REPORT

## A.    AGENCY

**Department of Health and Human Services, Office of the Secretary**

## B.    AGGRIEVED PERSON

Name: Arthuretta Martin

Job Title/Series/Grade: GS-1102-14, Deputy Director, Office of Small and Disadvantaged Business Utilization.

Place of Employment (Organization and location): Office of the Secretary, Department of Health and Human Services, 200 Independence Avenue, S. W. Room 360-G, Washington, D.C. 20201.

Work Phone Number: (202) 690-6845

Home Phone Number: N/A

Supervisor(s) Name/Title/Phone No.: Debbie Ridgely, Director, Office of Small and Disadvantaged Business Utilization, (202) 690-7300.

Administrative Code: N/A

Home Address: 9333 Raintree Road, Burke, VA 22015

Representative: Samuel Wright, Jr.

Representative's Mailing Address: Federal Employees Against Discrimination, Inc., 168 Peyton Road, Sterling, VA 20165, (703) 431-3759

## C.    CHRONOLOGY OF COUNSELING ACTIVITIES

Date of Initial Contact with the OS EEO Office: January 14, 2004.

Date of Initial Interview with the EEO Counselor: June 30, 2005

7

Page 2 (Arthuretta Martin)

Date of Incident: 2001 to the present.

Date Aggrieved Person Advised of Opportunity to Participate in Established Dispute Resolution Procedure: January 31, 2005

Date Aggrieved Person Agreed to Participate in Established Resolution Procedure: N/A

Date Aggrieved Person Declined to Participate in Established Dispute Resolution Procedure: March 10, 2005.

Date of Final Interview: August 29, 2005.

Date of Final Interview Notice: August 29, 2005.

Date Counseling Report Completed: September 1, 2005.

Date Counseling Report Submitted to EEO Officer: September 1, 2005.

Date Counseling Report Received by Aggrieved Person: Mailed return receipt on September 13, 2005.

Date of Notice of Right to File a Discrimination Complaint: September 13, 2005.

D.1    **BASIS FOR ALLEGED DISCRIMINATION**

**Race/Color**

(✓) 1 - Black                              ( ) 6 - Eskimo (Alaska Only)
( ) 2 - Hispanic                           ( ) 7 - White
( ) 3 - American Indian                    ( ) 8 - NonHispanic (Puerto
( ) 4 - Asian                                   Rico Only)
( ) 5 - Aleut (Alaska Only)                ( ) 9 - Other (Specify)

**Religion**
( ) A - Jewish
( ) B - Catholic
( ) C - Protestant
( ) D - Other (Specify)

BASIS (continued)

**Handicap (Specify):**

8

Page 3 (Arthuretta Martin)

( ) P - Physical:
( ) M - Mental
( ) B - Both

**National Origin** ( )

Specify National Origin:

**Age** ( )

Specify Age and Date of Birth:

**Sex** ( )

(✓) F - Female    ( ) M - Male

**Sexual Orientation** ( )

**Reprisal** (✓)

D.2.    **ISSUES ALLEGED**

( ) 1 - Appointment/Hire:
(✓) 2 - Assignment/Duties
( ) 3 - Awards
( ) 4 - Conversion FT
( ) 5 - Demotion
( ) 6 - Reprimand
( ) 7 - Suspension
( ) 8 - Termination
( ) 9 - Disciplinary Action (Other)
( ) 10- Duty Hours
( ) 11- Examination/Test
(✓) 12- Evaluation/Appraisal
( ) 13- Harassment (Nonsexual)
( ) 14- Harassment (Sexual)

**ISSUED ALLEGED (CONTINUED)**

( ) 15- Pay Including Overtime
( ) 16- Promotion/Nonselection:
( ) 17- Reassignment Request Denied
( ) 18- Reassignment Directed
( ) 19- Reinstatement

9

Page 4 (Arthuretta Martin)

    ( ) 20- Retirement
    ( ) 21- Time and Attendance:
    ( ) 22- Training
    ( ) 23- Terms/Conditions of Employment
    ( ) 24- Other
    ( ) 25- Reasonable Accommodation

---

E.   **NARRATIVE EXPLANATION OF ALLEGATION(S) OF DISCRIMINATION**

Ms. Martin claims that because of her race (African-American) and sex (female), she has been discriminated against. In addition, she also claims retaliation for exercising her statutory right to Family Leave and a hostile work environment. She further claims that management treats her differently from the other employees regarding the following concerns (Attachment 1):

Performance Evaluation:

With respect to this concern, Ms. Martin said that in 2004 during her annual rating, her supervisor, Ms. Debbie Ridgely, accused her of not being a "team player." Ms. Martin claims that during this rating period, Ms. Ridgely undermined her ability to perform her duties by withholding information from her; by holding discussions with customers without informing her; and by taking away all of her responsibilities as described in her job description, which she feels is a "technical demotion." Ms. Martin describes this as a "continuing pattern and practice" on the part of Ms. Ridgely. To date, Ms. Martin states that Ms. Ridgely has "refused to allow me to perform my duties in accordance with my position description" (Attachment 1).

Due Process Mandate:

With respect to this concern, Ms. Martin claims that since November 2004, management has unilaterally withheld $25. 00 per month from her paycheck without providing her with "an avenue of due process in accordance with the Collective Bargaining Agreement and Title V of the CFR" (Attachment 1).

Leave Usage:

With respect to this concern, Ms. Martin claims that Ms. Ridgely normally approves her leave requests, but then retaliates against her when she takes the leave by "creating a hostile working environment against me" (Attachment 1).

10

Page 5 (Arthuretta Martin)

Communication Segregation:

With respect to this concern, Ms. Martin claims that because of her necessity to take Family Leave, Ms. Ridgely has "discontinued almost all direct communication" with her and that the majority of their communication takes place by email. Ms. Martin states that when Ms. Ridgely gives her verbal directions and when she carries them out, Ms. Ridgely produces contradictory directions in writing and then proceeds to "discipline" her for following her original directions. Ms. Martin notes a constant pattern of inconsistent management direction and communication that are different for her, but appears to be just the opposite for all of the other employees in her immediate office (Attachment 1).

Responsiveness:

With respect to this area, Ms. Martin claims that on "several occasions Ms. Ridgely has excessively delayed responding to requests for information, assistance and clarification on personnel and work related matters." Specific examples of this include responding to her request for supporting documentation on the Performance Appraisal, receiving a copy of her personnel folder, and most recently delaying the processing of her request for outside activities (Attachment 1).

In a memorandum to Ms. Ridgely dated July 29, 2005, Ms. Martin has requested officially a six-month detail in the Office of Minority Health, Department of Health and Human Services, to begin on September 1, 2005. As of August 1, 2005, she has not received a response from Ms. Ridgely. However, Ms. Martin had requested a response no later than August 5, 2005 (Attachment 3).

Management Support:

With respect to this concern, Ms. Martin claims that Ms. Ridgely worked to undermined her ability to be effective in her job by undermining her efforts. For example, Ms. Ridgely has authorized the SBA Procurement Center Representative to stop communicating directly with her regarding work related matters (Attachment 1).

Work Assignments:

With respect to this concern, Ms. Martin claims that Ms. Ridgely has reassigned all of her job responsibilities to either lower level employees or to her Special Assistant, Mr. Clarence Randall (a white male). In addition, Ms. Martin claims further that "Ms. Ridgely's stated segregation of duties between her and Clarence Randall are procurement related and personnel/budget related, she

11

Page 6 (Arthuretta Martin)

rarely speaks to her about any procurement related matters and confers with Clarence about all management related matters in the office. Ms. Martin perceives she has been completely ostracized" (Attachment 1).

As part of Ms. Martin's claims, she expresses concern that many Pubic Laws related to discrimination that have been passed by the Congress or by Executive Order, have not been implemented by her agency.

<u>Legislation Concerns</u>:

Ms. Martin pointed out that in 1993, Congress passed P.L. 103-123 (an Appropriations Act). A section of the Act reads, "No department, agency, or instrumentality of the United States receiving appropriated funds under this or any other Act for fiscal year1994 shall obligate or expend any such funds, unless such department, agency or instrumentality has in place by July 1, 1994, and will continue to administer in good faith, a written policy designed to ensure that all of its workplaces are free from discrimination and sexual harassment and that all of its workplaces are not in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973." Other legislation cited by Ms. Martin includes Appropriation Acts for 1994 (P.L. 103-129); 1995 (P.L. 104-52); 1996 (P.L. 104-208); 1997 (P.L. 105-61); 1998 (P.L. 105-277); 1999 (P.L. 106-58); 2000 (P.L. 106-554); 2001 (P.L. 107-67); and 2003 (P.L. 108-7), contain a similar paragraph, with the exception that the number following the words fiscal year changes and the words "by July 1, 1994" are removed.

Ms. <u>Martin claims that in spite of the legislation cited above, her Agency "has no written policy **designed to ensure** that all of its workplaces are free from discrimination and sexual harassment and are not in violation of Title VII, the Age Discrimination in Employment Act of 1967, and the Rehabilitation Act of 1973"</u> (Attachment 2, p. 2).

Ms. Martin also cites Executive Order 11478, which mandates that "this policy of equal opportunity applies to and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement, and treatment of civilian employees of the Federal Government." <u>Ms. Martin claims that this policy "does not exist in the Department of Health and Human Services. Ms. Martin feels that because this policy does not exist, "management maintains an environment that permits managers to abuse her constitutional and statutory rights" (Attachment 2, p. 2).</u>

Ms. Martin further cites 29 C.F.R. § 1614.102 (b) which reads in relevant part, "In order to implement its program, each agency shall develop the plans, procedures

Page 7 (Arthuretta Martin)

and regulations necessary to carry out its program."  The word "shall" indicates that it is mandatory for the Department of Health and Human Services to develop the plans, procedures and regulations necessary to carry out its program.  Ms. Martin claims that "the facts indicate that the Department of Health and Human Services has no plans, procedures or regulations to carry out its program.  The failure to comply with this mandate caused and is a basis of my discrimination within this agency" (Attachment 2, p. 2).

Responsible Management Official(s):

Ms. Debbie Ridgely, Director, OSDBU
Telephone    (202) 690-7300

Mr. Marc Weisman, Deputy Assistant Secretary for Acquisition Management, OSDBU, Telephone   (202) 690-8554

F.    **REMEDY REQUESTED**

1.    Requests Compensatory damages in the amount of $300,000.00.

2.    Requests reimbursement of all legal expenses and reimbursement of all salary and benefits lost as a result of the discrimination and hostile work environment.

3.    Requests mandatory training for all manager's covering assignment of duties and communication with subordinates.

4.    Requests written direction to explain exactly what is expected of Ms. Martin as the Deputy Director of the Office of Small and Disadvantaged Business Utilization.

5.    Requests that an independent neutral organization conduct a thorough investigation of the civil rights program within the Department of Health and Human Services, with special attention to the reporting relationships within all aspects of the Department's Civil Right's program.

6.    Requests her personnel files be expunged of all negative "recordations."

7.    Requests permission for a one year detail in another organization within the Department.  Specifically, requests opportunity to work in the Office of Minority Health on a six-month detail to commence on September 1, 2005.

13

Page 8 (Arthuretta Martin)

8.    Requests that the Department address the failure to provide due process in the overpayment issue and provide her the same right to have her request to have the amount waived and to be considered as all other employees are permitted.

G.    **SUMMARY OF COUNSELOR'S INQUIRY**

1.    <u>Personal Contacts</u>                      <u>Phone Number</u>

Debbie Ridgely                          (202) 690 -7300

Marc Weisman                          (202) 690 -8554

2.    <u>Documents Reviewed</u>

Ms. Martin's memorandum entitled, "Basis and Issues of Complaint" (Attachment 1).

Ms. Martin's memorandum entitled, "Complaint of Discrimination" (Attachment 2).

Memorandum from Ms. Martin to Ms. Debbie Ridgely entitled, "Detail in the Office of Minority Health, Office of Public Health, Department of Health and Human Services" (Attachment 3).

3.    <u>Summary of Information</u>

On August 22, 2005, Mr. Weisman was interviewed in person by the EEO counselor. When asked by the EEO counselor about his knowledge about allegations of discrimination that had been made by Ms. Martin, Mr. Weisman said that he had no knowledge of the allegations. He further stated that he was not involved in any "supervisory role with Ms. Martin" and therefore he could not provide any useful information regarding the claims made by Ms. Martin.

When the EEO counselor asked Mr. Weisman about Ms. Martin's concerns regarding the lack of implementation of certain legislation (in the Department) that had been passed by the Congress, he stated "that was something that the Department would have to deal with." He said that he has no authority regarding this concern.

On August 22, 2005, Ms. Debbie Ridgely, Ms. Martin's immediate

Page 9 (Arthuretta Martin)

supervisor, was interviewed in person. Ms. Ridgely stated that she had been Ms. Martin's supervisor since December 2000.

When the EEO counselor asked Ms. Ridgely to respond to the claims of discrimination and remedies that had been provided by Ms. Martin, she said that she would prefer to listen and to notes during this interview but would provide responses at a later date. On August 31, 2005, Ms. Ridgely provided written responses by email. She provided the following :

### Responses to Allegations

1. **Performance Evaluation** – Allegation states that the employee received a comment in their performance appraisal relating to being a team player. Allegation goes on to state that management has undermined the ability of the employee to perform by withholding information that has resulted in a technical demotion. The employee received a fully successful rating, which was the highest rating possible. The team player concept was cited as an area for improvement. Information is not withheld from the employee. Team meetings are held on a weekly basis, monthly meetings are held with the entire staff, information is continually communicated.

2. **Due Process** – Allegation states that the employee has not been afforded due process. $25/month has been withheld from the employee's paycheck. The employee was paid for a Holiday in October while they were on Family Medical Leave for the entire month. This is outside of my scope and has been addressed by the Department's payroll.

3. **Leave usage under Family Medical Leave** – Allegation states that the leave was approved and retaliation and a hostile work environment has occurred after the leave was taken. The employee invoked FMLA and I approved it for the month of October 2004. The employee again invoked FMLA I approved it for the month of November 2004. Retaliation has never occurred; therefore no hostile work environment exists.

4. **Communication segregation** – Allegation states that I treat the employee differently and that the employee is singled out because I communicate via e-mail. I consistently use e-mail to communicate with my entire staff. Meeting schedules and out-of-office appointments make this the most effective method of communication. Face-to-face communication is used when employees are in the office.

Page 10 (Arthuretta Martin)

5. **Responsiveness to performance appraisal, personnel folder, and outside activity report.** Allegation states that excessive delays occurred in responding to the employee. Responses to all items were provided.

6. **Management support** – Allegation states that management worked to undermine the employee and that management authorized the Small Business Administration's Procurement Center Representative (SBA/ PCR) to stop communicating with the employee. Management support is provided for assignments and initiatives that support and further the Department's goals and objectives. The SBA/PCR works for another Executive Agency and has the latitude to determine how to perform her duties.

7. **Work assignments** – Allegation states that all of the employee's work has been reassigned to a lower level employee or to the Senior Advisor on the staff. There is no factual basis for this statement. Another staff member handled a single report that needed to be addressed during the time period when the employee was on FMLA. The responsibility for this area was never reassigned. All other programmatic areas of responsibility have not been reassigned.

8. **Legislation** – Allegation states that numerous civil rights laws have been passed and the Department does not adhere to or enforce any of those laws. The laws have not been implemented and the Department does not have any written policies to show we are not discriminating. This is outside of my scope of responsibility.

H.    **SUMMARY OF INFORMAL RESOLUTION ATTEMPT**

The complainant, Ms. Martin, was interviewed and provided documents (see attachments1, 2 and 3 above), which contained information relevant to her allegations. She also proposed eight (8) remedies as listed above.

Mr. Weisman, a respondent, was interviewed but stated that because he had no knowledge of the allegations and that he was not involved with Ms. Martin in any supervisory role, he could not respond appropriately to the allegations.

Ms. Ridgely, a respondent, was interviewed and provided written responses (see above) in which she denied any discrimination had taken place against Ms. Martin.

I.    **COUNSELOR'S CERTIFICATION**

The aggrieved person has been informed by me of all the applicable rights and responsibilities contained in the attached Counselor's Checklist. In addition, I

Page 11 (Arthuretta Martin)

have provided the aggrieved person with a written Notice of Final Interview.

Samuel Merrill, Jr.                      1101 Wooton Parkway, Suite 750
Name of EEO Counselor             Counselor's Office Address

*Samuel Merrill, Jr.*                      (240) 453-8429
Counselor's Signature              Counselor's Phone Number

September 1, 2005
Date Counselor's Report Completed

TOTAL NUMBER OF HOURS SPENT COUNSELING THIS CASE (INCLUDE ALL CONTACT, PREPARATION AND TRAVEL TIME)

Hours: 14

J.     **AGGRIEVED PERSON'S CERTIFICATION**

This acknowledges my receipt of two copies of this EEO Counselor's Report. The Counselor has advised me of my rights and responsibilities with the matter which I am aggrieved and has furnished me with a written Notice of Right to File a Discrimination Complaint.

_____         _____
Signature of Aggrieved Person         Date:

ATTACHMENTS:

1.     Basis and Issues of Complaint
2.     Complaint of Discrimination
3.     Detail in the Office of Minority Health, Office of Public Health, Department of Health and Human Services
4.     Notice of Right to File Letter

17

Attachment 1

Basis and Issues of Complaint

# Exhibit 4

Affidavit

District of Columbia

Washington, D.C.

I, Arthuretta Leonal Holmes-Martin, do hereby make the following statement freely and voluntarily to James E. Hubbard who has identified himself to me as a Contract EEO Investigator retained by JDG Associates, Inc., to investigate an allegation of discrimination filed against the U.S. Department of Health and Human Services (DHHS), Washington, D.C. Knowing this statement may be used in evidence, I understand this statement is not confidential and may be shown to any interested parties (those with a right to know), I hereby solemnly swear or affirm:

**Question 1: In your discrimination complaint Number OSH-010-06 filed on April 24, 2006 and accepted for investigation on August 8, 2008, you alleged you were subjected to reprisal from your first-level, supervisor, Ms. Deborah Ridgely, RMO, Director, Office of Small and Disadvantaged Business Utilization, DHHS, for filing an EEO complaint and subjected to a hostile work environment. You further alleged your supervisor created a hostile work environment for you in the manner in which she micro-managed your assignments and duties; sent you threatening and hostile e-mails on November 18, 2007; and, took away your authoritative responsibility. You stated collectively, these actions by Ms. Ridgely and others, contributed to the creation of a hostile work environment for you. Describe in detail, how your supervisor created a hostile work environment for you and include in your description, when this environment was created, how long it lasted, how it negatively impacted you, and what corrective actions if any, were taken by management at a higher level than your immediate supervisor to alleviate these conditions for you?**

Answer: No management at higher levels took actions to alleviate the conditions. Linda Garvin recently removed me from Federal Service because the hostile working environment has made me very ill. The EEO office under the management authority of Linda Garvin refused to process my complaints. The Personnel Office under the management authority of Linda Garvin refused to address my concerns with the manner Ms. Ridgely established performance standards. They also refused to properly process my claim for waiver of over payment, again under the management of Linda Garvin. Labor Relations and General Counsel refused to address Ms. Ridgely's and Ms. Weisman's failure to process my 2005 Ethics documents. The constant hostile environment has traumatized me causing me to develop a phobia, major depression and generalized anxiety disorder. In addition to alienation, I'm suffering from falls, hair loss, skin disorders, confusion, disorientation, insomnia, sleep apnea, and other stress induced illnesses. In total, I've suffered work place abuse at the hands of Debbie Ridgely and the other management officials and support staff at HHS who collude with her for over 3 years.

Page 1 of 7

(Initials)

**Question 2:  In your opinion, was the creation of the hostile environment that you attribute to your supervisor, Deborah Ridgely, subtle, overt or both?**
Answer: Both

**Question 3:  Describe what particular duties and or/assignments were taken from you or micro-managed by your supervisor and state when this practice began and ended?**
Answer:  (1) Review of the HHS 653 – Small Business Review Form – used to identify work for small businesses.  I was completely shut out of this process by Debbie.  Therefore I was unable to evaluate or identify procurement opportunities for small businesses.  (2) HHS Newsletter – I recommended this effort.  Once I recommended it, Debbie reassigned it. (3) Planning team building sessions.  I recommended it.  Debbie then reassigned the effort. (4) Small Business Climate Assessment – I recommended it through an employee suggestion.  Debbie reassigned the project from me to lower staff employees. (5) Development of a small business desk manual – I recommended it.  Debbie micro managed ever aspect of the desk manual.  Her micro managing diminished my efforts to simple clerical tasks. (6) Strategic Plan development.  I initiated this effort.  Debbie reassigned this effort completely shutting me out of this initiative. (7) Veterans Business project – prior to Tanisha beginning in the office, I had begun to build on the Veterans business program and develop strategies to improve contracts awarded to Veteran Businesses.  As Debbie did with any project I began to build that began to look successful, she reassigned it.

The above are not inclusive of the many ways Debbie harassed me through work assignments.

**Question 4:  If you mounted a protest or sought some relief from your second-level supervisor for the manner in which you alleged your assignments and duties were micro-managed by Ms. Ridgely, was the protest handled by management in an appropriate manner and if not, were there resulting negative outcomes for you for the manner in which management choose or attempted to resolve the situations or incidents of hostility that your brought to their attention?**
Answer:  When Marc Weisman was my second line supervisor, I raised concern about the manner in which she used the term "need to be a better team player" without explanation in my performance appraisal.  I simply asked Debbie to explain what she meant.  It took months to receive this explanation.  I had to file EEO complaints and go through mediation.  Mr. Weisman refused to ensure that Ms. Ridgely complied with this basic management responsibility.  Identification of my second level supervisor was kept away from me after the "reorganization."  Several times I verbally asked Debbie who this individual was.  A couple of times I asked the EEO office.  Debbie told me that this individual had not been identified.  The EEO Office said it was Marc Weisman based on my SF 50.  When I finally asked Debbie via email to identify the second level supervisor, she refused to identify that person.  Since that time she has said that the second level supervisor was the Deputy Secretary.  In June 2005 when I went to the Acting Deputy Secretary, Eve White about Marc and Debbie's refusal to process my ethics documents, she refused to act or acknowledge the blatant disregard for agency regulations and federal

(Initials)

guidelines. When my husband wrote a letter to the Secretary asking him to stop the retaliation, ensure that the EEO and personnel office comply with the laws and regulations governing Federal Employment, the Secretary refused to respond to his letter.

**Question 5: Regarding your assignments and duties, did you have projects taken from you and subsequently reassigned to other co-workers at or below your grade level in your unit or chain of command, and if so, please identify the individual or individuals who were assigned duties and responsibilities previously assigned to you?**

Answer – here are some but not all of the individuals and reassignments:

Climate Assessment – Annette Ownes-Scarboro
Newsletter – Linda Purnell.
Veterans Business Program – Debra Peters
Vendor Outreach Sessions – Debra Peters
NAPAW Conference coordination – Clarence Randall
Strategic Plan – Clarence Randall
Team Building Sessions – Clarence Randall

There were certain programs that Debbie "officially" had in my name. They were the Women's Business Program, the 8(a) program, the Service Disabled Business Program, and the Disadvantaged Business Program. This was in name only. There were no true "programs" other than for me to talk to businesses under these categories and direct them to the monthly outreach sessions. I did not have access to the agency's procurements, acquisition strategy, or future requirements so there was little I could do to assist these businesses. I did try and arrange matchmaking sessions with program offices. When I had arranged a match making session for Veteran Businesses with the Information Technology office, Debbie reassigned the program to Debra Peters.

**Question 6: In your opinion, did the threatening and hostile e-mails that you alleged having received on November 18, 2006, imply or convey such actions as a verbal reprimand, bodily harm, or disciplinary action and if so, did you receive a proposed notice of adverse action for your behavior or level of performance as a follow-up to actions described in the November 18, 2006 correspondence to you?**

Answer: I've not received a proposed notice of adverse action for the November 18, 2006. I've received two counseling notices for participating in team building sessions where I expressed my concerns in an environment that was supposed to be open to discuss concerns. I feel that the November 18, 2006 email along with many others was threatening. I believe that I could do nothing or say anything right. If I said something or questioned anything Debbie said it was "inappropriate" without defining what that meant. If anyone else on the staff questioned the same thing, she didn't seem to have a problem with it – like the tendency of what I perceived as misleading small businesses to believe there were business opportunities when in fact there were none. HHS was consolidating and bundling all work previously performed by small businesses – especially in the area of information technology. If I asked how we were to accomplish goals given this practice, my questioning was "inappropriate" and I wasn't supportive of the

(Initials)

administration's agenda. I simple saw my questions as legitimate given the fact that we were suppose to be the advocates for the small businesses.

**Question 7: Cite examples of the threatening and hostile e-mails that you received on November 18, 2006, and state if you sought relief through the agency's Employee and Labor Relations Branch and if relief was granted?**

Answer: I will provide copies of emails I believed were threatening. I have not sought relief from Labor Relations Branch for these incidents. I sought assistance from Labor Relations when Debbie over paid me and they turned the over payment on me to say I was dishonest. I sought assistance from Labor Relations when Debbie refused to define what she meant by team player. And they turned her failure as a negative reflection on me. Again I turned to Labor Relations when Debbie refused to provide me copies of my personnel file. Although I eventually received some papers from my personnel file, Labor Relations has and continues to collude with Debbie Ridgely to deny me the basic rights I should be entitled to as an employee. When I went to Employee Assistance to get help I was told by the counselor, after talking to Debbie, that they would not provide me counseling because the problem was work related. I was told that they only deal with issues that are not work related. Personnel and Labor Relations – not to mention the Secretary, Deputy Secretary and General Counsel's failure to hold her and Marc Weisman accountable for their management responsibilities are why I'm without a job and home sick right now.

**Question 8: If anticipated relief was granted, what was the time span between your request and the relief granted and was the relief helpful and/or sufficient to resolve the problems at hand?**

Answer: No relief was granted. Before I became ill I requested a detail from Debbie. After I found two organizations willing to work with me, Debbie said no to my detail request because she was short staffed. Then for the next year I sat with practically nothing to do except clerical based duties within the office.

**Question 9: If anticipated relief was not granted, what explanation was provided to you from management to justify non-action on their part?**

Answer: I never anticipated relief. It was never offered. Management never provided explanations as to why they were not responsive to my concerns. Debbie was the only management I had to work with. Again I did not have access to a second level supervisor other than Marc Weisman.

**Question 10: In your response to questions 6 and 7 in your affidavit dated June 12, 2007, Case No. OSH-014-05, you were asked to identify the manager or managers who created the hostile work environment for you and to cite specific examples of the hostile work environment in your unit or chain of command. You identified both Debbie Ridgely and Mark Weisman and stated there were other collaborating agency officials whose names you said were unknown to you. In citing examples of the alleged hostile work environment, you responded your federal career and reputation was ruined, your health was adversely impacted, and your co-workers shunned you.**

Page 4 of 7

(Initials)

You further stated you had filed three discrimination complaints and none had been processed by HHS officials in accordance with law and regulations. You stated you had sought assistance from labor relations and HR and at HHS, your concerns were ignored by HHS management officials. You stated you had raised concerns to the acting deputy secretary and general counsel about mishandling of ethics documents and those concerns were ignored. You said you had raised concerns about the mishandling of Debbie Ridgely's administrative error of over paying you in October 2004 and those concerns were ignored. You said you had sought relief from every management official you knew to go to and they were all non-responsive. You stated you even went to the Employee Assistance Program for assistance and spoke with Debbie Ridgely who refused you counsel for work related stress.

Are the issues of a hostile work environment that you addressed in Complaint No. OSH-014-05 different that the hostile work environment issues that you have addressed in this complaint, 010-06, and if so, how are they different?
    Answer: As I stated in my response to OSH-014-05, I did not know if HHS was going to process my 010-06 complaint and I simply addressed some of the issues from the 06 complaint in the 05 affidavit. Some of the questions raised by the investigator were from the 06 complaint. There are many more issues of hostile working environment. Finding out that there was this memo to Debbie about the overpayment that I never saw was devastating to me. Receiving an email from Debbie to my personal email account on the day I left. Debbie played games with me on attending a conference in Atlanta. Debbie established evaluation criteria as performance standards that were impossible for me to achieve given the conditions in which I was forced to work. I mean there are so many things she did. I think the worst was her habit of talking to me only via email. I believe she did this so she could entrap me. She would tell me to do something a certain way and then change or criticize the way I did it. So I began to ask her what she wanted. She wanted to micro manage but then when I let her micro manage she would say I should know what to do. It was unnerving.

Question 11: In this complaint, are you alleging you were treated unfairly by Ms. Ridgely in the manner in which she monitored your time and attendance and, do you know if other managers at your grade level had their time and attendance records monitored as critically as your records were monitored in e-mail correspondence between you and Ms. Ridgely?
    Answer: Although I did see Debby's monitoring of my time and attendance as harassing, I did not raise it as an allegation in this complaint. It should be. What I did raise was that Debbie placed terms and conditions of employment on me that were more than she imposed on other members of her staff. Specifically – while on flex time, permitted to report to work between the hours of 6:30 – 9:30, when I requested to come in earlier than my normal 8:00, Debbie stated that I had to make a request for change of duty schedule. When I informed her that I was not requesting a change in schedule but only reporting at a different time within the flex, she still continued to request that I submit a form that did not exist in the Bargaining Agreement.

Page 5 of 7                                                           (Initials)

In addition to this, Ms. Ridgely used "mapquest" routes to determine if she would validate my local travel. Nothing in the agency's travel regulations requires that we use mapquest to drive. What makes this situation worse was that I used the same travel route for three years. She approved that route for three years and then changed refusing to approve my reimbursement for local travel.

Also in the area of travel if I went on out of state travel requiring air flight, Debbie permitted other members of the staff to select the airport that was most convenient for them and their schedule. She dictated to me what airline and what airport I could use. She even required that I travel with luggage on metro – even when I told her I had a herniated disk and could not carry luggage on metro. She then refused to permit me to travel.

The list goes on and on with the various ways Debbie imposed terms and conditions on me that she did not impose on others in her staff.

**Question 12: Can you cite specific instances in which Ms. Ridgely purposefully violated privacy rights policy in suggesting and/or requiring you to send cc's of your e-mail messages intended for her eyes only to Ms. Ruth Lewis?**
Answer: No I cannot cite specific instances in which Debbie required Ruth Lewis be copied on personnel matters. However I can cite a specific instance in which Debbie told me to ask Clarence to help me get another job. This was in October 2005 – when I was out on family medical leave with my son. I saw her asking a total stranger to help me find another job as a violation of my privacy rights. It was none of his business and she was out of line to ask him. Her practice of copying Ruth was just another example of how Debbie operated – she did not respect me as a professional and at times not even as a human being.

**Question 13: What are the rules that govern requesting annual, sick and emergency leave and have you been unfairly accused by your supervisor of abusing those rules, and if so, when and how often?**
Answer: I was never accused – to my knowledge – of abusing leave. Debbie did not like the fact that I called in to take leave. She said she never knew when I would show up. At the time I only knew I was becoming very ill and had difficulty sleeping, concentrating; I was very irritable, at times lethargic. I cried a lot and was unable to drive. My husband took me to work a lot because I kept losing things like my keys and government ID. I didn't know it at the time, but the years of mental abuse had resulted in the illnesses. My absences were the result of work place abuse.

Page 6 of 7

(Initials)

**Question 14: Please provide a list of meetings and conferences you attended on a recurring basis as Deputy Director. Provide running dates for those meetings, the scheduled times and locations and the most convenient and appropriate mode of transportation available to you for traveling to and from those meetings?**

Answer: Every Tuesday was Debbie's staff meeting. The meeting was held in the office.

I also attended an interagency meeting on the eSRS project. These meetings were every Wednesday primarily but I also attended them other days and different hours as needed. I used the Virginia Rail to attend these meetings and sometimes METRO. On occasion I had to attend meetings in Bethesda or Rockville. Driving my personal car was the most convenient mode of transportation then. Because Debbie harassed me so when I tried to get reimbursed for local travel, I stopped requesting reimbursement and just ate the cost when I used my own car to attend these meetings.

**Question 15: What is your current employment status with the agency and if you are on extended medical leave, are you suggesting that having worked for a sustained period of time in an environment that you allege to be hostile, contributed to your current or present medical condition?**

Answer: HHS released me on July 1st from Federal Employment because of my illness. I am no longer a Federal Employee. Yes, I am saying, not suggesting, that having worked for a sustained period of time in a hostile environment caused my present medical condition.

**Question 16: What resolution are you requesting from management to resolve your complaint against the agency.**

Answer: Workman's Compensation reimbursement for medical and therapy
Disability Retirement at a 14 step 10
Attorney's Fees
Remove all negative records from my personnel file
Compensatory Damages for each discriminatory act by HHS officials.
Correct Retirement System from FERS to Civil Service-Offset

I have reviewed this statement consisting of 7 pages and hereby solemnly swear ___ affirm ___ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to interested parties as well as made a permanent part of the record.

_____                          7/31/07
(Signature of Deponent)                               (Date)

Signed before me at (Street and City) _____
On this ____ day ____ of _____, 2007.

_____
(Signature of Investigator/Witness)

(Initials)

# Exhibit 5

Affidavit

District of Columbia

Washington, D.C.

I, Arthuretta Leonal Holmes-Martin, do hereby make the following statement freely and voluntarily to James E. Hubbard who has identified himself to me as a Contract EEO Investigator retained by JDG Associates, Inc., to investigate an allegation of discrimination filed against the U.S. Department of Health and Human Services (DHHS), Washington, D.C. Knowing this statement may be used in evidence, I understand this statement is not confidential and may be shown to any interested parties (those with a right to know), I hereby solemnly swear or affirm:

**Question 1: In your discrimination complaint Number OSH-010-06 filed on April 24, 2006 and accepted for investigation on August 8, 2008, you alleged you were subjected to reprisal from your first-level, supervisor, Ms. Deborah Ridgely, RMO, Director, Office of Small and Disadvantaged Business Utilization, DHHS, for filing an EEO complaint and subjected to a hostile work environment. You further alleged your supervisor created a hostile work environment for you in the manner in which she micro-managed your assignments and duties; sent you threatening and hostile e-mails on November 18, 2007; and, took away your authoritative responsibility. You stated collectively, these actions by Ms. Ridgely and others contributed to the creation of a hostile work environment for you. Describe in detail, how your supervisor created a hostile work environment for you and include in your description, when this environment was created, how long it lasted, how it negatively impacted you, and what corrective actions if any, were taken by management at a higher level than your immediate supervisor to alleviate these conditions for you?**

Answer: No management at higher levels took actions to alleviate the conditions. Linda Garvin recently removed me from Federal Service because the hostile working environment has made me very ill. The EEO office under the management authority of Linda Garvin refused to process my complaints. The Personnel Office under the management authority of Linda Garvin refused to address my concerns with the manner Ms. Ridgely established performance standards. They also refused to properly process my claim for waiver of over payment, again under the management of Linda Garvin. Labor Relations and General Counsel refused to address Ms. Ridgely's and Ms. Weisman's failure to process my 2005 Ethics documents. The constant hostile environment has traumatized me causing me to develop a phobia, major depression and generalized anxiety disorder. In addition to alienation, I'm suffering from falls, hair loss, skin disorders, confusion, disorientation, insomnia, sleep apnea, and other stress induced illnesses. In total, I've suffered work place abuse at the hands of Debbie Ridgely and the other management officials and support staff at HHS who collude with her for over 3 years.

Exhibit 6
Page 1 of 8                    (Initials)

Question 2:  In your opinion, was the creation of the hostile environment that you attribute to your supervisor, Deborah Ridgely, subtle, overt or both?
Answer: Both

Question 3:  Describe what particular duties and or/assignments were taken from you or micro-managed by your supervisor and state when this practice began and ended?
Answer:  (1) Review of the HHS 653 – Small Business Review Form – used to identify work for small businesses. I was completely shut out of this process by Debbie. Therefore I was unable to evaluate or identify procurement opportunities for small businesses. (2) HHS Newsletter – I recommended this effort. Once I recommended it, Debbie reassigned it. (3) Planning team building sessions. I recommended it. Debbie then reassigned the effort. (4) Small Business Climate Assessment – I recommended it through an employee suggestion. Debbie reassigned the project from me to lower staff employees. (5) Development of a small business desk manual – I recommended it. Debbie micro managed ever aspect of the desk manual. Her micro managing diminished my efforts to simple clerical tasks. (6) Strategic Plan development. I initiated this effort. Debbie reassigned this effort completely shutting me out of this initiative. (7) Veterans Business project – prior to Tanisha beginning in the office, I had begun to build on the Veterans business program and develop strategies to improve contracts awarded to Veteran Businesses. As Debbie did with any project I began to build that began to look successful, she reassigned it.

The above are not inclusive of the many ways Debbie harassed me through work assignments.

Question 4:  If you mounted a protest or sought some relief from your second-level supervisor for the manner in which you alleged your assignments and duties were micro-managed by Ms. Ridgely, was the protest handled by management in an appropriate manner and if not, were there resulting negative outcomes for you for the manner in which management choose or attempted to resolve the situations or incidents of hostility that your brought to their attention?
Answer:  When Marc Weisman was my second line supervisor, I raised concern about the manner in which she used the term "need to be a better team player" without explanation in my performance appraisal. I simply asked Debbie to explain what she meant. It took months to receive this explanation. I had to file EEO complaints and go through mediation. Mr. Weisman refused to ensure that Ms. Ridgely complied with this basic management responsibility. Identification of my second level supervisor was kept away from me after the "reorganization." Several times I verbally asked Debbie who this individual was. A couple of times I asked the EEO office. Debbie told me that this individual had not been identified. The EEO Office said it was Marc Weisman based on my SF 50. When I finally asked Debbie via email to identify the second level supervisor, she refused to identify that person. Since that time she has said that the second level supervisor was the Deputy Secretary. In June 2005 when I went to the Acting Deputy Secretary, Eve White about Marc and Debbie's refusal to process my ethics documents, she refused to act or acknowledge the blatant disregard for agency regulations and federal

Exhibit 6
Page 2 of 9        (Initials)

guidelines. When my husband wrote a letter to the Secretary asking him to stop the retaliation, ensure that the EEO and personnel office comply with the laws and regulations governing Federal Employment, the Secretary refused to respond to his letter.

**Question 5: Regarding your assignments and duties, did you have projects taken from you and subsequently reassigned to other co-workers at or below your grade level in your unit or chain of command, and if so, please identify the individual or individuals who were assigned duties and responsibilities previously assigned to you?**

Answer – here are some but not all of the individuals and reassignments:

Climate Assessment – Annette Ownes-Scarboro
Newsletter – Linda Purnell.
Veterans Business Program – Debra Peters
Vendor Outreach Sessions – Debra Peters
NAPAW Conference coordination – Clarence Randall
Strategic Plan – Clarence Randall
Team Building Sessions – Clarence Randall

There were certain programs that Debbie "officially" had in my name. They were the Women's Business Program, the 8(a) program, the Service Disabled Business Program, and the Disadvantaged Business Program. This was in name only. There were no true "programs" other than for me to talk to businesses under these categories and direct them to the monthly outreach sessions. I did not have access to the agency's procurements, acquisition strategy, or future requirements so there was little I could do to assist these businesses. I did try and arrange matchmaking sessions with program offices. When I had arranged a match making session for Veteran Businesses with the Information Technology office, Debbie reassigned the program to Debra Peters.

**Question 6: In your opinion, did the threatening and hostile e-mails that you alleged having received on November 18, 2006, imply or convey such actions as a verbal reprimand, bodily harm, or disciplinary action and if so, did you receive a proposed notice of adverse action for your behavior or level of performance as a follow-up to actions described in the November 18, 2006 correspondence to you?**

Answer: I've not received a proposed notice of adverse action for the November 18, 2006. I've received two counseling notices for participating in team building sessions where I expressed my concerns in an environment that was supposed to be open to discuss concerns. I feel that the November 18, 2006 email along with many others was threatening. I believe that I could do nothing or say anything right. If I said something or questioned anything Debbie said it was "inappropriate" without defining what that meant. If anyone else on the staff questioned the same thing, she didn't seem to have a problem with it – like the tendency of what I perceived as misleading small businesses to believe there were business opportunities when in fact there were none. HHS was consolidating and bundling all work previously performed by small businesses – especially in the area of information technology. If I asked how we were to accomplish goals given this practice, my questioning was "inappropriate" and I wasn't supportive of the

Exhibit 6
Page 3 of 8

(Initials)

administration's agenda. I simple saw my questions as legitimate given the fact that we were suppose to be the advocates for the small businesses.

**Question 7:  Cite examples of the threatening and hostile e-mails that you received on November 18, 2006, and state if you sought relief through the agency's Employee and Labor Relations Branch and if relief was granted?**
Answer: I will provide copies of emails I believed were threatening. I have not sought relief from Labor Relations Branch for these incidents. I sought assistance from Labor Relations when Debbie over paid me and they turned the over payment on me to say I was dishonest. I sought assistance from Labor Relations when Debbie refused to define what she meant by team player. And they turned her failure as a negative reflection on me. Again I turned to Labor Relations when Debbie refused to provide me copies of my personnel file. Although I eventually received some papers from my personnel file, Labor Relations has and continues to collude with Debbie Ridgely to deny me the basic rights I should be entitled to as an employee. When I went to Employee Assistance to get help I was told by the counselor, after talking to Debbie, that they would not provide me counseling because the problem was work related. I was told that they only deal with issues that are not work related. Personnel and Labor Relations – not to mention the Secretary, Deputy Secretary and General Counsel's failure to hold her and Marc Weisman accountable for their management responsibilities are why I'm without a job and home sick right now.

**Question 8:  If anticipated relief was granted, what was the time span between your request and the relief granted and was the relief helpful and/or sufficient to resolve the problems at hand?**
Answer: No relief was granted. Before I became ill I requested a detail from Debbie. After I found two organizations willing to work with me, Debbie said no to my detail request because she was short staffed. Then for the next year I sat with practically nothing to do except clerical based duties within the office.

**Question 9:  If anticipated relief was not granted, what explanation was provided to you from management to justify non-action on their part?**
Answer: I never anticipated relief. It was never offered. Management never provided explanations as to why they were not responsive to my concerns. Debbie was the only management I had to work with. Again I did not have access to a second level supervisor other than Marc Weisman.

**Question 10:  In your response to questions 6 and 7 in your affidavit dated June 12, 2007, Case No. OSH-014-05, you were asked to identify the manager or managers who created the hostile work environment for you and to cite specific examples of the hostile work environment in your unit or chain of command. You identified both Debbie Ridgely and Mark Weisman and stated there were other collaborating agency officials whose names you said were unknown to you. In citing examples of the alleged hostile work environment, you responded your federal career and reputation was ruined, your health was adversely impacted, and your co-workers shunned you.**

(Initials)

Exhibit 6
Page 4 of 8

You further stated you had filed three discrimination complaints and none had been processed by HHS officials in accordance with law and regulations. You stated you had sought assistance from labor relations and HR and at HHS, your concerns were ignored by HHS management officials. You stated you had raised concerns to the acting deputy secretary and general counsel about mishandling of ethics documents and those concerns were ignored. You said you had raised concerns about the mishandling of Debbie Ridgely's administrative error of over paying you in October 2004 and those concerns were ignored. You said you had sought relief from every management official you knew to go to and they were all non-responsive. You stated you even went to the Employee Assistance Program for assistance and spoke with Debbie Ridgely who refused you counsel for work related stress.

Are the issues of a hostile work environment that you addressed in Complaint No. OSH-014-05 different that the hostile work environment issues that you have addressed in this complaint, 010-06, and if so, how are they different?

Answer: As I stated in my response to OSH-014-05, I did not know if HHS was going to process my 010-06 complaint and I simply addressed some of the issues from the 06 complaint in the 05 affidavit. Some of the questions raised by the investigator were from the 06 complaint. There are many more issues of hostile working environment. Finding out that there was this memo to Debbie about the overpayment that I never saw was devastating to me. Receiving an email from Debbie to my personal email account on the day I left. Debbie played games with me on attending a conference in Atlanta. Debbie established evaluation criteria as performance standards that were impossible for me to achieve given the conditions in which I was forced to work. I mean there are so many things she did. I think the worst was her habit of talking to me only via email. I believe she did this so she could entrap me. She would tell me to do something a certain way and then change or criticize the way I did it. So I began to ask her what she wanted. She wanted to micro manage but then when I let her micro manage she would say I should know what to do. It was unnerving.

Question 11: In this complaint, are you alleging you were treated unfairly by Ms. Ridgely in the manner in which she monitored your time and attendance and, do you know if other managers at your grade level had their time and attendance records monitored as critically as your records were monitored in e-mail correspondence between you and Ms. Ridgely?

Answer: Although I did see Debby's monitoring of my time and attendance as harassing, I did not raise it as an allegation in this complaint. It should be. What I did raise was that Debbie placed terms and conditions of employment on me that were more than she imposed on other members of her staff. Specifically – while on flex time, permitted to report to work between the hours of 6:30 – 9:30, when I requested to come in earlier than my normal 8:00, Debbie stated that I had to make a request for change of duty schedule. When I informed her that I was not requesting a change in schedule but only reporting at a different time within the flex, she still continued to request that I submit a form that did not exist in the Bargaining Agreement.

Exhibit 6
Page 5 of 8

(Initials)

In addition to this, Ms. Ridgely used "mapquest" routes to determine if she would validate my local travel. Nothing in the agency's travel regulations requires that we use mapquest to drive. What makes this situation worse was that I used the same travel route for three years. She approved that route for three years and then changed refusing to approve my reimbursement for local travel.

Also in the area of travel if I went on out of state travel requiring air flight, Debbie permitted other members of the staff to select the airport that was most convenient for them and their schedule. She dictated to me what airline and what airport I could use. She even required that I travel with luggage on metro – even when I told her I had a herniated disk and could not carry luggage on metro. She then refused to permit me to travel.

The list goes on and on with the various ways Debbie imposed terms and conditions on me that she did not impose on others in her staff.

**Question 12: Can you cite specific instances in which Ms. Ridgely purposefully violated privacy rights policy in suggesting and/or requiring you to send cc's of your e-mail messages intended for her eyes only to Ms. Ruth Lewis?**

Answer: No I cannot cite specific instances in which Debbie required Ruth Lewis be copied on personnel matters. However I can cite a specific instance in which Debbie told me to ask Clarence to help me get another job. This was in October 2005 – when I was out on family medical leave with my son. I saw her asking a total stranger to help me find another job as a violation of my privacy rights. It was none of his business and she was out of line to ask him. Her practice of copying Ruth was just another example of how Debbie operated – she did not respect me as a professional and at times not even as a human being.

**Question 13: What are the rules that govern requesting annual, sick and emergency leave and have you been unfairly accused by your supervisor of abusing those rules, and if so, when and how often?**

Answer: I was never accused – to my knowledge – of abusing leave. Debbie did not like the fact that I called in to take leave. She said she never knew when I would show up. At the time I only knew I was becoming very ill and had difficulty sleeping, concentrating; I was very irritable, at times lethargic. I cried a lot and was unable to drive. My husband took me to work a lot because I kept losing things like my keys and government ID. I didn't know it at the time, but the years of mental abuse had resulted in the illnesses. My absences were the result of work place abuse.

Exhibit 6
Page 6 of 8

(Initials)

**Question 14: Please provide a list of meetings and conferences you attended on a recurring basis as Deputy Director. Provide running dates for those meetings, the scheduled times and locations and the most convenient and appropriate mode of transportation available to you for traveling to and from those meetings?**

Answer: Every Tuesday was Debbie's staff meeting. The meeting was held in the office.

I also attended an interagency meeting on the eSRS project. These meetings were every Wednesday primarily but I also attended them other days and different hours as needed. I used the Virginia Rail to attend these meetings and sometimes METRO. On occasion I had to attend meetings in Bethesda or Rockville. Driving my personal car was the most convenient mode of transportation then. Because Debbie harassed me so when I tried to get reimbursed for local travel, I stopped requesting reimbursement and just ate the cost when I used my own car to attend these meetings.

**Question 15: What is your current employment status with the agency and if you are on extended medical leave, are you suggesting that having worked for a sustained period of time in an environment that you allege to be hostile, contributed to your current or present medical condition?**

Answer: HHS released me on July 1st from Federal Employment because of my illness. I am no longer a Federal Employee. Yes, I am saying, not suggesting, that having worked for a sustained period of time in a hostile environment caused my present medical condition.

**Question 16: What resolution are you requesting from management to resolve your complaint against the agency.**

Answer:  Workman's Compensation reimbursement for medical and therapy
Disability Retirement at a 14 step 10
Attorney's Fees
Remove all negative records from my personnel file
Compensatory Damages for each discriminatory act by HHS officials.
Correct Retirement System from FERS to Civil Service-Offset

I have reviewed this statement consisting of 7 pages and hereby solemnly swear ___ affirm ___ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to interested parties as well as made a permanent part of the record.

_____                    7/31/07
(Signature of Deponent)                       (Date)

Signed before me at (Street and City) _____
On this ____ day ____ of _____, 2007.

_____
(Signature of Investigator/Witness)

Page 7 of 7

Exhibit 6
Page 7 of 7

(Initials)

## PRIVACY ACT NOTICE TO COMPLAINANT
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *DHHS* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Failure to furnish the information may result in your complaint being returned without action and being recommended for cancellation for failure to prosecute.

_____
Signature of Interviewer

_____
Signature of Complainant

Date: _8/22/2007_____

Place: _____

Exhibit 6
Page 8 of 8

# Exhibit 6

## COMPLAINT OF DISCRIMINATION

COMPLAINANT INFORMATION
Arthuretta H. Martin
9333 Raintree Road
Burke, VA 22015
202-690-6845 (Business)

AGENCY INFORMATION
Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

DESIGNATED REPRESENTATIVE
Douglas Hartnett
Elitok & Hartnett
2428 Wisconsin Ave., N.W.
2nd Floor,
Washington, D.C. 20007
202-965-0529

29 C.F.R. § 1614.106© reads "A complaint must contain a signed
statement from the person claiming to be aggrieved or that
person's attorney. This statement must be sufficiently precise
to identify the aggrieved individual and the agency and to
describe generally the action(s) or practice(s) that form the
basis of the complaint. The complaint must also contain a
telephone number and address where the complainant or the
representative can be contacted." My signature at the bottom of
this statement satisfies the first requirement. The information
provided under the heading "COMPLAINANT INFORMATION" satisfies
the second requirement. In order to satisfy the fourth
requirement, my telephone number and my representative's
telephone number are listed above.

The information in this paragraph and in subsequent paragraphs
satisfies the third requirement. I submit that I believe that I
am the victim of discrimination based on retaliation for
exercising my statutory right file an EEO complaint and a
hostile work environment. Generally, the actions or practices
that form the basis of the complaint are that management treats
me differently in areas including but not limited to
establishing performance standards, due process mandates,
communication segregation, responsiveness, management support,
developmental opportunities, awards, raising concerns of

1

discriminatory management practices against small businesses, and work assignments, than similarly situated employees who are not in a protected class and participated in the EEO process.

This complaint is brought pursuant to Executive Order 11478 and Title VII of the Civil Rights Act of 1964, as amended.  During this complaint my representative will answer all questions, handle all matters, provide all documents or other information. Therefore, all communications of any nature must be addressed to my representative.   I demand that **ALL** communication regarding this complaint of discrimination be through my representative. **No one** may contact me directly by any means for any reason.

## RESOLUTIONS

1. I demand compensatory damages and restoration of leave.
2. Reimbursement of all legal expenses and reimbursement of all salary and benefits lost as a result of the discrimination and hostile work environment.
3. I demand mandaotry personnel management and civil rights training for all HHS manager's.
4. I demand written clarification for all employees on a reasonable time for managers and general counsel to process requests for outside activities.
5. I demand clarification as to who the second line supervisor is for the position of Deputy Director, OSDBU at the Department of Health and Human Services above the Director, OSDBU.

Arthuretta M. Martin

April 24, 2006

Cc:  Deputy Secretary, Department of Health and Human Services

2

2

Washington, D.C. 20201

## Notice of Right to File a Formal Discrimination Complaint

FROM:      Noah Duvall, EEO Counselor

APR 17 2006

SUBJECT:   Notice of Right to File a Discrimination Complaint

TO:        Arthuretta Martin , Complainant

This is to inform you that, because the matter you brought to my attention has not been resolved to your satisfaction, you are now entitled to file a discrimination complaint based on race, color, religion, sex, national origin, physical or mental handicap, age and/or reprisal.

If you file a complaint, it must be in writing, signed, and filed in person or by mail <u>within fifteen (15) calendar days</u> after your receipt of this notice.  (See attached)

A discrimination complaint must be filed with the following agency official:

> EEO Manager, OS Equal Employment Opportunity Office
> Department of Health and Human Services
> Room 709-D, HHH Building
> 200 Independence Avenue, S. W.
> Washington, D.C. 20201

If you file a formal complaint with the agency, you are reminded of your responsibility to keep the agency informed of your current mailing address.

Attachments

cc:    David  L. Shorts, EEO Manager
       OS EEO Office

3

DEPARTMENT OF HEALTH AND HUMAN SERVICES
EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR'S REPORT

**A.** **AGENCY**

**U.S. Department of Health and Human Services, Office of Small and Disadvantaged Business Utilization**

**B.** **AGGRIEVED PERSON**

Name: **Arthuretta Martin**

Job Title/Series/Grade: **Deputy Director, GS-1102-14 /Office of Small and Disadvantaged Business Utilization**

Place of Employment (Organization and location): **Office of Small and Disadvantaged Business Utilization 200 Independence Ave., S. W. Washington, D. C. 22015**

Work Phone Number: **202- 690-6845**

Home Phone Number: **703- 426 8057**

Supervisor(s) Name/Title/Phone No.: **Debbie Ridgley, Director, Office of Small and Disadvantaged Business Utilization 202- 690-7300**

Administrative Code:

Home Address: **9333 Raintree Road, Burke, Va 22015**

Representative : **N/A**

Representative's Mailing Address: **N/A**

**C.** **CHRONOLOGY OF COUNSELING ACTIVITIES**

Date of Initial Contact with the OS EEO Office: **December 23, 2005**

Date of Initial Interview with the EEO Counselor: **January 20, 2006**

4

Page 2 - (Arthuretta Martin)

Date of Incident: **December 23, 2005**

Date Aggrieved Person Advised of Opportunity to Participate in Established Dispute Resolution Procedure: **December 23, 2005**

Date Aggrieved Person Agreed to Participate in Established Resolution Procedure:**N/A**

Date Aggrieved Person Declined to Participate in Established Dispute Resolution Procedure: **December 23, 2005**

Date of Final Interview:                    APR 1 7 2006

Date of Final Interview Notice:        APR 1 7 2006

Date Counseling Report Completed:        APR 1 7 2006

Date Counseling Report Submitted to EEO Officer:    APR 1 7 2006

Date Counseling Report Received by Aggrieved Person: **Mailed Fed Ex**

Date of Notice of Right to File a Discrimination Complaint: **Mailed Fed Ex**


D.1    **BASIS FOR ALLEGED DISCRIMINATION**

**Race/Color**

( ) 1 - Black                    ( ) 6 - Eskimo (Alaska Only)
( **)** 2 - Hispanic            ( ) 7 - White
( ) 3 - American Indian        ( ) 8 - NonHispanic (Puerto
( ) 4 - Asian                            Rico Only)
( ) 5 - Aleut (Alaska Only)    ( ) 9 - Other (Specify)

**Religion**

( ) A - Jewish
( ) B - Catholic
( ) C - Protestant
( ) D - Other (Specify)

Page 3 - (Arthuretta Martin)

BASIS (continued)

**Handicap (Specify):**

( ) P - Physical
( ) M - Mental
( ) B - Both

**National Origin** ( )

Specify National Origin:

**Age** ( )

Specify Age and Date of Birth:

**Sex** ( )

( ) F - Female    ( ) M - Male

**Sexual Orientation** ( )

**Reprisal** (**X** )

D.2.    **ISSUES ALLEGED**

( ) 1 - Appointment/Hire
(**X**) 2 - Assignment/Duties
( ) 3 - Awards
( ) 4 - Conversion FT
( ) 5 - Demotion
( ) 6 - Reprimand
( ) 7 - Suspension
( ) 8 - Termination
( ) 9 - Disciplinary Action (Other)
( ) 10- Duty Hours

6

Page 4 - (Arthuretta Martin)

      ( ) 11- Examination/Test
      ( ) 12- Evaluation/Appraisal
      ( ) 13- Harassment (Nonsexual)
      ( ) 14- Harassment (Sexual)
      ( ) 15- Pay Including Overtime
      ( ) 16- Promotion/Nonselection
      ( ) 17- Reassignment Request Denied
      ( ) 18- Reassignment Directed
      ( ) 19- Reinstatement
      ( ) 20- Retirement
      ( ) 21- Time and Attendance
      ( ) 22- Training
      ( ) 23- Terms/Conditions of Employment
      ( ) 24- Other
      ( ) 25- Reasonable Accommodation

E.    **NARRATIVE EXPLANATION OF ALLEGATION(S) OF DISCRIMINATION**

**The Aggrieved Person (AP), Arthuretta Martin is claiming that she was discriminated against based on reprisal (prior EEO activity) when on November 18, 2005, she was sent threatening and hostile emails from the Responsible Management Official (RMO) 'Debbie Ridgely' that are continuing.  Also the AP claims that the RMO has taking away all of her authoritative responsibility.**

**Interview with the Responsible Management Officials**

**Interview Debbie Ridgely on 02-06-2006**

**The RMO denies discriminating against the AP based on reprisal, for prior EEO activity. The RMO also denies that she threatened the AP at any time and that the emails that the AP is referring to as hostile does not reflect a hostile attitude toward the AP from the RMO.**

7

Page 5 - (Arthuretta Martin)

Responsible Management Official(s):

**Debbie Ridgely    (202) 690-7300**

F.    **REMEDY REQUESTED**

**1) To be removed from under the supervision of the RMO**

G.    **SUMMARY OF COUNSELOR'S INQUIRY**

1.    Personal Contacts              Phone Number

**Debbie Ridgely**              **(202) 690-7300**

2.    Documents Reviewed

**None**

3.    Summary of Information

H.    **SUMMARY OF INFORMAL RESOLUTION ATTEMPT**

**Management showed a willingness to negotiate however an informal resolution could not be reached at this time.  Negotiations are still in progress.**

Page 6 (Arthuretta Martin)

I.    **COUNSELOR'S CERTIFICATION**

The aggrieved person has been informed by me of all the applicable rights and responsibilities contained in the attached Counselor's Checklist. In addition, I have provided the aggrieved person with a written Notice of Final Interview.

Noah Duvall                                                     Washington, D.C. 20210

Name of EEO Counselor                                Counselor's Office Address

N . 0h                            AFR  1 7  2006   202-6905785

Counselor's Signature                                    Counselor's Phone Number

Date Counselor's Report Completed

**TOTAL NUMBER OF HOURS SPENT COUNSELING THIS CASE (INCLUDE ALL CONTACT, PREPARATION AND TRAVEL TIME)**

Hours: 14 Hours

J.    **AGGRIEVED PERSON'S CERTIFICATION**

This acknowledges my receipt of two copies of this EEO Counselor's Report. The Counselor has advised me of my rights and responsibilities with the matter which I am aggrieved and has furnished me with a written Notice of Right to File a Discrimination Complaint.

Signature of Aggrieved Person                    Date:

ATTACHMENTS:

1.    Statement of Revised Rights and Responsibilities of Aggrieved Persons
2.    Thirty Day Letter

9

# Exhibit 7

Follow-Up Questions for Martin Case
Initial Interview Conducted 06/04/2007
By James Hubbard

### 1. Additional clarification on overpayment of salary while on Leave Without Pay (LWOP)

**Answer:** Human Resources drafted a memorandum that recommended denial of Ms. Martin's waiver request to reimburse the Federal Government for the single day's salary she was paid while on LWOP. As the immediate supervisor, I concurred with the recommendation and returned the memorandum to Human Resources, as specifically instructed.

### 2. State for the record the remarks I offered when Ms. Martin's son was ill (she was on FMLA) and when she lost her grandson

**Answer:** The e-mail records reflect that I specifically asked about the condition of her son, Justin and how both Justin and Ms. Martin were doing. I definitely emphasized with what she was experiencing at the time. Let the record also reflect that when I learned about the death of her grandchild I went into Ms. Martin's office and shared with Ms. Martin the loss of my own infant daughter in 1980. This is a very painful experience and not something that I readily or easily share with people. I shared my experience out of compassion for Ms. Martin and her family. Ms. Martin's statement that I showed no empathy or compassion is totally unfounded.

### 3. Clarify the signature request on the FY 2005 Performance Appraisals

**Answer:** FY 2005 Performance Appraisals were issued in August 2006 due to on-going negotiations with the Labor Union. All employees were asked to sign them prior to August 31, 2006 and Ms. Martin was no exception. Ms. Martin was asked to sign her Performance Appraisal as soon as they were available. Let the record show that Ms. Martin refused to sign her FY 2005 Performance Appraisal.

### 4. Clarify the use of Map Quest for local travel

**Answer:** Ms. Martin alleges that I "made" her use the directions off of Map Quest for local travel. The issue centers on the fact that Ms. Martin claimed unusually high mileage rates for local travel. A specific example is her claim to have traveled 60 miles from the Hubert Humphrey Building located at 200 Independence Avenue, SW, Washington, DC to the American Inn in Bethesda, MD to teach Contracting 301. Map Quest was used as a mileage gage and I never advised Ms. Martin that she had to use the Map Quest directions. The one-way distance was approximately 15 miles, not the 60 miles that Ms. Martin submitted on her local travel voucher.

### 5. Clarify the procedure for a change in duty hours

**Answer:** Ms. Martin advised me that she was changing her duty hours effective x date. In accordance with Article 37 of the Collective Bargaining Agreement, all requests must be submitted in writing check the CBA x weeks in advance. I asked Ms. Martin to simply comply with the provisions outlined in the Collective Bargaining Agreement. Ms. Martin was not treated differently than any other employee who would ask to change their duty hours.

### 6. Ms. Martin did not know who her second line supervisor was

**Answer:** The Small Business Office was consolidated in October 2004. From that point forward I reported only to the Deputy Secretary of HHS. As such, the Deputy Secretary of HHS was Ms. Martin's second line supervisor.

### 7. Clarify the role and position of Malda Brown.

**Answer:** Ms. Brown was/is employed by the Small Business Administration and serves as the Procurement Center Representative for the Department. Since Ms. Brown does not work for HHS; Ms. Martin's statement that I instructed Ms. Brown not to communicate with her is not relevant or valid. I am not Ms. Brown's supervisor and have no supervisory authority with respect to Ms. Brown. Ms. Brown works with the Department and interfaces and speaks to all HHS employees, as she determines appropriate.

### 8. Clarify Ms. Martin's leave record

**Answer:** Ms. Martin used sick leave from 06/20/2006 – 08/04/2006. Ms. Martin was on LWOP from 08/04- 01/24/2007. Ms. Martin used AL from 01/25/2007 – 03/08/2007. Ms. Martin used SL from 03/08 – 09/2007. Ms. Martin used LWOP from 03/09/ - 03/18/2007. Ms. Martin was on AL on 03/19/2007. Ms. Martin was on LWOP on 03/20 – 23/2007. Ms. Martin was on SL 03/26/2007. Ms. Martin was/is on LWOP from 03/26 – present 06/09/2007.

### 9. Organization chart when the EEO complaint was filed (August 2005)

**Answer:** An organization chart, as of August 2005 has been attached. The chart shows, the race, sex and color of every employee on the OSDBU staff.

Our mission statement is as follows:

*"Small Business is the HEART of our Economy".* The OSDBU office has organized its responsibilities, programs and activities under three lines of business: advocacy, outreach and unification of the business process. The results achieved under all three lines of business,

support the accomplishment of HHS' strategic goal to encourage and assist the participation of all small businesses in HHS' contracts. This office has published a **Small Business Program Manual**, for internal and external use, to ensure small businesses compete for and receive a fair share of the Department's expenditures. OSDBU hosts a monthly **Vendor Outreach Session (VOS)** that are designed to educate vendors on the small business program and to provide information on how to effectively market your products and services to HHS. We encourage you to review our **Forecast** of upcoming opportunities.

In addition to hosting monthly vendor outreach sessions, this office publishes a ***quarterly*** newsletter, **"The Pulse"**, to keep the small business community abreast of activities within this Department. For additional information, we ask that you browse our website and review our Frequently Asked Questions (FAQs) to learn more about HHS' Small Business Program

# Exhibit 8



**PERFORMANCE
MANAGEMENT PLAN AND RATING**

---

### IDENTIFICATION INFORMATION

Holmes Martin, Arthuretta L.

*EMPLOYEE 'S NAME (Last, First, MI)*

| | Social Security Number |
|---|---|

Procurement Analyst

*POSITION TITLE*                        GS/WG   **1102**            **14**
                                                *Series*            *Grade*

OS/ASAM/OAMP/OSDBU

*ORGANIZATION*                                              *Code*
PERFORMANCE PERIOD:  **01/01/04**      **09/30/04**      APPRAISAL YEAR   **2004**

### PLAN ESTABLISHMENT

This Plan consists of       **4**      elements.

| | Element | Critical | Non Critical |
|---|---|---|---|
| 1. | Works to accomplish tasks relating to achieving efficiencies in the HHS Small Business Program through outreach events, training and policy development and dissemination in support of the Agency's mission. Strives for Excellence | ☒ | ☐ |
| 2. | Works with others in formal teams or ad hoc groups to improve and insure that small business services are provided effectively and efficiently. | ☒ | ☐ |
| 3. | Contributes to the improvement of customer service for the Small Business Program and community. Supports the Agency's small business goals. | ☒ | ☐ |
| 4. | Completes a variety of assignments that cover a range of subject matter areas with emphasis on small business policies and procedures designed to implement Results-oriented Management. | ☒ | ☐ |

I certify that this performance plan sets forth the job elements and standards upon which the work performance of this employee will be rated. The elements will be assessed against demonstrated contributions to meeting functionally relevant priorities.

*Debbie Ridgly*                        *06/18/2004*
APPRAISING OFFICIAL 'S SIGNATURE        *Date*

I have received a copy of this plan and understand that it describes the job elements and standards upon which my work performance will be rated.

*Arthuretta Martin*                     *6/21/04*
EMPLOYEE 'S SIGNATURE                    *Date*

Relationship to Within-grade Increase: At least a Fully Successful Summary Rating is required for an acceptable level of competence determination for granting a within-grade increase.



**PERFORMANCE**
**MANAGEMENT PLAN AND RATING**

---

## PROGRESS REVIEW

I certify that a review of progress under this plan was conducted.

_Nettie Ridgely_          08/13/04          _(signature)_          8/13/04
APPRAISING OFFICIAL                Date                EMPLOYEE
Date

---

EMPLOYEE 'S NAME (Last, First, MI)                          Social Security Number

### PERFORMANCE RATING

Summary Rating

| | | | Code |
|---|---|---|---|
| Employee is rated unacceptable on one or more critical elements | ☐ | UNACCEPTABLE | 1 |
| Employee is rated marginally successful on one or more critical elements | ☐ | MARGINALLY SUCCESSFUL | 2 |
| | ☒ | FULLY SUCCESSFUL | 3 |

---

This Rating is   ☑  A Rating of Record          ☐  A Summary Rating

_Nettie Ridgely_          11/30/2004
APPRAISING OFFICIAL 'S SIGNATURE            Date

_(signature)_
EMPLOYEE 'S SIGNATURE                  Date              REVIEWER 'S SIGNATURE
Date
(Indicates that a copy of summary rating was received)        (Required if Final Rating is "Unacceptable")

---

## DOCUMENTATION OF SUMMARY RATINGS
## IF MORE THAN ONE RATING DURING THE YEAR

Note: Complete when two or more Summary Ratings have been issued during the appraisal year.

SUMMARY RATING #1
FROM (mmddyy)          TO (mmddyy)          _____ RATING          _____ DAYS

SUMMARY RATING #2
FROM (mmddyy)          TO (mmddyy)          _____ RATING          _____ DAYS

SUMMARY RATING #3
FROM (mmddyy)          TO (mmddyy)          _____ RATING          _____ DAYS

SUMMARY RATING #4
FROM (mmddyy)          TO (mmddyy)          _____ RATING          _____ DAYS



PERFORMANCE
MANAGEMENT PLAN AND RATING

| STANDARD LEVELS | NON-SUPERVISORY | SUPERVISORY |
|---|---|---|
| **FULLY SUCCESSFUL (LEVEL 3)** | This is the level of good, sound performance. The quality and quantity of the employee's work under this level are those of a competent employee. The performance represents a level of accomplishment expected of the great majority of employees.<br><br>Most of the employee's work requires only minor revisions. Tasks are completed in an accurate, thorough, and timely manner. The employee's technical skills and knowledge are applied effectively to specific job tasks. In completing work assignments, he or she adheres to procedures and format requirements and follows necessary instructions from supervisors.<br><br>The employee's work planning is realistic and results in completion of work by established deadlines. Priorities are duly considered in planning and performing assigned responsibilities.<br><br>The employee's interpersonal behavior toward supervisors, co-workers and clients promotes attainment of work objectives.<br><br>The employee's work products meet customer expectations. Employee provides the customer with professional and responsive service within mutually agreed upon time frames.<br><br>The employee completes special, one-time assignments when required, without regular duties being disrupted. Problems associated with completing assignments are resolved with a minimum of supervision.<br><br>The employee speaks and writes clearly and effectively. | The employee is a good leader. Establishes sound working relationships and shows good judgment in dealing with subordinate employees' views. He/She provides opportunities for staff to have a meaningful role in accomplishing organization objectives and makes special efforts to assist subordinates in improving their performance.<br><br>The employee conveys customer service objectives to subordinates, which are often met.<br><br>The employee rewards good performance and corrects poor performance through sound use of the performance appraisal system, performance-based incentives and when appropriate, adverse actions, and selects and assigns employees in ways that use their skills effectively.<br><br>The employee effectively anticipates customer needs and fosters cooperative working relationships with customers. |



| STANDARD LEVELS | NON-SUPERVISORY | SUPERVISORY |
| --- | --- | --- |
| **MARGINALLY SUCCESSFUL (LEVEL 2)** | Several but not all of the following deficiencies are characteristic of the employee's work: | Several but not all of the following deficiencies are characteristic of the employee's work: |
| | The quantity and quality of the employee's work product is sometimes below expectation. Assignments are, at times, not completed within prescribed time frames. | Sometimes fails to motivate subordinates and promote team spirit. |
| | Occasionally, tasks are not completed in an accurate and thorough manner. The employee has had instances when deadlines were not met. Quality of work sometimes necessitates major revisions. Close supervision is sometimes necessary to ensure that organizational standards are met. | In some cases, provides unclear assignments and performance requirements to subordinates.

Provides insufficient instructions to subordinate on how to carry out programs. |
| | On occasion, the employee's work products do not demonstrate the use of technical knowledge and skill. Variations from policies, procedures, and instructions by the employee cause delay in the completion of his/her work or the work of others. | Often fails to provide sufficient explanation of organizational goals to subordinates in meeting goals and objectives.

Often fails to satisfy and meet customer service objectives. |
| | Errors in work planning periodically lead to the failure to meet agreed upon deadlines. Some difficulty in adapting to changes in priorities or procedures, or to new approaches to programs, causes delays and diminished quality of work, requiring supervisory intervention. | Frequently fails to meet production or mission goals in a timely and quality manner. |
| | Occasionally the employee's work products fall below customer expectations and are not completed within the prescribed time frames. Customers are not kept informed of the status of projects. | |
| | The employee's behavior toward supervisor, co-workers, and/or clients poses problems and disrupts the working environment needed for cooperation and the completion of assignments. | |
| | The employee's spoken and written expression sometimes fails to convey information. | |



**PERFORMANCE MANAGEMENT PLAN AND RATING**

| STANDARD LEVELS | NON-SUPERVISORY | SUPERVISORY |
| --- | --- | --- |
| **UNACCEPTABLE (LEVEL 1)** | Performance is below a level that meets requirements for fully successful and marginally successful (e.g., continually fails to meet deadlines and produces work that is unacceptable). | |

**U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES**

**PERFORMANCE MANAGEMENT PLAN AND RATING**

**Performance Plan:** *Procurement Analyst*
*Location of Office: ASAM/Office of Acquisition Management and Policy/OSDBU*

## Element 1
Works to accomplish tasks relating to achieving efficiencies in the HHS Small Business Program through outreach events, training and policy development and dissemination in support of the Agency's mission. Strives for Excellence.

> Initiative #9 – ACHIEVE EFFICIENCIES THROUGH HHS-WIDE PRO-CUREMENTS.
> - ✓ Works to support achievement of the Department's goal to meet or exceed every small business goal.
>
> - ✓ Works to devise other initiatives and innovative techniques to increase efficiency by implementing a systematic approach to program evaluation for HHS programs to achieve regular independent and quality evaluations to indicate that the program is effective and achieving results.

Meets established goals and deadlines. Uses effective judgment in the performance of duties. Seeks guidance and support from supervisor or team leaders as appropriate. Devises or solicits effective solutions to problems and appropriate procedures for accomplishing objectives.

Shows initiative in starting, carrying out, and completing tasks. Seeks alternative solutions and creative approaches to problem solving. Takes into consideration new ideas and differing opinions. Creates opportunities to add value. Finds ways to make a difference, does not wait to be told what to do. Requires little day-to-day direction to complete projects. Manages own career proactively.

Follows and supports established procedures, directives, regulations or policies. Supports division, office and Agency goals. Exhibits collegiality. Works well with other individuals, groups and organizations for the success of the mission and goals. Treats others professionally, courteously and respectfully.

Communicates clearly and effectively, both orally and in writing. Seeks other opinions, as appropriate, in producing work products. Advises supervisor, team leaders and team members of changes, progress, and barriers to progress, as appropriate. Adjusts communication style to the needs of the recipients. Openly communicates opinions and provides candid, constructive feedback when appropriate.

Demonstrates a commitment to quality. Accepts responsibility in the performance of work activities. Displays an understanding of how the job is related to other Agency work. Submits work products that are understandable, organized and thorough. Supports work products with technical evidence and research.

## Element 2



PERFORMANCE
MANAGEMENT PLAN AND RATING

*Works with others in formal teams or ad hoc groups to improve and insure that small business services are provided effectively and efficiently. Ensures that work products are in sync with HHS goals, objectives and with work performed by other teams. Provides assistance to other members of the Office of Acquisition Management in various areas, including*

Participates actively in team efforts. Works with others to develop and implement solutions to problems. Assists others in meeting objectives. Actively looks for ways to contribute to the group effort.

Shares information willingly. Shares credit, recognition, and visibility with others. Supports and promotes team decisions and initiatives. Places team goals ahead of individual plans.

## Element 3

*Contributes to the improvement of customer service for the Small Business Program and the vendor community. Supports the Agency's small business goals. Interacts with multiple customer organizations (both internal and external). Develops methods and procedures for dealing with customers, including educational and marketing materials about products and services. Actively learns about customer organizations and situations in order to be proactive in developing solutions to issues. Assists and encourages peers in their dealings with customers.*

Facilitates communication with customers regarding requests, work products, and services. Refers customers to appropriate sources for information and guidance. Finds or solicits solutions to customer problems. Addresses customer requests in a timely manner. Demonstrates positive manners in telephone and face-to-face contacts.

Designs work products with customer needs in mind. Obtains customer input to, and feedback on, work products as they are developed and finalized. Recognizes the need for customer involvement in work products to ensure project success. Regularly solicits feedback from customers to make changes and obtain guidance.

- Works to add value to customer organization for Small Business Services.

## Element 4

*Completes a variety of assignments that cover a range of subject matter areas with emphasis on small business policies and procedures designed to implement Results-oriented Management.*

*Provides advice and technical assistance on matters relating to HHS Small Business and Acquisition programs, workforce development issues,*

 **PERFORMANCE
MANAGEMENT PLAN AND RATING**

*monitoring adoption of small business policies by the Department's OP-
DIVs, conducting performance measurement of Department's procure-
ment systems, making studies of new policies or revision of current poli-
cies, including application of Departmental Management controls, serves
as the Department's liaison in the area of small business, as related to,
acquisition and maintains working relationships with OMB, GSA, GAO,
and other Federal Agencies, and conducting special projects to develop
improved mechanisms for Department-wide management of small busi-
ness and acquisition programs.*

- ***INITIATIVE #1 – IMPLEMENT RESULTS-ORIENTED MANAGE-
MENT***
    - ✓ *Model private industry "Best Practices" for performance met-
rics and assess small business program outcomes.*



**PERFORMANCE
MANAGEMENT PLAN AND RATING**

Insert Progress Review(s) Here

— Employee is performing satisfactorily
— Future rotational assignment was discussed



Insert Overall Assessment Here

Arthuretta L. Holmes Martin

Employee meets established goals and deadlines and shows initiative in carrying out tasks. Follows established procedures, directives, regulations and policies. Communicates clearly in oral presentations and in writing. Demonstrates a commitment to quality to enhance the Small Business Program.

Ms. Martin has focused on improving and enhancing the Department's subcontracting program during FY 2004. She has led the effort to gather and analyze the subcontracting data submitted by our prime contractors. She has worked very closely with each of the Small Business Specialists in the OPDIVs to improve the amount and the quality of the subcontracting data that is being submitted.

Above and beyond the Department, Ms. Martin has served as a key member on the Interagency Task Force devoted to automating the reporting of the subcontracting data across the Federal Government. The Task Force developed the Statement of Work for the solicitation and has subsequently evaluated the proposals received in response to the solicitation. Findings were forwarded to the Selection Official. The new automated system will greatly improve and simplify access to subcontracting data across the entire Federal Government.

Ms. Martin also conducted a Prime Contractor's Roundtable in August 2004. HHS invited some or our major prime contractors and a group of small business trade associations. The purpose was to provide a forum for an open dialogue between the two entities and exchange ideas. The ideas will be used to develop some "best practices".

An area for improvement is to become a better "team player".



## IDENTIFICATION INFORMATION

**Ridgely, Deborah H.**

*EMPLOYEE'S NAME  (Last, First, MI)*

Small and Disadvantaged Bus Utilization Program Manager

*POSITION TITLE*

OS/ASAM/OAMP/OSDBU

*ORGANIZATION*

| | | | |
|---|---|---|---|
| | GS/WG | *Social Security Number* | |
| | | 1101 | 15 |
| | | *Series* | *Grade* |
| | | *Code* | |

PERFORMANCE PERIOD:  01/01/04    09/30/04          APPRAISAL YEAR   **2004**

## PLAN ESTABLISHMENT

This Plan consists of ___4___ elements.

| | **Element** | **Critical** | **Non Critical** |
|---|---|---|---|
| 1. | Works to accomplish tasks relating to achieving efficiencies in the HHS Acquisition and Small Business Program through outreach events, training and policy development and dissemination including consolidating functions in the area of acquisition in support of the Agency's mission.  Strives for Excellence | ☒ | ☐ |
| 2. | Works with others in formal teams or ad hoc groups to improve and insure that small business services are provided effectively and efficiently. | ☒ | ☐ |
| 3. | Contributes to the improvement of customer service for the Small Business Program and community. Supports the Agency's small business goals. | ☒ | ☐ |
| 4. | Completes a variety of assignments that cover a range of subject matter areas with emphasis on small business policies and procedures and acquisition activities to include implementation of Results-oriented Management. | ☒ | ☐ |

I certify that this performance plan sets forth the job elements and standards upon which the work performance of this employee will be rated.  The elements will be assessed against demonstrated contributions to meeting functionally relevant priorities.

_____        _6/15/04_
*APPRAISING OFFICIAL'S SIGNATURE*              *Date*

I have received a copy of this plan and understand that it describes the job elements and standards upon which my work performance will be rated:

_Debbie Ridgely_          _06/17/04_
*EMPLOYEE'S SIGNATURE*          *Date*

Relationship to Within-grade Increase:  At least a Fully Successful Summary Rating is required for an acceptable level of competence determination for granting a within-grade increase.



U.S. DEPARTMENT OF
HEALTH & HUMAN SERVICES

PERFORMANCE
MANAGEMENT PLAN AND RATING

## PROGRESS REVIEW

I certify that a review of progress under this plan was conducted:

_____        _____        _____
*APPRAISING OFFICIAL*                              *Date*                     *EMPLOYEE*
*Date*

_____

_____

*EMPLOYEE'S NAME (Last, First, MI)*                                    *Social Security Number*

## PERFORMANCE RATING

|  | Summary Rating | Code |
|---|---|---|
| Employee is rated unacceptable on one or more critical elements | ☐ UNACCEPTABLE | 1 |
| Employee is rated marginally successful on one or more critical elements | ☐ MARGINALLY SUCCESSFUL | 2 |
|  | ☐ FULLY SUCCESSFUL | 3 |

This Rating is    ☐ A Rating of Record        ☐ A Summary Rating

_____        _____
*APPRAISING OFFICIAL'S SIGNATURE*                         *Date*

_____    _____    _____
*EMPLOYEE'S SIGNATURE*                                   *Date*       *REVIEWER'S SIGNATURE*
*Date*
*(Indicates that a copy of summary rating was received)*          *(Required if Final Rating is "Unacceptable")*

## DOCUMENTATION OF SUMMARY RATINGS
## IF MORE THAN ONE RATING DURING THE YEAR

*Note: Complete when two or more Summary Ratings have been issued during the appraisal year.*

**SUMMARY RATING #1**
FROM (mmddyy)        TO (mmddyy)            _____ RATING        _____ DAYS
_____

**SUMMARY RATING #2**
FROM (mmddyy)        TO (mmddyy)            _____ RATING        _____ DAYS
_____

**SUMMARY RATING #3**
FROM (mmddyy)        TO (mmddyy)            _____ RATING        _____ DAYS
_____

**SUMMARY RATING #4**
FROM (mmddyy)        TO (mmddyy)            _____ RATING        _____ DAYS
_____



**PERFORMANCE**
**MANAGEMENT PLAN AND RATING**

| STANDARD LEVELS | NON-SUPERVISORY | SUPERVISORY |
|---|---|---|
| **FULLY SUCCESSFUL (LEVEL 3)** | This is the level of good, sound performance. The quality and quantity of the employee's work under this level are those of a competent employee. The performance represents a level of accomplishment expected of the great majority of employees.<br><br>Most of the employee's work requires only minor revisions. Tasks are completed in an accurate, thorough, and timely manner. The employee's technical skills and knowledge are applied effectively to specific job tasks. In completing work assignments, he or she adheres to procedures and format requirements and follows necessary instructions from supervisors.<br><br>The employee's work planning is realistic and results in completion of work by established deadlines. Priorities are duly considered in planning and performing assigned responsibilities.<br><br>The employee's interpersonal behavior toward supervisors, co-workers and clients promotes attainment of work objectives.<br><br>The employee's work products meet customer expectations. Employee provides the customer with professional and responsive service within mutually agreed upon time frames.<br><br>The employee completes special, one-time assignments when required, without regular duties being disrupted. Problems associated with completing assignments are resolved with a minimum of supervision.<br><br>The employee speaks and writes clearly and effectively. | The employee is a good leader. Establishes sound working relationships and shows good judgment in dealing with subordinate employees' views. He/She provides opportunities for staff to have a meaningful role in accomplishing organization objectives and makes special efforts to assist subordinates in improving their performance.<br><br>The employee conveys customer service objectives to subordinates, which are often met.<br><br>The employee rewards good performance and corrects poor performance through sound use of the performance appraisal system, performance-based incentives and when appropriate, adverse actions, and selects and assigns employees in ways that use their skills effectively.<br><br>The employee effectively anticipates customer needs and fosters cooperative working relationships with customers. |





| | | PERFORMANCE MANAGEMENT PLAN AND RATING |
| STAFFING LEVELS | NON-SUPERVISORY | SUPERVISORY |
|---|---|---|
| MARGINALLY SUCCESSFUL (LEVEL 2) | Several but not all of the following deficiencies are characteristic of the employee's work: <br><br> The quantity and quality of the employee's work product is sometimes below expectation. Assignments are, at times, not completed within prescribed time frames. <br><br> Occasionally, tasks are not completed in an accurate and thorough manner. The employee has had instances when deadlines were not met. Quality of work sometimes necessitates major revisions. Close supervision is sometimes necessary to ensure that organizational standards are met. <br><br> On occasion, the employee's work products do not demonstrate the use of technical knowledge and skill. Variations from policies, procedures, and instructions by the employee cause delay in the completion of his/her work or the work of others. <br><br> Errors in work planning periodically lead to the failure to meet agreed upon deadlines. Some difficulty in adapting to changes in priorities or procedures, or to new approaches to programs, causes delays and diminished quality of work, requiring supervisory intervention. <br><br> Occasionally the employee's work products fall below customer expectations and are not completed within the prescribed time frames. Customers are not kept informed of the status of projects. <br><br> The employee's behavior toward supervisor, co-workers, and/or clients poses problems and disrupts the working environment needed for cooperation and the completion of assignments. <br><br> The employee's spoken and written expression sometimes fails to convey information. | Several but not all of the following deficiencies are characteristic of the employee's work: <br><br> Sometimes fails to motivate subordinates and promote team spirit. <br><br> In some cases, provides unclear assignments and performance requirements to subordinates. <br><br> Provides insufficient instructions to subordinate on how to carry out programs. <br><br> Often fails to provide sufficient explanation of organizational goals to subordinates in meeting goals and objectives. <br><br> Often fails to satisfy and meet customer service objectives. <br><br> Frequently fails to meet production or mission goals in a timely and quality manner. |





**PERFORMANCE
MANAGEMENT PLAN AND RATING**

| STANDARD LEVELS | NON-SUPERVISORY | SUPERVISORY |
|---|---|---|
| **UNACCEPTABLE (LEVEL 1)** | Performance is below a level that meets requirements for fully successful and marginally successful (e.g., continually fails to meet deadlines and produces work that is unacceptable). | |

**Performance Plan:** *Small and Disadvantaged Business Utilization Program Manager*

**HEALTH & HUMAN SERVICES**

PERFORMANCE
MANAGEMENT PLAN AND RATING

*Location of Office:  ASAM/Office of Acquisition Management and Policy*

### Element 1

Works to accomplish tasks relating to achieving efficiencies in the HHS Acquisition System and Small Business Program through outreach events, training and policy development and dissemination.including consolidating functions in the area of acquisition in support of the Agency's mission.    Strives for Excellence.

> Initiative #6 – ADMINISTRATIVE EFFICIENCIES
> ✓ Works to achieve procurement consolidation across divisions to maximize resources
>
> Initiative #9 – ACHIEVE EFFICIENCIES THROUGH HHS-WIDE PROCUREMENTS.
> ✓ Works to support achievement of the Department's goal to meet or exceed every small business goal.
> ✓ Works to devise other initiatives and innovative techniques to increase efficiency by implementing a systematic approach to program evaluation for HHS programs to achieve regular independent and quality evaluations to indicate that the program is effective and achieving results.

Meets established goals and deadlines.  Uses effective judgement in the performance of duties.  Seeks guidance and support from supervisor or team leaders as appropriate.  Devises or solicits effective solutions to problems and appropriate procedures for accomplishing objectives.

Shows initiative in starting, carrying out, and completing tasks.  Seeks alternative solutions and creative approaches to problem solving. Takes into consideration new ideas and differing opinions.  Creates opportunities to add value.  Finds ways to make a difference, does not wait to be told what to do.  Requires little day-to-day direction to complete projects.  Manages own career proactively.

Follows and supports established procedures, directives, regulations or policies. Supports division, office and Agency goals.  Exhibits collegiality.  Works well with other individuals, groups and organizations for the success of the mission and goals.  Treats others professionally, courteously and respectfully.

Communicates clearly and effectively, both orally and in writing.  Seeks other opinions, as appropriate, in producing work products.  Keeps supervisor, team leaders and team members informed of changes, progress, and barriers to progress, as appropriate.  Adjusts communication style to the needs of the recipients. Openly communicates opinions and provides candid, constructive feedback when appropriate.

Demonstrates a commitment to quality.  Accepts responsibility in the performance of work activities.  Displays understanding of how the job is related to other Agency work.  Submits work products that are understandable, organized and thorough.  Supports work products with technical evidence and research.

 PERFORMANCE
MANAGEMENT PLAN AND RATING

### Element 2

*Works with others in formal teams or ad hoc groups to improve and insure that small business services are provided. effectively and efficiently.*

*Ensures that work products are in sync with HHS goals, objectives and with work performed by other teams. Provides assistance to other members of the Office of Acquisition Management in various areas, including*

Participates actively in team efforts. Works with others to develop and implement solutions to problems. Assists others in meeting objectives. Actively looks for ways to contribute to the group effort.

Shares information willingly. Shares credit, recognition, and visibility with others. Supports and promotes team decisions and initiatives. Places team goals ahead of individual plans.

### Element 3

*Contributes to the improvement of customer service for the Small Business Program and Community. Supports the Agency's small business goals. Interacts with multiple customer organizations (both internal and external). Assists in the development of methods and procedures for dealing with customers, including educational and marketing materials about products and services. Actively learns about customer organizations and situations in order to be proactive in developing solutions to issues. Assists and encourages peers in their dealings with customers.*

Facilitates communication with customers regarding requests, work products, and services. Refers customers to appropriate sources for information and guidance. Finds or solicits solutions to customer problems. Addresses customer requests in a timely manner. Demonstrates positive manners in telephone and face-to-face contacts.

Designs work products with customer needs in mind. Obtains customer input to, and feedback on, work products as they are developed and finalized. Recognizes the need for customer involvement in work products to ensure project success. Regularly solicits feedback from customers to make changes and obtain guidance.

- Works to add value to customer organization from Acquisition Services.

### Element 4

*Completes a variety of assignments that cover a range of subject matter areas with emphasis on small business policies and procedures and acquisition activities to include implementation of Results-oriented Management.*

**U.S. DEPARTMENT OF**
**HEALTH &**
**HUMAN SERVICES**

PERFORMANCE
MANAGEMENT PLAN AND RATING

*Provide Advice and technical assistance on matters relating to HHS Small Business and Acquisition programs, workforce development issues, monitoring adoption of acquisition policies by the Department's OPDIVs, conducting performance measurement of Department's procurement systems, making studies of new policies or revision of current policies, including application of Departmental Management controls, serving as the Department's liaison in the area of acquisition and maintains working relationships with OMB, GSA, GAO, and other Federal Agencies, and conducting special projects to develop improved mechanisms for Departmentwide management of acquisition programs.*

- **INITIATIVE #1 – IMPLEMENT RESULTS-ORIENTED MANAGEMENT**
    - ✓ *Identify long term outcomes for HHS acquisition programs and include these goals in the FY 2005 agency annual performance plans.*
    - ✓ *Model private industry "Best Practices" for performance metrics and assess acquisition program outcomes.*



Insert Progress Review(s) Here



PERFORMANCE
MANAGEMENT PLAN AND RATING

Insert Overall Assessment Here




## HHS SENIOR EXECUTIVE SERVICE PERFORMANCE PLAN

| EXECUTIVE'S NAME | APPRAISAL PERIOD |
|---|---|
| MARC R. WEISMAN | 10/01/03-09/30/04 |

| ORGANIZATION | POSITION TITLE |
|---|---|
| Office of Administration and Management | Acting Director, Office of Acquisition Management and Policy/Acting Director, Strategic Acquisition Service |

I.    PERFORMANCE DEFINITIONS
Fully Successful (FS): Expectations are met or exceeded.
Minimally Satisfactory (MS): Performance is marginally acceptable; needs improvement.
Unsatisfactory (U): Undeniably unacceptable performance.

II.    LEADERSHIP IN SUPPORT OF AGENCY STRATEGIC INITIATIVES – *CRITICAL ELEMENT*
Leads in a proactive, customer-responsive manner consistent with ASAM/PSC vision and values, effectively communicating program issues to external audiences. Demonstrates prudence and the highest ethical standards when executing fiduciary responsibilities. Uses effective business practices including balanced measure of results; values and invests in each employee; provides fair and equitable recognition and equal opportunity; emphasizes empowerment, two-way communication and Teamwork.

FS_____ MS_____U_____

*"ONE HHS" END-OUTCOME GOALS OF ASAM – CRITICAL ELEMENT*

FS_____MS_____U_____

III.    PERFORMANCE AGREEMENT – *CRITICAL ELEMENT*
Performance Requirement: Accountable for key initiatives contributing to the success of ASAM/PSC, effectively achieving results-oriented goals in sync with ASAM's and PSC's Strategic Goals, successfully accomplishing interim milestones for long-term activities. Performance is of high quality and integrity, efficient, effective, producing significant benefits. Results provide customers, internal and external, services equal or superior to that in comparable sectors. Is committed to enhancing support for and understanding of HHS/ASAM OAMP and PSC goals. Fosters effective improvements. Outputs reflect balanced consideration of the public's and other stakeholders' concerns.

| KEY INITIATIVES | FS | MS | U |
|---|---|---|---|
| **A. IMPLEMENT RESULTS-ORIENTED MANAGEMENT (Business Strategy & Innovations, Customer Service, Cost Management, Workforce Excellence)** | | | |
| ✓ Guide Operating Divisions in developing long-term outcomes for HHS acquisition programs and include these goals in FY 04 agency annual performance plans. | | | |
| ✓ Model private industry "best practices" for performance metrics and assess Department acquisition program outcomes. | | | |
| ✓ Ensure that processes are in place to implement the PSC Logic Model and to clearly measure the PSC Key Performance Indicators successfully at the individual business lines. Ensure that measures are met within reasonable levels as they apply to improving PSC Services. Asset Management (Cost, People, Capital) and Pursue new Business Opportunities. | | | |
| ✓ Implement the new PSC Performance Management System clearly linking performance to the Department and PSC Strategic goals and Performance Contracts. | | | |
| ✓ Ensure full participation and mandatory attendance for PSC Continuous Customer Service Training. | | | |
| ✓ Ensure that at least one PSC Innovation Council recommendation is adopted and successfully implemented annually. | | | |
| **B. IMPLEMENT STRATEGIC HUMAN CAPITAL MANAGEMENT (Workforce Excellence).** | | | |
| ✓ Begin to assess SAS workforce in relationship to buy-outs and restructuring and develop plan by 09/30/04. | | | |
| ✓ Review HRMI statistics for SAS and develop action plan based on results by 9/30/04. | | | |
| **C. ADMINISTRATIVE EFFICIENCIES (Business Strategy & Innovation, Customer Service, Communication).** | | | |
| ✓ Consolidate purchases of office supplies and other expendable commodities within one procurement office, i.e. Center of Excellence. | | | |
| ✓ Conduct Department strategic sourcing pilot and evaluate outcomes by 03/31/04. | | | |
| ✓ Develop and begin implementation of the Department strategic sourcing capability for at least two types of commodities by 06/30/04. | | | |
| ✓ Oversee the on-time and within-budget leasing of a new PSC-SSC warehouse facility by 09/30/04. | | | |
| ✓ Judiciously control SAS overhead, operational and internal costs, and understand the competition from cost, technology and best practice perspectives. In FY04, explore at least one strategic partnership, customer expansion strategy, overhead reduction strategy or cost controlling method and be able to exhibit how this | | | |

| | | | | |
|---|---|---|---|---|
| | share these results with customers. | | | |
| ✓ | Develop and implement PSC Customer Account Representative program with designated OPDIV(s), establishing baseline satisfaction statistics. Show improvement to overall baseline or resolution of OPDIV specific problems by 09/30/04. | | | |
| ✓ | Support implementation of PSC communications plan and participate to the fullest extent. Based on feedback, develop action plan for further refinement by 9/30/04. | | | |
| **D. CONSOLIDATE MANAGEMENT FUNCTIONS  (Cost Management)** | | | | |
| ✓ | Achieve procurement consolidation across divisions to maximize resources. Decrease duplicative contract work and move appropriate common work to a Center(s) of Excellence. | | | |
| **E. ACHIEVE EFFICIENCIES THROUGH HHS-WIDE PROCUREMENTS** | | | | |
| | Lead HHS in reverse auctions and consolidated procurements.  Obtain 20% increase. | | | |
| | Meet or exceed  the Department's Small Business goals. | | | |

**I.  SIGNATURES AND DATES OF PERFORMANCE MANAGEMENT ACTIVITIES**

**Establish Plan:**  _____        _____

                   *Supervisor*               *Executive*         *Date*

**Progress Review:**  _____        _____

                   *Supervisor*               *Executive*         *Date*

**Initial Rating:**    Fully Successful _____     Minimally Satisfactory _____     Unsatisfactory _____

                   *Supervisor*                 *Executive*          *Date*

**Recommended
Summary Rating:** Fully Successful _____     Minimally Satisfactory _____     Unsatisfactory _____

                   *Chair, Performance Review Board*

**Annual Summary
Rating:**        Fully Successful _____     Minimally Satisfactory _____     Unsatisfactory _____

                   *OPDIV Head (xxx)*

I.

## EMPLOYEE PERFORMANCE MANAGEMENT PLAN AND RATING

Holmes Martin, Arthuretta L.
EMPLOYEE'S NAME (LAST, FIRST, MI)

SSN [2][0][9] − [5][2] − [8][2][6][4]

Procurement Analyst
POSITION TITLE

GS/WG - [1][1][0][2] − [1][4]

OS/ASAM/Office of Grants and Acquisition Management
ORGANIZATION

Appraisal Year 2002

### PLAN ESTABLISHMENT

This Plan consists of __4__ elements.

☑ The total weight of all job elements is 100 points.

☑ The total weight of all critical job elements is greater than total weight of all non-critical job elements (i.e., at least 51 points).

☑ The lowest weighted critical element ____(points) has a higher weight than the highest weighted non-critical element (____ points).

I certify that this performance plan sets forth the job elements and standards upon which the work performance of this employee will be rated:

_Debbie Ridgely_ ___08/27/02___ _Mark Weisman_ __8/27/02__
APPRAISING OFFICIAL'S SIGNATURE    DATE    REVIEWER'S SIGNATURE    DATE

I have received a copy of this plan and understand that it describes the job elements and standards upon which my work performance will be rated.

_Arthuretta Holmes_ ___9/7/02___
EMPLOYEE'S SIGNATURE    DATE

Relationship to Within-grade increase: At least a Fully Successful Summary Rating is required for an acceptable level of competence determination for granting a within-grade increase.

### PROGRESS REVIEW

I certify that a review of progress under this plan was conducted:

_____    _____    _____    _____
RATER    DATE    EMPLOYEE    DATE

## PERFORMANCE RATING

| | SUMMARY RATING: | | POINT RANGE: | | LEVEL OF PERFORMANCE | | CODE |
|---|---|---|---|---|---|---|---|
| _____ | _____ UNACCEPTABLE --- | | 100-199 ---.OR | Employee is rated unacceptable on one or more critical elements | ☐ --- | | N |
| | MARGINALLY SUCCESSFUL | --- | 200-299 ---.OR | Employee is rated marginally successful on one or more critical elements | ☐ --- | | K |
| _____ | _____ FULLY SUCCESSFUL | --- | 300-399 ---. | _____ | ☐ --- | | G |
| | _____ EXCELLENT | --- | 400-460 ---. | _____ | ☐ --- | | D |
| ✓ | _____ OUTSTANDING | --- | 461-500 ---. | *500* | ☐ --- | | A |

I derived this summary rating on the following basis (check one):

☑ Rating the job elements in the attached plan.

☐ Consolidating the attached summary ratings (Document below the method used to consolidate summary ratings.)

This Rating is    ☑ A Rating of Record    ☐ A Summary Rating

*Deboria Ridgely*                    *03/13/03*
APPRAISING OFFICIAL'S SIGNATURE         DATE

*Marc R. Derman*                    *4-30-03*
REVIEWER'S SIGNATURE                 DATE

_____    _____
MANAGER OF PERFORMANCE     DATE
BUDGET SIGNATURE

*Whitnella Martin*                  *5-5-03*
EMPLOYEE'S SIGNATURE                 DATE

(Indicates that a copy of summary rating was received)

Comments:

ELEMENT#  01        EPMS JOB ELEMENT        ✓ Check if critical

_____ [ DESCRIPTION ] _____

Plans, coordinates, and conducts staff studies and special projects. Develops and recommends Department-wide policies and procedures, inspects and evaluates program efforts and accomplishments. Serves as project leader for special studies and program evaluations. Participates as a departmental representative in study groups with SBA, GSA, Commerce and other federal agencies to evaluate government-wide programs. Reviews proposed revisions to the Federal Acquisition Regulation and the HHS Acquisition Regulations which impact on the Department's small business program. Serves as the focal point for all complaints or inquiries from the small business community on matters involving the department and resolves the problems. In the absence of the Director, assumes certain delegated duties and responsibilities of that position.

_____ [ STANDARDS ] _____

**Outstanding:** Consistently exceeds the Director's expectations in all areas of responsibility in a courteous and professional manner. Takes the initiative to enhance and improve those areas of responsibility without management direction. Is successful with follow-through in implementing new and innovative ideas that have improved the overall functioning of the OSDBU. Always keeps OSDBU Director informed on the status of work products. Fully committed to working as a team member for the benefit of the office.

**Excellent:** Exceeds the goals and objectives established for the position. Accomplishes tasks in a courteous and professional manner. Routinely identifies and recommends improvements to the Director on how to improve the overall effectiveness of the office. Keeps the OSDBU Director informed on the status of work products. Participates as a team member.

**Fully Successful:** Completes assigned tasks in a timely and efficient manner. Is courteous and professional in the manner in which tasks are completed. Regularly keeps OSDBU Director informed on the status of work products. Participates as a team manner.

**Marginally Successful:** Completion of tasks rarely on time. OSDBU Director must follow-up with employee reminding them of due dates. Work product normally requires extensive revisions. Takes few initiatives in the enhancement of program areas. Customers have complained about work products or timeliness. Rarely works as a team player.

**Unacceptable:** Work Product and tasks are almost always late or incomplete. Employee takes no initiative and does not follow-through on work assignments. Employee is unable and unwilling to follow instructions given by Director. Refuses to be a team player.

_____ [ SCORE ] _____

Weight: *40*   X   Value: *5*   =   Score: *200*

ELEMENT #  1          EPMS JOB ELEMENT (Continued)

_____ **[ PROGRESS REVIEW NARRATIVE ]** _____

_____ **[ SUMMARY NARRATIVE ]** _____

**ELEMENT# _2_**                           EPMS JOB ELEMENT                      ✓ Check if critical

_____ **[ DESCRIPTION ]** _____

Works to accomplish tasks or provide services effectively and efficiently in support of the Agency's mission. Strives for excellence.

_____ **[ STANDARDS ]** _____

**Work planning/time management** --Meets established goals and deadlines. Uses effective judgement in the performance of duties. Seeks guidance and support from supervisor or team leaders as appropriate. Devises or solicits effective solutions to problems and appropriate procedures for accomplishing objectives.

**Risk-taking, initiative and innovation** -- Shows initiative in starting, carrying out, and completing tasks. Seeks alternative solutions and creative approaches to problem solving. Takes into consideration new ideas and differing opinions. Creates opportunities to add value. Finds ways to make a difference, does not wait to be told what to do. Requires little day-to-day direction to complete projects. Manages own career probatively.

**Manner of performance** -- Follows and supports established procedures, directives, regulations or policies. Supports division, office and Agency goals. Exhibits collegiality. Works well with other individuals, groups and organizations for the success of the mission and goals. Treats others professionally, courteously and respectfully.

**Communication** -- Communicates clearly and effectively, both orally and in writing. Seeks other opinions, as appropriate, in producing work products. Keeps supervisor, team leaders and team members informed of changes, progress, and barriers to progress, as appropriate. Adjusts communication style to the needs of the recipients. Openly communicates opinions and provides candid, constructive feedback when appropriate.

**Quality and accountability** -- Demonstrates a commitment to quality. Accepts responsibility in the performance of work activities. Displays understanding of how the job is related to other Agency work. Submits work products that are understandable, organized and thorough. Supports work products with technical evidence and research.

_____ STANDARDS _____

**Outstanding:** Always meets expected deadlines, with the only exception being when managers and customers have been fully notified of a problem or issue that requires a schedule change. Work products are always of professional quality and meet the goals and objectives of the project. Provides factual information, research and content for the development of briefings to the organization=s most senior customers and executives.

Works with senior managers and team leaders to eliminate barriers to success by developing and implementing innovative approaches for completing projects. Is known by customers and executives as a full contributor to the mission of the office.

**Excellent:** Always meets expected deadlines, with the only exception being when managers and customers have been fully notified of a problem or issue that requires a schedule change. Work products typically require little or no revision and meet the project requirements. Works diligently and independently, while keeping senior management and team members informed of progress. Recognized by managers and staff as a major contributor to projects. Works within established procedures and regulations and conveys them to peers.

**Fully Successful:** Regularly meets established deadlines with acceptable work products. Notifies customer or manager when deadlines are not feasible or when barriers to work completion exist. Works with team and management to find solutions to problems and barriers. Incorporates review and comment from managers and customers into work products. Serves as the direct liaison between the office and the customers for projects. Keeps management apprized of developments in projects and of customer requests. Relies on established procedures and regulations for producing work products. Looks to managers and more senior staff for solutions to issues and problems with work products.

**Marginally Successful:** Has had several instances when deadlines have not been met and when managers were not kept informed of issues or problems. Does not always understand or adhere to established procedures and regulations when performing or completing work assignments. Requires ongoing direction from team leader or manager to accomplish work products. Sometimes uses established procedures and regulations as excuses for not trying new and innovative approaches. For the most part, work products are complete but require some revision to help them better address the objective or to be more professionally presented. Needs to communicate with team members and customers more regularly to ensure that everyone is kept abreast of progress and potential issues or barriers to success. Is likely to assume that a project cannot be performed successfully before exhausting all avenues or asking managers and senior staff for solutions. Is viewed by management and peers as just doing the minimum to get by. Submits work products that do not address the objectives completely or are lacking in technical support or documentation.

**Unacceptable:** Often misses established deadlines without notifying the team leader or customer. Continually fails to utilize or follow established procedures or regulations. Fails to communicate with team members, management and customers or communicates in a manner that is not fully informative or appropriate for the recipient. Requires extensive and ongoing direction from managers and other team members in order to perform work. Cannot be counted on for a completed work product  team members and managers most often have to make significant revision and additions in order to complete the product. Team members would rather do the work themselves than rely on this person for his or her contributed

_____ **[ SCORE ]** _____

ϳ

Weight: _20_  X  Value: _5_  = Score: _100_

ELEMENT # 2                              EPMS JOB ELEMENT                              (Continued)

_____ [ PROGRESS REVIEW NARRATIVE ] _____

_____ [ SUMMARY NARRATIVE ] _____

ELEMENT# __3__                   EPMS JOB ELEMENT                   ✓ **Check if critical**

_____ **[DESCRIPTION ]** _____

**Teamwork:** Works with others in formal teams or ad hoc groups to accomplish tasks or provide services effectively and efficiently. Ensures that work products are in sync with HHS goals, objectives and with work performed by other teams. Provides assistance to other members of the Office of Grants and Acquisition as needed.

_   **Cooperation** -- Participates actively in team efforts. Works with others to develop and implement solutions to problems. Assists others in meeting objectives. Actively looks for ways to contribute to the group effort.

_   **Commitment to team effort** -- Shares information willingly. Shares credit, recognition, and visibility with others. Supports and promotes team decisions and initiatives. Places team goals ahead of individual plans.

_____ **[ STANDARDS ]** _____

**Outstanding:** Actively seeks opportunities to participate on teams for solving problems and meeting Agency objectives. Suggests innovative ways to encourage team interaction. Speaks up in group meetings with suggestions, brainstorm ideas, personal experiences, etc., are considered especially constructive. Brings innovative suggestions and solutions, rather than problems, for group consideration. Actively informs team of new data, publications, etc., relevant to team=s work. Makes as much time as possible available to assist others, within limits of own job duties. In a team effort, does substantially more than his/her share of the assigned work. Is rated by coworkers and management as someone who encourages group cooperation and is generous in sharing credit.

**Excellent:** Regularly attends or leads team meetings. Informs group in advance about absence or conflicts. Makes time available to assist others, within limits of own job duties. Speaks up in group meetings with suggestions, brainstorm ideas, personal experiences, etc., that are considered especially constructive. Brings suggestions and possible solutions, rather than problems, for group consideration. Actively informs team of new data, publications, etc., relevant to team's work. Is rated by coworkers as especially cooperative, willing to share in group effort and credit.

**Fully Successful:** Attends or leads team meetings regularly. Makes time available to assist others, within limits of own job duties. Speaks up appropriately in group meetings with suggestions, brainstorm ideas, personal experiences, etc., that are considered constructive, not negative. Is rated by coworkers as cooperative, willing to share in group effort and credit. Willingly assists OGAM staff members and all clients by providing correct and timely information.

**Marginally Successful:** Attends team meetings unreliably. Fails to act or lead in team meetings unless directed to do so. Makes little time available to assist others. Only performs team support activities, e.g. note-taking, scheduling, distributing minutes, etc., when assigned. Speaks up occasionally in group meetings with suggestions, brainstorm ideas, personal experiences, etc. Comments are often negative, not constructive. Is rated by coworkers as seldom cooperative, or even as someone who claims more credit than is due. Occasionally refuses to assist or handle issues directed to the Office of Grants and Acquisition Management.

**Unacceptable:** Seldom attends team meetings. Rarely assists others. Avoids performing team support activities. Seldom speaks up in group meetings. Comments are typically negative, not constructive. Is rated by coworkers as generally uncooperative, or even as someone who claims more credit than is due. Constantly refuses to help staff members and unwillingly provides assistance to clients in areas not normally assigned to the employee.

_____ **[ SCORE ]** _____

Weight: __20__     X     Value: __5__     =     Score: __100__

ELEMENT # __03__                    EPMS JOB ELEMENT                    (Continued)

_____ [ PROGRESS REVIEW NARRATIVE ] _____

_____ [ SUMMARY NARRATIVE ] _____

**ELEMENT#  04**                         EPMS JOB ELEMENT                    ✓ Check if Critical

<u>Customer Service</u>: Demonstrates knowledge of the importance of customer service to the Agency=s goals. Interacts with multiple customer organizations (both internal and external). Assists in the development of methods and procedures for dealing with customers, including educational and marketing materials about products and services. Actively learns about customer organizations and situations in order to be proactive in developing solutions to issues. Assists and encourages peers in their dealings with customers.

_____[STANDARDS ] _____

**Outstanding :** Customers ask for this person by name because of the excellent quality of services provided. Looked to by other staff for guidance in dealing with customer complaints or issues. Deals with irate customers in a calm and courteous manner. Offers suggestions and solutions without being argumentative. Has gone above and beyond the call of duty@ in answer to customer requests and has been acknowledged by customers as having done so.

**Excellent :** Makes suggestions for the simplification of interactions with customers and for education materials based on personal experiences with customers. Takes a practice approach in looking for solutions to customer issues. Customers value this person=s input and look to them for guidance and solutions. Customers consistently state that this person provides practice, timely and high quality information and products.

**Fully Successful** Responds to customer inquiries within the established norms. Customers (both internal and external) state that they are pleased with their interactions and the level of service they receive from this person. Recognizes internal customers and treats them with the same respect as external customers. Regularly ensures work products incorporate customer input and review.

**Marginally Successful B** Customers have complained about poor work products or lack of timeliness in responding to requests. Often claims to be too busy to be able to address customer concerns in a timely manner. Does not always take care to ensure that he/she understands customer requests so work products and responses do not always meet the request. Frequently refers customer issues and requests to others rather than address them personally. Fails to incorporate customer input and feedback into the development of work products.

**Unacceptable B** Frequently fails to respond to customer calls or requests. Customers complain about the lack of response and the poor quality of responses and work products. Customers frequently request to speak to someone other than this individual. Unable or unwilling to assist other staff in solving customer issues.

_____ [ SCORE ] _____

Weight: _20_  X  Value: _5_  =  Score: _100_

Arthuretta Martin
Summary Narrative for Elements #1-4

Ms. Martin has done an outstanding job in supporting and promoting the Small
Business Program at HHS. Since issuing the Departmental Subcontracting
Policy in February 2002, she has worked on a daily basis to educate the Small
Business Specialists, the Contracting Officers and the Program Office personnel.
In addition, she has worked with our prime contractors and small business
subcontractors to educate, monitor and explain the regulations, policies and
procedures. The depth and breadth of this effort has been far greater than
anticipated.

Ms. Martin also conducted some special studies in the area of public relations
and media advertising. As a result of her analysis, she conducted an extremely
successful Outreach Event that brought together Small Business Vendors, Prime
Contractors and Program Office personnel. The groups exchanged information
and had the opportunity to network with one another.

Ms. Martin also conceived and championed a Health Disparities Roundtable.
She devoted a considerable amount of time and effort in bringing together key
stakeholders from inside of the Department as well as, significant players on the
outside. Even though this project has been put on hold, she deserves much
credit for the outstanding effort that she put forth.

Ms. Martin is a very strong advocate for the small business community. She
represents the true interests' of the small business vendor in everything she
undertakes. She represents the Department on numerous interagency work
groups and councils.

Recommend an Outstanding Rating ("5") for all four elements.



DEPARTMENT OF HEALTH AND HUMAN SERVICES
Office of the Secretary and Administration on Aging

**PERFORMANCE ASSESSMENT AND RECOGNITION SYSTEM (PARS)**

# Performance Evaluation Plan (PEP)

**PART I: IDENTIFYING INFORMATION**

| EMPLOYEE'S NAME: Arthuretta L. Holmes Martin | SSN: ▆▆▆▆▆▆▆ |
|---|---|

| POSITION TITLE: Procurement Analyst | SERIES: GS-1102 | GRADE: 14 |
|---|---|---|

ORGANIZATION: DHHS/OS/ASMB/OGAM/Office of Grants Management

**PART II: PERFORMANCE PLAN**

| SET AND APPROVED | FOR THE PERIOD: 07/31/01 | TO: 12/31/01 |
|---|---|---|

| RATING OFFICIAL SIGNATURE: *Debbie Ridgely* | DATE: 07/31/01 |
|---|---|
| EMPLOYEE SIGNATURE: | DATE: 7/31/01 |

**PART III: MIDYEAR PROGRESS REVIEW**

| DATE REVIEW CONDUCTED: 07/31/01 | RATING OFFICIAL SIGNATURE: *Debbie Ridgely* | EMPLOYEE SIGNATURE: |
|---|---|---|

COMMENTS:

**MIDYEAR PROGRESS REVIEW**

**PART IV: FINAL RATING**

FINAL RATING:

[✓] Meets Performance Measures          [ ] Unacceptable

| RATING OFFICIAL SIGNATURE: *Debbie Ridgely* | DATE: 01/24/02 |
|---|---|
| EMPLOYEE SIGNATURE: | DATE: 01/24/02 |
| REVIEWING OFFICIAL SIGNATURE: (Required if Final Rating is "Unacceptable") | DATE: |

COMMENTS: (Required if Final Rating is "Unacceptable")

**Performance Evaluation Plan (PEP)**
**Directions**

Column 1      The element, a brief description of the element's objective, and the final rating for that element. Each plan must contain at least two (2) elements, of which at least one (1) must be a generic element. Space is provided in which the supervisor can add up to two (2) additional elements for specific tasks or goals, if necessary to accurately evaluate performance. Such elements must be in the same format as the three generic elements and include at least two (2) performance measures.

Column 2      Measures for the element. Measures are written for the "Meets Performance Measures" level.

In planning employee goals, the supervisor and employee shall discuss elements for the year and those measures appropriate for the objective of the element and for the employee. Those measures for which the employee is to be appraised are checked in the boxes to the left of the measures. At least two (2) generic performance measures shall be selected for each generic element included in a plan. Space is also provided in which the supervisor can add additional individualized measures, if necessary to accurately measure performance within the element. The supervisor and employee shall discuss what is expected in each of these measures based on the individual employee's work responsibilities. There is a space below the measures beginning with the phrase "As demonstrated by" in which the supervisor can add examples of performance for the measures above, such as: "Routinely answers correspondence by due dates," or "With few exceptions, completes case work within established time frames."

Measures and examples of performance must be objective, explicit, observable or measurable, and attainable. In addition, measures and examples of performance may not be expressed in absolute terms. If examples of performance containing numerical goals are used, such goals should be stated either as a range (e.g., "completes 15 - 20 cases") or make clear, if a single number is used, that it is a floor for achieving a "Meets Performance Measures" rating (e.g., "completes at least 15 cases.")

Column 3      Progress Review notes. A "✓" is placed in this column for a specific performance measure which the supervisor perceives as an area of weakness or area s/he feels an employee needs to concentrate on until the next progress review or for the remainder of the rating period. A "✓" will only be placed in this column following a documented discussion between the employee and supervisor about specific ways in which the employee can improve and the assistance to be given the employee to provide her/him an opportunity to succeed. When the employee's performance improves and reaches the "Meets Performance Measures" level, the "✓" will be removed and a page without the "✓" will be substituted in the employee's PEP.

Column 4      The performance measure rating.

If the employee "Exceeds Performance Measures" for a specific measure, a "3" will be placed in this column at the end of the rating period. This level surpasses the requirements specified in the "Meets Performance Measures" level in the PEP. It is reserved for exceptional contributions.

If the employee "Meets Performance Measures" for a specific measure, a "2" will be placed in this column at the end of the rating period. This is the level of performance needed to successfully accomplish all of the performance measures.

If the employee is "Unacceptable" for a specific measure, a "1" will be placed in this column at the end of the rating period. Performance is rated at this level when it does not meet the requirements in the "Meets Performance Measures" level.

**Rating Levels**

**Deriving Element Ratings**      The rating level for each element is determined by averaging the ratings of all the applicable performance measures within the element, as shown in Column 4. Exceeds = "3," Meets ="2," and Unacceptable = "1, ". An average of ".5" or better is rounded up to the next whole number. Ratings for elements are based on whole numbers.

**Deriving Final Ratings**      A "✓" is placed in the appropriate box in "Part IV: Final Rating":

Meets Performance Measures      If all **elements** are rated "Meets Performance Measures" or "Exceeds Performance Measures," the final rating level is "Meets Performance Measures."

Unacceptable      If any **element** is rated "Unacceptable," the final rating is "Unacceptable."

**Performance Evaluation Plan (PEP)**

| ELEMENTS | PERFORMANCE MEASURES | M I D Y E A R | Final Measures Ratings |
|---|---|---|---|
| | Standards for "Meets Performance Measures"<br>1. Check all measures for which the employee will be rated.<br>2. Add additional measures after the bullets, if needed.<br>3. Define a measure further on the "As demonstrated by" line, if needed. | | 3 - Exceeds<br>2 - Meets<br>1 - Unacceptable |
| [✓] **Individual Work**<br><br>*Works to accomplish tasks or provide services effectively and efficiently in support of the Agency's mission. Strives for excellence.*<br><br>**Final Element Rating**<br>[✓] Exceeds<br>[ ] Meets<br>[ ] Unacceptable | [✓] **Work Planning/Time Management** *(Examples may include, as appropriate):*<br><br>• Plans work to meet established goals/results<br>• Uses effective judgement in the performance of duties<br>• Devises effective solutions to problems and appropriate procedures for accomplishing objectives<br>• Seeks guidance and support from supervisor or team leader(s)<br>• Adapts to changes in workload and priorities<br>• Completes work within established deadlines<br><br>• As demonstrated by: | 3 | 3 |
| | [✓] **Risk-taking, Initiative and Innovation** *(Examples may include, as appropriate)*<br><br>• Shows initiative in starting, carrying out, and completing tasks<br>• Seeks alternative solutions and creative approaches to problem solving<br>• Takes necessary and appropriate risks<br>• Takes into consideration new ideas and differing opinions<br>• Treats mistakes as learning opportunities<br><br>• As demonstrated by: | 3 | 3 |
| | [✓] **Manner of Performance** *(Examples may include, as appropriate):*<br><br>• Follows established procedures, directives, regulations or policies<br>• Supports division, office and agency goals<br>• Exhibits collegiality; works well with other individuals, groups and organizations for the success of mission and goals<br>• Deals with customers effectively<br>• Treats others professionally, courteously and respectfully<br>• Treats change as an opportunity for growth<br><br>• As demonstrated by: | 3 | 3 |
| | [✓] **Communication** *(Examples may include, as appropriate):*<br><br>• Communicates clearly and effectively, both orally and in writing<br>• Seeks other opinions in producing work products<br>• Keeps supervisor, team leader(s) and team members informed of changes, progress and barriers to progress<br><br>• As demonstrated by: | 3 | 3 |

| | | | |
|---|---|---|---|
| [✓] **Technical Competency**<br><br>*Knowledge skills and abilities.*<br><br>**Final Element Rating**<br>[✓] Exceeds<br>[ ] Meets<br>[ ] Unacceptable | [✓] **Technical Competency** *(Examples may include, as appropriate):*<br><br>• Demonstrates expertise in area(s) of responsibility<br>• Keeps abreast of current developments within area(s) of responsibility<br>• Applies technical knowledge to achieve sound results<br><br>• As demonstrated by: | 3 | 3 |
| | [✓] **Quality and accountability** *(Examples may include, as appropriate):*<br><br>• Demonstrates a commitment to quality<br>• Accepts responsibility in the performance of work activities<br>• Displays understanding of how job related to other work<br>• Submits work products that are understandable, well-organized and thorough<br><br>• As demonstrated by: | 3 | 3 |
| [✓] **Teamwork**<br><br>*Works with others either in formal teams or ad hoc groups to accomplish tasks or provide services effectively and efficiently.*<br><br>**Final Element Rating**<br>[✓] Exceeds<br>] Meets<br>[ ] Unacceptable | [✓] **Cooperation** *(Examples may include, as appropriate):*<br><br>• Participates actively in team efforts<br>• Works with others in developing and implementing solutions to problems<br>• Assists others in meeting objectives<br><br>• As demonstrated by: | 3 | 3 |
| | [✓] **Commitment to Team Effort** *(Examples may include, as appropriate):*<br><br>• Shares information willingly<br>• Shares credit, recognition, and visibility with others<br>• Supports and promotes team decisions and initiatives<br>• Completes assignments within established time frames<br><br>• As demonstrated by: | | |
| [ ] **Specific Task or Goal**<br><br><br>**Final Element Rating**<br>[ ] Exceeds<br>[ ] Meets<br>[ ] Unacceptable | •<br>•<br>•<br>•<br><br>• As demonstrated by: | | |

| [ ] Specific Task or Goal | • | | |
|---|---|---|---|
| | • | | |
| | • | | |
| | • | | |
| Final Element Rating | • As demonstrated by: | | |
| [ ] Exceeds | | | |
| [ ] Meets | | | |
| [ ] Unacceptable | | | |



DEPARTMENT OF HEALTH AND HUMAN SERVICES
Office of the Secretary and Administration on Aging

**PERFORMANCE ASSESSMENT AND RECOGNITION SYSTEM (PARS)**

# Performance Evaluation Plan (PEP)

| PART I: IDENTIFYING INFORMATION | | |
|---|---|---|
| EMPLOYEE'S NAME:<br>**Arthuretta L. Holmes Martin** | SSN: | |
| POSITION TITLE:<br>**Procurement Analyst** | SERIES:<br>**GS-1102** | GRADE:<br>**14** |
| ORGANIZATION:<br>**DHHS/OS/ASMB/OGAM/Office of Grants Management** | | |

| PART II: PERFORMANCE PLAN | | |
|---|---|---|
| **SET AND APPROVED** | FOR THE PERIOD:<br>MAR – 9 2000 | TO:<br>10/31/00 |
| RATING OFFICIAL SIGNATURE: | | DATE:<br>3/8/00 |
| EMPLOYEE SIGNATURE: | | DATE:<br>3/8/00 |

| PART III: MIDYEAR PROGRESS REVIEW | | |
|---|---|---|
| DATE REVIEW CONDUCTED:<br>July 13, 2000 | RATING OFFICIAL SIGNATURE: | EMPLOYEE SIGNATURE: |
| COMMENTS:<br>**MIDYEAR PROGRESS REVIEW** Progress to date has been satisfactory. | | |

| PART IV: FINAL RATING | |
|---|---|
| FINAL RATING:<br>[✓] Meets Performance Measures        [ ] Unacceptable | |
| RATING OFFICIAL SIGNATURE: | DATE:<br>1-02-01 |
| EMPLOYEE SIGNATURE: | DATE:<br>1-19-01 |
| REVIEWING OFFICIAL SIGNATURE: *(Required if Final Rating is "Unacceptable")* | DATE: |

COMMENTS: *(Required if Final Rating is "Unacceptable")*

)S/AoA (9/99)

**Performance Evaluation Plan (PEP)**
**Directions**

Column 1    The element, a brief description of the element's objective, and the final rating for that element. Each plan must contain at least two (2) elements, of which at least one (1) must be a generic element. Space is provided in which the supervisor can add up to two (2) additional elements for specific tasks or goals, if necessary to accurately evaluate performance. Such elements must be in the same format as the three generic elements and include at least two (2) performance measures.

Column 2    Measures for the element. Measures are written for the "Meets Performance Measures" level.

In planning employee goals, the supervisor and employee shall discuss elements for the year and those measures appropriate for the objective of the element and for the employee. Those measures for which the employee is to be appraised are checked in the boxes to the left of the measures. At least two (2) generic performance measures shall be selected for each generic element included in a plan. Space is also provided in which the supervisor can add additional individualized measures, if necessary to accurately measure performance within the element. The supervisor and employee shall discuss what is expected in each of these measures based on the individual employee's work responsibilities. There is a space below the measures beginning with the phrase "As demonstrated by" in which the supervisor can add examples of performance for the measures above, such as: "Routinely answers correspondence by due dates," or "With few exceptions, completes case work within established time frames."

Measures and examples of performance must be objective, explicit, observable or measurable, and attainable. In addition, measures and examples of performance may not be expressed in absolute terms. If examples of performance containing numerical goals are used, such goals should be stated either as a range (e.g., "completes 15 - 20 cases") or make clear, if a single number is used, that it is a floor for achieving a "Meets Performance Measures" rating (e.g., "completes at least 15 cases.")

Column 3    Progress Review notes. A "✓" is placed in this column for a specific performance measure which the supervisor perceives as an area of weakness or area s/he feels an employee needs to concentrate on until the next progress review or for the remainder of the rating period. A "✓" will only be placed in this column following a documented discussion between the employee and supervisor about specific ways in which the employee can improve and the assistance to be given the employee to provide her/him an opportunity to succeed. When the employee's performance improves and reaches the "Meets Performance Measures" level, the "✓" will be removed and a page without the "✓" will be substituted in the employee's PEP.

Column 4    The performance measure rating.

If the employee "Exceeds Performance Measures" for a specific measure, a "3" will be placed in this column at the end of the rating period. This level surpasses the requirements specified in the "Meets Performance Measures" level in the PEP. It is reserved for exceptional contributions.

If the employee "Meets Performance Measures" for a specific measure, a "2" will be placed in this column at the end of the rating period. This is the level of performance needed to successfully accomplish all of the performance measures.

If the employee is "Unacceptable" for a specific measure, a "1" will be placed in this column at the end of the rating period. Performance is rated at this level when it does not meet the requirements in the "Meets Performance Measures" level.

**Rating Levels**

**Deriving Element Ratings**    The rating level for each element is determined by averaging the ratings of all the applicable performance measures within the element, as shown in Column 4. Exceeds = "3," Meets ="2," and Unacceptable = "1, ". An average of ".5" or better is rounded up to the next whole number. Ratings for elements are based on whole numbers.

**Deriving Final Ratings**    A "✓" is placed in the appropriate box in "Part IV: Final Rating":

Meets Performance Measures    If all elements are rated "Meets Performance Measures" or "Exceeds Performance Measures," the final rating level is "Meets Performance Measures."

Unacceptable    If any element is rated "Unacceptable," the final rating is "Unacceptable."

## Performance Evaluation Plan (PEP)

| ELEMENTS | PERFORMANCE MEASURES | MID YEAR | Final Measures Ratings |
|---|---|---|---|
| | Standards for "Meets Performance Measures"<br>1. Check all measures for which the employee will be rated.<br>2. Add additional measures after the bullets, if needed.<br>3. Define a measure further on the "As demonstrated by" line, if needed. | | 3 - Exceeds<br>2 - Meets<br>1 -<br>Unacceptable |
| ☑ **Individual Work**<br><br>*Works to accomplish tasks or provide services effectively and efficiently in support of the Agency's mission. Strives for excellence.*<br><br>**Final Element Rating**<br>☑ Exceeds<br>[ ] Meets<br>[ ] Unacceptable | ☑ **Work Planning/Time Management *(Examples may include, as appropriate):***<br><br>• Plans work to meet established goals/results<br>• Uses effective judgement in the performance of duties<br>• Devises effective solutions to problems and appropriate procedures for accomplishing objectives<br>• Seeks guidance and support from supervisor or team leader(s)<br>• Adapts to changes in workload and priorities<br>• Completes work within established deadlines<br><br>• As demonstrated by: | | *3* |
| | ☑ **Risk-taking, Initiative and Innovation *(Examples may include, as appropriate)***<br><br>• Shows initiative in starting, carrying out, and completing tasks<br>• Seeks alternative solutions and creative approaches to problem solving<br>• Takes necessary and appropriate risks<br>• Takes into consideration new ideas and differing opinions<br>• Treats mistakes as learning opportunities<br><br>• As demonstrated by: | | *3* |
| | ☑ **Manner of Performance *(Examples may include, as appropriate):***<br><br>• Follows established procedures, directives, regulations or policies<br>• Supports division, office and agency goals<br>• Exhibits collegiality; works well with other individuals, groups and organizations for the success of mission and goals<br>• Deals with customers effectively<br>• Treats others professionally, courteously and respectfully<br>• Treats change as an opportunity for growth<br><br>• As demonstrated by: | | *3* |
| | ☑ **Communication *(Examples may include, as appropriate):***<br><br>• Communicates clearly and effectively, both orally and in writing<br>• Seeks other opinions in producing work products<br>• Keeps supervisor, team leader(s) and team members informed of changes, progress and barriers to progress<br><br>• As demonstrated by: | | *3* |

OS/AoA (9/99)

| [M] Technical Competency | [M] **Technical Competency** *(Examples may include, as appropriate)*: | 3 |
|---|---|---|
| *Knowledge skills and abilities.* | • Demonstrates expertise in area(s) of responsibility<br>• Keeps abreast of current developments within area(s) of responsibility<br>• Applies technical knowledge to achieve sound results<br><br>• As demonstrated by: | |
| **Final Element Rating**<br>[M] Exceeds<br>[ ] Meets<br>[ ] Unacceptable | | |
| | [M] **Quality and accountability** *(Examples may include, as appropriate)*: | 3 |
| | • Demonstrates a commitment to quality<br>• Accepts responsibility in the performance of work activities<br>• Displays understanding of how job related to other work<br>• Submits work products that are understandable, well-organized and thorough<br><br>• As demonstrated by: | |
| [M] Teamwork | [M] **Cooperation** *(Examples may include, as appropriate)*: | 3 |
| *Works with others either in formal teams or ad hoc groups to accomplish tasks or provide services effectively and efficiently.* | • Participates actively in team efforts<br>• Works with others in developing and implementing solutions to problems<br>• Assists others in meeting objectives<br><br>• As demonstrated by: | |
| **Final Element Rating**<br>[M] Exceeds<br>] Meets<br>[ ] Unacceptable | | |
| | [M] **Commitment to Team Effort** *(Examples may include, as appropriate)*: | 3 |
| | • Shares information willingly<br>• Shares credit, recognition, and visibility with others<br>• Supports and promotes team decisions and initiatives<br>• Completes assignments within established time frames<br><br>• As demonstrated by: | |
| [ ] Specific Task or Goal | •<br>•<br>•<br>•<br><br>• As demonstrated by: | |
| **Final Element Rating**<br>[ ] Exceeds<br>[ ] Meets<br>[ ] Unacceptable | | |

| | | | |
|---|---|---|---|
| **[ ]  Specific Task or Goal**<br><br><br><br>Final Element Rating<br><br>[ ]    Exceeds<br><br>[ ]    Meets<br><br>[ ]    Unacceptable | •<br><br>•<br>•<br>•<br><br>•  As demonstrated by: | | |

# Exhibit 9

⚠ Please treat this as Confidential.
This message was sent with high importance.

**Martin, Arthuretta (HHS/ASAM)**

| | | | |
|---|---|---|---|
| **From:** | Martin, Arthuretta (HHS/ASAM) | **Sent:** | Thu 7/6/2006 5:22 PM |
| **To:** | Shorts, David (HHS/ASAM) | | |
| **Cc:** | | | |
| **Subject:** | 3rd EEO Complaint | | |
| **Attachments:** | | | |

David this is a request to file another EEO complaint against Debbie Ridgely.  I am out on extended sick leave.  I am requesting an EEO Counselor call me at home – 703-426-8057.  What is the status of the investigation of my second EEO complaint?

# Exhibit 10

# the Family Center    **Family Center Counseling Associates**

Glory Fox Dierker, LPC, LMFT, PhD.
Keith Erickson, PhD.
Frances McCreary Holland, PhD.
Gus Nava, PhD.
Lorraine Schooner, MA, PhD. cand.
Susan Tobin, MA
Lauren Wolfe, MA

6/16/06

DEBBIE RIDGELY, DIRECTOR
OFFICE OF SMALL AND DISADVANTAGED BUSINESS UTILIZATION
200 INDEPENDENCE AVENUE, SW
ROOM 360-G HUMPHREY BUILDING
WASHINGTON DC 20201

Dear Ms. Ridgely:

This letter concerns the health and well being of one of your employees and my patient, Ms. Arthuretta Martin. Ms. Martin has been under my care for psychological treatment for several years. Treatment was necessary due in part to episodes of Major Depression and Generalized Anxiety Disorder induced by extended stressful conditions, particularly in her work situation. She had made considerable progress until recently. In the past 2-3 months, however, her symptoms have not only reoccurred but have exacerbated. These symptoms include increased irritability, apathy, forgetfulness, distractibility, dread, and sleeplessness. Physical manifestations of her increased symptomotology are reflected in significant weight gain, chest, back and shoulder pain. This exacerbation of symptoms, in turn, has necessitated increasing her medication in order to allow even minimal functioning. It is my understanding that she is using an increased amount of sick leave and leave without pay when anxiety and depression render her incapable of functioning.

Ms. Martin is experiencing a tremendous amount of stress in her current work position. She reports consistently that she feels ostracized, alienated, marginalized, and demeaned. While Ms. Martin has developed coping skills to endure a tremendous amount of work place stress, I believe what has made the current situation intolerable is her feeling of hopelessness. She believes that she has no venue either within or outside the agency that will address her concerns. She has stated that the HHS officials will not even investigate her concerns, as compared to previous employers, who would at least provide avenues of redress. In her opinion, required avenues of redress that would allow her relief and/or change are not adhered to at her current agency. In addition, she informed me that she is constantly subjected to manipulation of the work environment such as withholding needed information, setting unreasonable deadlines, excluding her from critical meetings, not responding to her requests for assistance and information,

receiving trivial demands and virtually isolating her, i.e. communicating with her via email only. Similar to people subjected to psychological abuse over a long period of time, Ms. Martin internalizes her fear, sorrow or rage because she believes displaying these behaviors may result in ridicule or increased hostility. I am concerned that she has reached her breaking point. Her constant exposure to the stress she experiences in her work situation is detrimental to her mental health, functions as a barrier to her recovery and blocks return to her normal coping level.

It is my recommendation that Mrs. Martin request and be given a medical leave of absence immediately. The duration of this leave should be not less than 30-45 days. During this time she will continue treatment with me, including reevaluation of her status, with the goal of successfully ameliorating her current symptoms.

Sincerely,

F. M. Holland, Ph.D.
Licensed Clinical Psychologist

# Exhibit 11

 **Family Center Counseling Associates**

5691 Columbia Pike, Ste 200
Falls church, VA 22041
703-998-5606

July 26, 20006

Debbie Ridgely, Director
Office of Small and Disadvantaged Business Utilization
200 Independence Avenue, SW
Room 360 G Humphrey Building
Washington, DC 20201

Dear Ms. Ridgely:

This letter is an update on the status of Ms. Arthuretta Martin who is currently on sick leave from your office as a result of multiple symptoms she is experiencing. Her symptoms, which I set forth in my letter of June 16, 2006, include irritability, apathy, forgetfulness, distractibility, dread and sleeplessness, as well as some physical signs.

Ms. Martin evidences intermittent mild improvement overall. In contrast to this, however, any discussion of her work situation during psychotherapy sessions consistently induces visible agitation, restlessness, acceleration of speech patterns and, on several occasions, inconsistent speech content. During these times, her concentration and attention are negatively affected to the extent that she has evidenced some disorientation.

In addition, she has reported frequent difficulties in sleeping. i.e., waking up and being unable to go to sleep again for several hours. She also reported feelings of despair, hopelessness and helplessness to such an extent that she becomes immobilized. These feelings have been corroborated by her husband.

On the basis of her current status and rate of improvement over the past six weeks, I strongly recommend that Ms. Martin be permitted to extend her leave from work.

Sincerely yours,

*Frances McCreary Holland, Ph.D.*
Frances McCreary Holland, Ph.D.

# Exhibit 12

 **Family Center Counseling Associates**

11/7/2006

Rachel Chance
Human Services Specialist
Rockville Human Resources Center
330 C Street, SW Room 5530
Washington DC  20201

Dear Ms. Chance:

I have been requested by Ms. Arthuretta Holmes-Martin to update you regarding her current status as a patient diagnosed with Major Depression and Generalized Anxiety Disorder.

Ms. Martin is improving slowly but continues to experience pronounced symptoms of sleeplessness, anxiety, inattentiveness, memory lapses, tension, and chest pain whenever her work situation requires her attention, or when her professional status is introduced in the therapy sessions.  At these times, she becomes visibly tense, her facial expression is taut and fearful, her speech becomes strained and staccato-like, and she evidences cognitive lapses.  In addition, Ms. Martin relates that even positive associations or mention of work result in symptoms such as eye twitching, anxiety rushes uncontrollable crying and severe cognitive lapses in attention.  Even the simplest demands regarding her work situation appear to cause such distress that Ms. Martin is unable to cognitively process the demands.

In my professional opinion, it would be detrimental to Ms. Martin's mental and physical health for her to return to her professional work in the Department of Health & Human Services at this time.

Sincerely yours,

Frances McCreary Holland, Ph.D.

# Exhibit 13

Office of Workers' Compensation Programs

**Record of Examination**

| 1. Patient's name    Last      First      Middle | 2. Date of Injury mo., day yr. | 3. DWCP File Number | OMB No. 1215-0103 Expires: 10-31-08 |
|---|---|---|---|
| MARTIN   Arthuretta | | | |

**4. What history of injury (including disease) did patient give you?**
See information provided by psychotherapist

**5. Is there any history or evidence of concurrent or pre-existing injury or disease or physical impairment?** (If yes, please describe)  ☑Yes  ☐No   See previous information provided    ICD-9 Code

**6. What are your findings? (Include results of X-Rays, laboratory reports, etc.)**
Anxiety symptoms develop when thoughts of work arise.

**7. What is your diagnosis?**   ICD-9 Code
MAJOR DEPRESSION / GENERALIZED Anxiety Disorder

**8. Do you believe the condition found was caused or aggravated by an employment activity? (Please explain answer)**
☐Yes  ☐No BASED ON patients History and documents from pt's therapist

| 9. Did injury require hospitalization? If no, go to item # 13  ☐Yes  ☑No | 10. Date of admission mo., day yr. N/A | 11. Date of discharge mo., day yr. N/A | 12. Additional Hospitalization required If Yes, describe in "Remarks" (Item 25)  ☐Yes  ☐No N/A |
|---|---|---|---|

**13. What treatment did you provide?**
Recommended continued meds and psychotherapy

| 14. Date of first examination mo., day yr. 5/9/06 first month ago? | 15. Date(s) of treatment mo., day yr.   mo., day yr.   mo., day yr. pt has been seeing therapist | 16. Date of discharge from treatment mo., day yr. NA |
|---|---|---|

| 17. Period of total disability From mo., day yr. Thru mo., day yr. | 18. Period of Partial Disability From mo., day yr. Thru mo., day yr. | 19. Date employee able to resume light work mo., day yr. unknown |
|---|---|---|

| 20. Date employee is able to resume regular work mo., day yr. unknown | 21. Has employee been advised that he/she can return to work?  ☐Yes  ☑No | 22. If yes, on what date was he/she advised? mo., day yr. N/A |
|---|---|---|

| 23. If employee is able to resume only light work, indicate the extent of physical limitations and the type of work that could reasonably be performed with these limitations. (Continue in item #25 if necessary.) | 24. Are any permanent effects expected as a result of this injury? If yes, describe in item #25.  ☐Yes  ☐No |
|---|---|

**25. Remarks**
See Remarks by patient's psychotherapist

**26. If you have referred the employee to another physician provide the following:**   Specialty
Name The Family Center Counseling Associates
Address 5691 Columbia Pike Ste 200
**27. What was the reason for this referral?**
City Falls Church  State VA  ZIP 22041   ☑Consultation  ☑Treatment

**Signature**

**28.** I certify that the statements in response to the questions asked above are true, complete and correct to the best of my knowledge. Further, I understand that any false or misleading statements or any misrepresentation or concealment of material fact which is knowingly made may subject me to felony criminal prosecution.

Signature of Physician _Alice MD_   Date _____

| 29. Name of Physician ALTON G. TUCKER, MD | 30. Tax ID Number 54-2027210 |
|---|---|
| Address 7489 Huntsman BLVD | 31. Do you specialize?  ☑Yes  ☐No |
| City Springfield  State VA.  ZIP 22153 | 32. If yes, indicate specialty Family Practice |

# Exhibit 14

DEPARTMENT OF HEALTH & HUMAN SERVICES

---

**Memorandum**

Office of Small & Disadvantaged Business Utilization
200 Independence Avenue, SW, Room 360-G
Washington, DC 20201
202-690-7300/202-260-4872

Federal Express

THIS NOTICE AT YOUR OWN OPTION MAY BE FURNISHED TO NTEU

Date:      January 12, 2007

From:      Director, Office of Small and Disadvantaged Business Utilization
           Office of the Secretary

Subject:   Proposed Removal

To:        Arthuretta Holmes Martin
           Office of Small and Disadvantaged Business Utilization
           Office of the Secretary

This is notice that I propose that you be removed from your position of
Procurement Analyst, GS-1102-14, Office of Small and Disadvantaged Business
Utilization, Office of the Secretary, Department of Health and Human Services,
and from the Federal service. This action is proposed in accordance with
Chapter 75 of Title 5 of the United States Code and the implementing regulations
at Part 752 of Title 5 of the Code of Federal Regulations and, if sustained, will be
effective no earlier than 30 calendar days from the date you receive this
memorandum. The reason for this proposed action is your medical inability to
perform the duties of your position.

My reason for proposing this action is discussed specifically below.

On June 20, 2006, I received a letter from your doctor, Frances M. Holland, M.D.,
who stated that she is treating you for Major Depression and Generalized Anxiety
Disorder. Dr. Holland stated that you were experiencing a tremendous amount of
stress in your position and that she recommends you be given an immediate
medical leave of absence, for no less than 30-45 days. Dr. Holland also stated

- 2 -

Arthuretta Martin

that your treatment would continue but that she would update and reevaluate your status. I immediately approved your use of sick leave.
On July 26, 2006, Dr. Holland provided another letter updating me of your status. In the letter, Dr. Holland states that you are evidencing "intermittent mild improvement," but that any discussion of your work situation consistently induced symptoms such as agitation, restlessness, and disorientation. On or about July 10, 2006, Human Resources Specialist (HRS) Rachel Chance, received your Power of Attorney authorizing your husband Clyde Martin to act on your behalf for your employment issues. On July 10, 2006, Mr. Martin asked that you be placed on leave without pay (LWOP) when you exhaust all of your sick leave.

On October 27, 2006, Ms. Chance contacted Mr. Martin on my behalf about your continuing absence from the office. Mr. Martin was informed that your absence had created a hardship on the office, and the office needs an employee available for duty on a regular full-time basis. Mr. Martin was also informed that I could not approve your requests for LWOP indefinitely and that additional medical documentation should be provided to inform me of your current medical status and expectation for your return to work. On November 7, 2006, Dr. Holland forwarded a letter stating that although you are improving slowly  you continue to experience a number of symptoms including sleeplessness, anxiety, inattentiveness, memory lapses, tension and pain whenever your work situation requires your attention. Dr. Holland further reported that even positive work associations have resulted in your experiencing eye twitching, anxiety rushes, uncontrollable crying and severe cognitive lapses in attention. Finally, Dr. Holland stated that in her professional opinion your return to work with the Department would be detrimental to your mental and physical health.

Our office needs someone in your position who can be available for duty on a regular, full-time basis. You have been away from your position for more than 6 months and based on the available information, it appears that you will not be able to return to your position at anytime in the foreseeable future.

Therefore, based upon the above, I am proposing that you be removed from your position and from the Federal service in order to promote the efficiency of the service. I believe that this action is fully warranted based upon your medical inability to perform the duties of your position.

## Rights

You have the right to be represented in this matter by an attorney or other representative such as a Union representative. If you choose someone to represent you, that person's name, address, and telephone number must be given to me and to Ms. Linda Garvin in writing providing your authorization for your

- 3 -

Arthuretta Martin

representative to have access to official records personal to you and relevant to this proposed action. A sheet on which this may be accomplished is attached.

You are allowed 14 calendar days after your receipt of this proposal to respond orally, in writing, or both orally and in writing. You may also submit affidavits and other documentary evidence in support of your reply(ies). Any reply you make should be addressed to Ms. Linda Garvin, Principal Deputy Assistant Secretary, 200 Independence Avenue, SW, Room 309-F, Washington, DC 20201, 202-690-7431. Any reply you submit within the time allowed will be given full and careful consideration before a decision is made and issued. **If you are considering an oral reply, you must contact the Deciding Official promptly so that an appointment can be scheduled within the period for reply.**

You are entitled to review the material relied upon to support this proposed action and may do so before making any written and/or oral reply. You may contact Ms. Chance on 202-260-6886 to arrange a time to review/receive the material. Your authorized representative may also review the supporting material. (Non-Public Information will be appropriately redacted before being released to your representative. See the attached Supplemental Explanation of Rights for further information.) You, if in an active duty status, and your representative, if an employee of the Department of Health and Human Services (DHHS) in an active duty status, may be allowed a reasonable amount of official time to review the supporting material, secure affidavits, and prepare and present your reply(ies). A request to use official time must be made to me in writing and in advance and you must receive written approval before using official time for this purpose. Your representative, if an employee of DHHS, should request use of official time from his or her own supervisor.

I am obligated to advise you that you have two options if you believe that it is impossible for you to return to duty because of your medical condition. First, you may submit a voluntary resignation if you wish. Alternatively, you may be eligible to apply to the Office of Personnel Management (OPM) for disability retirement under the Federal Employees Retirement System. I am aware that you are applying to the Department of Labor for workers compensation. Neither action will affect your current standing with OWCP. If your disability retirement and occupational disease claim are approved, you may be given the opportunity to elect a retirement annuity from OPM or receive compensation payments from OWCP. If you decide to submit a voluntary resignation, I have enclosed a pre-addressed envelope for your convenience to mail to me. If you decide to apply for disability retirement, you should contact the Benefits Office at (301) 827-3512. You should initiate any action to accomplish a voluntary resignation or disability retirement prior to the end of the 15-day reply period.

- 4 -

Arthuretta Martin

If you decide to submit a voluntary resignation, I have enclosed a pre-addressed envelope for your convenience to mail to me. If you decide to apply for disability retirement, you should contact the Benefits Office. You should initiate any action to accomplish a voluntary resignation or disability retirement prior to the end of the 15-day reply period.

During the course of the notice period, you will remain on LWOP. In any event, you will be carried on the rolls of this Department until a decision has been issued on this proposed action.

If you have any questions about the regulations or procedures applicable to this proposal, you may contact Ms. Chance on 202-260-6886.

*Debbie Ridgely*

Debbie Ridgely

# Exhibit 15

**DEPARTMENT OF HEALTH & HUMAN SERVICES**    Office of the Secretary

Assistant Secretary for Administration and Management
Washington DC 20201

JUN 2 2 2007

**Memorandum**
Principal Deputy Assistant Secretary
200 Independence Ave, SW, Room 309-F
Washington, DC 20201
Phone: 202-690-7431

Method of Delivery – Fed Ex to Representative

THIS NOTICE AT YOUR OWN OPTION MAY BE FURNISHED TO NTEU

Date:

From:    Principal Deputy Assistant Secretary, HHS

Subject:  Decision to Remove

To:      Arthuretta Holmes Martin
         Procurement Analyst
         Office of Small and Disadvantage Business Utilization
         Office of the Secretary

In a memorandum dated January 12, 2007, Ms. Debbie Ridgely notified you of her proposal to remove you from the Federal service and your position of Procurement Analyst, GS-1102-14, Office of Small and Disadvantaged Business Utilization, Office of the Secretary, Health and Human Services, for medical inability to perform the duties of your position. The following constitutes my decision on your proposed removal.

Since June 19, 2006, you have not returned to work due to your medical condition. Prior to your absence, in a letter dated June 16, 2006, Dr. Frances Holland, a licensed clinical psychologist, recommended leave for at least 30-45 days due to Major Depression and Generalized Anxiety Disorder. Based on the June 16, 2006 request and your absences, you were requested to allow our Department's contract physicians to review your medical condition and contact Dr. Holland to better understand your condition and ability to return to work. In a letter from Mr. Clyde Martin (your representative), dated July 10, 2006, he stated that "we will not authorize access to her (your) medical records." Subsequently, additional medical information has been provided; however, the inability of our contract physician to properly review the medical information requires me to solely rely on the information provided by your medical provider.

In a July 26, 2006 letter from Dr. Holland, she strongly recommended that you be permitted to extend your leave from work; however, she gave no specifics as to when you

Page 2 – Arthuretta Holmes Martin/Decision to Remove

would be able to return to work. In a November 7, 2006 letter to Ms. Rachel Chance (Human Resources Specialist), Dr. Holland wrote: "In my professional opinion, it would be detrimental to Ms. Martin's mental and physical health for her to return to her professional work in the Department of Health & Human Services at this time."

During the oral reply, I requested that your attorney submit a letter from your physician providing a more current update on your condition and your ability to return to work. Subsequently, your attorney submitted another letter from Dr. Holland dated May 3, 2007 which provided the following: "Concerning her prognosis as this pertains to her employment status, I believe it may be possible for Ms. Martin to return to a position within DHHS in a part time capacity in 6-8 months; i.e. late September or early October if her current level of progress continues. Based on my clinical judgment, however, I am recommending this with a caveat: she may not be able to return to the office in which she is currently employed inasmuch as she continues to regard it with considerable anxiety and distrust."

In reaching my decision, I have reviewed the proposal to remove you from your position and all of the material that formed the basis for the proposal, which was also available for your review. I have also given full consideration to your representative's, David Shapiro, Esq., written reply dated February 20, 2007. In your written response, Mr. Shapiro raises a number of issues; however, the response does not provide conclusive information as to your ability to return to full-time work at HHS in the near future.

In addition, while Dr. Holland states that it may be possible for you to return to a position in HHS in a part-time capacity in 6-8 months, she gives no inclination as to when or if you will be able to return to full-time work in the foreseeable future. Leaving your position vacant and holding your position open for another six to eight months would cause an undue hardship on the office. The Office of Small and Disadvantaged Business Utilization has been severely understaffed and operating beneath its expected level for eleven months during your absence which began on June 19, 2006. Moreover, even if we were to hold your position for an additional six to eight months, Dr. Holland is only stating that it is "possible" that you will be able to return. Based on Dr. Holland's assessment, even if you are able to return to work in six to eight months, you will only be able to return to a part-time position.

Accordingly, based on the proposal specifications, the written response, and medical documentation, I find that a preponderance of evidence supports a conclusion that you are medically unable to perform the duties of your position, and I have decided to sustain this charge.

Therefore, it is my decision that, in order to promote the efficiency of the service, you will be removed effective 1 July 2007.

In reaching my decision, I have considered the fact that you are unable to perform the duties of your current position for the foreseeable future. In addition, I considered the fact that your physicians concur that your medical condition makes you unable to perform the essential functions of any other full-time position now or in the foreseeable future.

My decision is also based on the fact that the Agency needs someone in your position of record who can carry out the duties and responsibilities of the position on a full-time, regular basis.

Because you raised a medical issue in response to the proposal to remove you, and your records show you appear to meet the years of service requirement for disability retirement under FERS, I recommend you contact the Benefits Branch on 301-827-4140, for more information on how to apply for disability retirement.

Between your receipt of this notice and the effective date of the action, you will be continued in an active duty status at your present grade and salary.

<u>Rights</u>
You have the right to challenge this action in only one of the following ways. Once you have elected one of these procedures, you may not change thereafter to a different procedure.

- by filing an appeal with the Merit Systems Protection Board (MSPB) in accordance with applicable law and regulation; or

- by appealing directly to binding arbitration, with the concurrence of NTEU, in accordance with the Collective Bargaining Agreement (CBA) between OS and NTEU; or

- by filing a formal complaint of discrimination under the administrative Equal Employment Opportunity (EEO) process.

If you elect to file an appeal with the MSPB, you must file your appeal with the Regional Director, Merit Systems Protection Board (MSPB), Washington DC Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, VA, 22314 no sooner than the effective date of this action and no later than 30 calendar days after the effective date of this action. In the event you and the Agency agree in writing to use an alternative dispute resolution (ADR) process prior to your timely filing of an MSPB appeal, MSPB grants an automatic 30 calendar day extension for filing an appeal, i.e., from 30 calendar days to 60 calendar days after the effective date of this action. The specific requirements for an appeal and the procedures under which MSPB processes an appeal are set forth in detail in Parts 1201 and 1209 of Title 5 of the Code of Federal Regulations, (MSPB Regulations 5 CFR Parts 1201 and 1209) which you may access by typing the following internet address on a

personal or public library computer: http://www.access.gpo.gov/nara/cfr/cfr-table
search.html.

If you cannot access the intranet or internet pages, you may contact your servicing
Employee and Labor Relations Specialist (identified below) to obtain a copy of the MSPB
regulations. See in particular, MSPB regulations 5 CFR 1201.24, "Content of an appeal,
right to hearing" and 5 CFR 1201.22c, "Timeliness of appeals".

An appeal to MSPB should inform MSPB that the records of your removal may be
obtained by writing to the Rockville Human Resources Center, Parklawn Building,
Room 9-89, 5600 Fishers Lane, Rockville, Maryland 20857. This will assist the MSPB
in processing your appeal.

Attached is a copy of the appeal form illustrated in Appendix I to MSPB Regulation 5
CFR Part 1201, which may be used in filing an appeal. In the alternative, you may file
an appeal electronically from the MSPB website, www.mspb.gov/e-appeal.html.

An appeal to the MSPB containing an allegation of discrimination as defined in MSPB
regulation 5 CFR Part 1201.151[a][2] will not be processed concurrently with a
discrimination complaint filed within the Department of Health and Human Services
(DHHS). Accordingly, if you believe that this action is based on discrimination, you may
either,

1. Appeal to the MSPB within 30 calendar days after the effective date
of this action, 60 days if ADR is agreed to in writing prior to timely
appeal, raising the matter of discrimination in your appeal and
otherwise complying with MSPB regulation 5 CFR Part 1201.153; or

2. File a discrimination complaint within the DHHS under the provisions
of the DHHS discrimination complaint procedures that flow from
Equal Employment Opportunity Commission (EEOC) regulations.
To do so, you must first consult an EEO Counselor within 45
calendar days after the effective date of the action taken against you.
If after EEO counseling you decide to file a formal discrimination
complaint within the DHHS, you still have the right thereafter to
appeal to the MSPB, as provided in MSPB regulation 5 CFR Part
1201.154 that provides for such appeals:

a. Within 30 calendar days after you receive the DHHS'
resolution or final decision on your discrimination complaint;

or

Page 5 – Arthuretta Holmes Martin/Decision to Remove

b.  At any time after the expiration of 120 days when the DHHS
    has neither resolved your discrimination complaint nor issued
    a final decision on your formal discrimination complaint within
    a period of 120 calendar days of filing.

Finally, if you believe this action is based on discrimination or harassment because
of sexual orientation, you may have such an allegation addressed under the
DHHS' separate procedures for processing such allegations. Under the DHHS'
separate procedures, you must present such concerns to an EEO Counselor
within 45 calendar days of the effective date of this action. This entitlement
derives from DHHS policy and not from EEOC regulations and cannot be pursued
to EEOC.

This action is being processed according to Title 5 Code of Federal Regulations Part 752,
Subparts C and D, and the terms of applicable sections of the CBA.

If you have any questions on appeal procedures and requirements, you may contact
Wendy Lawrence on 202-260-6886.

Linda Garvin

Enclosure
 MSPB Appeal Form

Receipt Acknowledgment
To acknowledge that you have received this notice, please sign, date, and return this
memorandum using the enclosed envelope). Your signature does not mean that you
agree or disagree with this notice and, by signing you will not forfeit any rights to which
you are entitled. Your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum:


_____          _____
Arthuretta Holmes Martin                     Date

# Exhibit 16

# SWICK & SHAPIRO, P.C.

### ATTORNEYS AT LAW

1225 EYE STREET, N.W., SUITE 1290
WASHINGTON, D.C. 20005

(202) 842-0300
FAX (202)-842-1418

June 15, 2007

**VIA UPS**

James E. Hubbard
Contract EEO Investigator
JDG Associates, Inc.
8007 Steve Drive
Forestville, MD 20747

Re:    Arthuretta Martin EEO Investigation

Dear Mr. Hubbard:

Enclosed, please find copies of documents from Ms. Martin that relate to her EEO investigation. Ms. Martin's affidavit and rebuttal statement make reference to these documents. In particular, the documents relate to the following issues: (1) Ms. Martin's FY 2004 performance appraisal; (2) Ms. Martin's attempts to request the waiver of an overpayment; (3) Ms. Martin's attempts to receive permission to engage in outside activities, particularly a June 2005 conference in Dakar, Senegal; and (4) Ms. Martin's FY 2006 performance plan.

We hope these documents will assist you in your investigation.

Sincerely,

Nicholas B. Lewis

cc:    Arthuretta Martin

Enclosure(s)

## Documents

1. FY 2004 Performance Appraisal
2. Email correspondence re: 2004 Performance Appraisal
3. Documents re: Request of Waiver for Overpayment
4. Request for Approval of Conference in Dakar, Senegal (Apr. 22, 2005)
5. June 2005 Email Discussing Request for Outside Activity
6. Attorney Letters re: Non-responsiveness to Request for Outside Activities
7. (Post-Activity) Approval of Conference (May, 17, 2006)
8. Tables Showing Submission Dates for Requests for Outside Activities
9. FY 2006 HHS Employee Performance Plan

# Plaintiff's List of Exhibits

| Plaintiff's Exhibit | Description |
| --- | --- |
| 1 | Martin Affidavit, June 12, 2007 |
| 2 | Email responses from Scarboro, Bryant, and Randall |
| 3 | Request for Hearing and March 24, 2005 EEO Complaint |
| 4 | Martin Affidavit, July 31, 2007 |
| 5 | Martin Affidavit, August 22, 2007 |
| 6 | EEO Complaint, April 24, 2006 |
| 7 | Ridgley Interview, June 4, 2007 |
| 8 | Martin Performance Appraisals, 2000-2004 |
| 9 | Email from Martin to Shorts requesting 3rd EEO Complaint, July 7, 2006 |
| 10 | Letter from Dr. Holland, June 16, 2006 |
| 11 | Letter from Dr. Holland, July 26, 2006 |
| 12. | Letter from Dr. Holland, November 7, 2006 |
| 13. | Records from Dr. Tucker |
| 14. | Notice of Proposed Removal, January 12, 2007 |
| 15. | Decision to Remove, June 22, 2007 |
| 16. | Letter from Lewis, June 22, 2007 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARTHURETTA L. HOLMES-MARTIN, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 07-2128 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| Department of Health and Human | ) |
| Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

UPON CONSIDERATION of Defendant's Motion to Dismiss, or in the Alternative, for

Summary Judgment and Plaintiff's Opposition to Defendant's Motion to Dismiss, or in the

Alternative, for Summary Judgment, it is this _____ day of _____, 2008 hereby

ORDERED that the Defendant's Motion is DENIED.

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARTHURETTA L. HOLMES-MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 07-2128 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| Department of Health and Human | ) |
| Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## STATEMENT OF GENUINE ISSUES

Pursuant to Local Rule 7.1(h), plaintiff hereby submits her statement of genuine issues in response to the "Statement of Material Facts Not in Dispute" filed by defendant in support of its Motion for Summary Judgment.

**I.    General Response to Defendant's Statements.**

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." *Mitchell v. DCX, Inc.*, 274 F.Supp. 2d 33, 39 (D.D.C. 2003). In a discrimination action such as this, the material issues are the defendant's motives, whether defendant took adverse employment actions against Martin, and the legitimacy of any alleged non-discriminatory reasons for those actions. Yet, for the most part, the facts recited in defendant's statement are not "material" to these issues. Thus, even if those facts are accepted, they do not entitle defendant to judgment. *See United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir. 1996) ("material fact" defined as "a fact that would be of importance to a reasonable

1

person in making a decision about a particular matter or transaction"). As such, defendant's

statements do not satisfy the requirement of Local Rule 7.1(h) that defendant provide, "a

statement of *material* facts as to which the moving party contends there is no genuine issue."

Therefore, Defendant's Motion for Summary Judgment must be denied.

## II.     Genuine Issues of Material Fact.

### 1.     *Whether Ridgley Removed Martin's Substantive Responsibilities and Gave them to A White Male.*

DHHS claims that Martin's responsibilities were not reassigned and that she retained her

job responsibilities as the Deputy Director of OSBDU. Instead, they allege that "a single task

(the report for the Small Business Regulatory Enforcement Fairness Act) was reassigned to

another co-worker." Def.'s Motion for Summary Judgment at 7. However, Plaintiff has put

forth evidence that in 2004, Ridgley assigned practically all of Martin's duties to Clarence

Randall. PX 1 (Martin Affidavit, June 12, 2007) at 2-3; *see also* PX 3 (Request for Hearing and

March 24, 2005 EEO complaint) at 11. Ridgley told Randall to assist Martin in getting another

job. PX 4 (Martin Affidavit, July 31, 2007) at 6. When Martin inquired about Randall's role at

DHHS, she was told that he was there to handle budget and personnel issues. PX 1 at 2.

However, Ridgley constantly assigned Randall procurement duties, which were Martin's

responsibility, to the point where Martin's coworkers inquired about whether she had been fired.

*Id.* Specifically, Randall was assigned to work as the NAWPAW conference coordinator and put

on the Strategic Plan project, each of which was formerly Martin's responsibility. PX 5 (Martin

Affidavit, August 22, 2007) at 3.

2

Furthermore, the Climate Assessment project, the Newsletter, the Veteran's Business Program, and the Vendor Outreach Sessions were all taken from Ms. Martin and reassigned to other staff. *Id.*; *see also* PX 2 (Email response from Curtis Bryant, June 7, 2007) (stating "some tasks were supported by member's of the Director's immediate staff; Ms. Debra Peters, Procurement Analyst, HHS Service Disabled Veteran-Owned Small Business Advocate, and Ms. Teneshia G. Alston, Small Business Analyst- Agency Coordinator, Electronic Subcontracting Reporting Systems (eSRS)"). Additionally, Ridgley so micro-managed Martin's management of the Women's Business Program, the 8(a) program, the Service Disabled Business Program, and the Disadvantaged Business Program, that Martin was relegated to steering businesses to the monthly outreach sessions. PX 5 (Martin Affidavit, August 22, 2007) at 3. Ms. Martin was no longer given the task of reviewing the Small Business Review Forms, which meant she could no longer evaluate or even identify procurement opportunities for small business. *Id.* at 2. Since Martin did not have access to the agency's procurements, acquisition strategy, or future requirements, she was severely limited in what she could do to assist the business she did continue working with. *Id.* at 4.

When Martin came up with project ideas and recommendations, Ridgley regularly reassigned these to other staff members as well. *Id.* at 2. For instance, Martin attempted to arrange matchmaking sessions with program offices, however, when she arranged a match making session between the Veterans Businesses and the Information Technology office, Ridgley reassigned the program. *Id.* Martin recommended the creation of an HHS newsletter, which Ridgley reassigned to a lower-ranked staff member. Martin suggested the Small Business Climate Assessment which was also reassigned. *Id.* When she recommended the development

3

of a small business desk manual, Ridgley micro-managed every aspect of the manual until

Martin's role was diminished to mere clerical tasks. *Id.* Martin recommended the Strategic Plan

development, but shortly after she began working on it, Ridgley reassigned it and completely shut

Martin out of the initiative. *Id.* Finally, Martin had worked hard to build on the Veteran's

business program and develop strategies to improve contracts awarded to Veteran Businesses.

*Id.* As soon as the project became a success, Ridgley reassigned it to another staff member. *Id.*

### 2.    *Whether Ridgley treated Martin different from white employees and those who have not complained of discrimination.*

Ridgley denies treating Martin differently than other employees at DHHS. *See e.g.,* DX 2

(Ridgley Affidavit). However, there are material issues of fact regarding the truth of this

statement. For instance, Ridgley ordered the SBA procurement center representative to stop

communicating with Ms. Martin. PX 1 (Martin Affidavit, June 12, 2007) at 7; PX 3 (EEO

Complaint, March 24, 2005) at 11. Because Martin was responsible for procurement within her

office, this direction by Ridgley impeded Ms. Martin's ability to perform her job. PX 3 at 11.

She also excluded Ms. Martin from all meetings except for the weekly staff meeting. PX 1

(Martin Affidavit, June 12, 2007) at 4. Later, Ridgley changed the locks on Ms. Martin's door at

the office and prevented her access to her voicemail and e-mail. *See* DX 37 (Clyde Martin

Worker's Comp. Letter) at 5.

While Martin had to make appointments to see Ridgley, Randall had open-door access.

PX 1 at 4. Randall attended all meetings with Ridgley, while Martin was often left behind. *Id.*

In fact, Randall was required to go to all meetings that Martin attended, giving Martin the

impression she was not trusted to attend these meetings herself. *Id.* at 2.

4

Additionally, Ridgley excessively delayed responses to any requests made by Ms. Martin that required Ridgley's approval. *See e.g.* PX 3 (EEO Complaint, March 24, 2005) at 10. For instance, Ridgley delayed providing supporting documentation for Martin's performance appraisals (PX 1 at 4), providing copies of Ms. Martin's personnel folder (PX 3 at 11), and responding to Ms. Martin's travel vouchers (PX 4 at 6), Martin's requests to perform outside activities (PX 1 at 3, 5-6), and even her application for workers' compensation (DX 38). With regard to Ms. Martin's request for a waiver of an overpayment claim, Ridgley and DHHS management delayed acting on it for over 18 months; meanwhile, the Department withdrew money from Ms. Martin's paychecks. PX 1 (Martin Affidavit, June 12, 2007) at 2-4.

Similarly, Ridgley set up needless obstacles for Ms. Martin – when she requested a change in her hours, Ridgley refused, claiming that Ms. Martin had to submit her request "in writing" despite the fact that Ms. Martin had e-mailed the request, thus providing the necessary written documentation. *See* PX 1 at 9; PX 4 (Martin Affidavit, July 31, 2007) at 5. Ridgley imposed restrictions on Martin's travel arrangements that she did not impose on others. PX 4 (Martin Affidavit, July 31, 2007) at 5. Ridgley used "mapquest" routes to determine if she would approve Martin's local travel even though agency regulations do not require staff to use "mapquest" directions. *Id.* Martin used the same travel route for three years without incident, and then Ridgley determined that she would not reimburse Martin for local travel along that route. *Id.* When it came to traveling out of state, other staff members were permitted to select the airport most convenient to them, while Martin was told which airport to use and was told she had to take the metro to the airport, despite back trouble that prevented her from doing so. When Martin complained that she could not take metro with her luggage, Martin was not permitted to

5

travel. *Id.* Ridgley also delayed her response to Ms. Martin's request for a six-month detail to

the Office of Minority Health - a temporary assignment that would have removed Ms. Martin

from the stressful and hostile environment created by Ridgley. PX 3 (EEO Complaint, March 24,

2005) at 11. After waiting to hear whether she would be allowed to go on detail, Ms. Martin was

informed that she could not go because the office was "short staffed." DX 26 (Ridgley Response

to Plaintiff Detail Request); *see also* PX 5 (Martin Affidavit, August 22, 2007) at 4. Then, for

the next year, Martin sat with practically nothing to do except clerical duties. *Id.* Considering

the evidence put forward by Martin, there are genuine issues of fact regarding whether Martin

was treated differently than her white colleagues.

### 3.   *Whether DHHS had to terminate Martin because of her medical condition.*

In the June 22, 2007 "Decision to Remove" DHHS specifically states, that, she was being

terminated because she was unable to do her job. However, defendant was aware that Martin

could come back to work part time. Her treating physician certified on May 3, 2007 that, "it may

be possible for Ms. Martin to return to a position within DHHS in a part time capacity in 6-8

months; i.e. late September or early October if her current level of progress continues." DX 40

(Frances Holland Letter, May 3, 2007). The defendant could have accommodated the plaintiff's

disability. The plaintiff could have performed the duties of her job, as she has successfully done

in the past (*see e.g.,* PX 8 (Martin's Performance Appraisals) if the Department had provided her

with a simple reasonable accommodation, completion of her treatment plan by her

psychotherapist, along with a transfer away from Ridgley's supervision. As Dr. Holland's letters

indicate, Ms. Martin's condition has improved over time, and she was expected to be able to

return to work part time in September or October of 2007. PX 11. Allowing Ms. Martin to

complete her therapy and then permitting her to return to work with a new supervisor would have addressed both the harassment and feelings of hopelessness that Ms. Martin experienced. Another accommodation that could have been made was to allow Martin to go on detail, as Ridgley had suggested to Martin during her 2004 Performance Evaluation. See DX 17 (2004 Performance Evaluation); DX 5 (Plaintiff email, October 5, 2004) at 2 ("In my midyear review you recommended that I pursue a detail in another office like the Office of Women's Health. I agreed with you and I planned to pursue that avenue"). When Martin sent in her request to go on a six-month detail in the Office of Minority Health beginning in September of 2005, Ridgley denied the request. DX 25 (Plaintiff Detail Request, July 29, 2005); DX 26 (Ridgley Response to Plaintiff Detail Request, August 4, 2005). Since the plaintiff could have been accommodated, the statement that Martin was unable to perform the duties of her position is not true.

**4.      *Whether Martin's termination was motivated by race or retaliation.***

Martin has put forth evidence that the true motivation for her termination was race discrimination and retaliation. In the fall 2004, Ms. Ridgley created a position in her office for Clarence Randall, a Caucasian male. Ms. Ridgley made Mr. Randall a GS-15 Special Assistant. Ms. Ridgley assigned Ms. Martin's substantive responsibilities to Mr. Randall. *Id.; see also* PX 3 at 11. When Martin returned to work, Ridgley told Randall to help Martin get another job. PX 4 (Martin Affidavit, July 31, 2007) at 6. Indeed, Martin, a GS-14 manager, was relegated to clerical work while Randall took over many of her former responsibilities. *Id.*; PX 3 (Request for hearing and March 24, 2005 EEO Complaint) at 11-12. Randall was assigned to work as the NAWPAW conference coordinator and put on the Strategic Plan project, two duties that had

7

belonged to Martin. PX 5 at 3. This evidence creates an issue of material fact regarding whether Martin was terminated because of her race.

Furthermore, Martin has put forth evidence that her termination was in retaliation for her EEO activity. The plaintiff's protected activities continued after she attempted to file her third EEO Complaint. For instance, on November 14, 2006, after Ms. Martin gave her husband Clyde power of attorney (DX 32), he wrote a letter to Rachel Chance, Human Resources Specialist specifically evidencing his wife's continued pursuit of her EEO complaints. DX 37 (Clyde Martin Worker's Comp. Letter) ("To date, neither [Arthuretta] or I have heard anything from Mr. Short nor anyone from the HHS EEO office. Will HHS continue to delay the investigation of my wife's complaints? Are the lines no longer open?"). Again, on December 28, 2006, Clyde Martin (acting on behalf of his wife) evidences Martin's pursuit of her EEO Complaints in the application for Worker's Compensation by stating, "1/04- Present. David Short, HHS EEO Director, refuses to process Arthuretta's EEO Complaints. I have spoken to him personally. He has not assigned an EEO Counselor to Arthuretta's last complaint, has not investigated either of her previous complaints. I've brought Mr. Short's actions to the attention of the Secretary of HHS and he has not responded to my letter." DX 37 (Clyde Martin Worker's Comp. Letter) at 8. Then, on February 20, 2007, in her response to the Notice of Proposed Removal, Ms. Martin's representative stated:

> The EEO office has repeatedly delayed or ignored Ms. Martin's requests for help. Regarding her first complaint of discrimination (race discrimination and retaliation for FMLA use)...Ms. Martin has since requested a hearing before the EEOC. To date, however, the EEOC has yet to appoint an Administrative Judge. It is now more than three years since the discrimination complained of, but Ms. Martin has not had the benefit of any effort to ever look into the situation.

8

DX 42 (Plaintiff's Written Reply) at 5.  Next, on June 4, 2007, Ridgley was interviewed by

James Hubbard, the EEO investigator, to ask some follow up questions regarding Martin's EEO

Complaint. PX 7 (Ridgley Interview, June 4, 2007).  Ms. Martin participated in further protected

activity on June 12, 2007, when she signed another Affidavit in support of her EEO Complaint.

PX 1 (Martin Affidavit, June 12, 2007).  Finally, On June 15, 2007, just seven days before

Martin was terminated, Plaintiff's counsel wrote a letter to James L. Hubbard regarding Martin's

EEO Complaint which accompanied additional documentation for him to review.  PX 16 (Letter

from Nicholas Lewis to Hubbard, June 15, 2007).  Given that this more recent activity was so

close in time to the termination of Ms. Martin from her position at DHHS, there is an issue of

material fact regarding whether Martin was terminated from her position at DHHS in retaliation

for filing EEO complaints against Ridgley and the Department.

## III.    Specific Responses to "Defendant's Statement of Material Facts as to Which There Is No Genuine Issue."

Most of the statements listed in "Defendant's Statement of Material Facts as to Which

There Is No Genuine Issue" do not address  material questions, but merely mention background

information or restate the claims of defense witnesses.  To the extent that defendant's statements

touch on the material facts in this case, there is ample evidence to dispute those.


**Statement No. 3:**      On January 2, 2000, the Plaintiff began her employment as a Procurement
Analyst, GS-1102-14, in OSDBU. In the fall of 2004, the Plaintiff was counseled by her first-
level supervisor, Ms. Ridgely [sic] with regard to her excessive unscheduled leave use and
failure to submit leave requests in the system.

**Response:  Immaterial**. Whether Ridgley counseled Martin about her use of leave and the

method to request leave is not material to Martin's discrimination case because DHHS is not

9

alleging that Martin was terminated because she used unscheduled leave or because she allegedly

failed to submit leave requests in the system.  Additionally, Martin was never given a

performance evaluation for 2005 reflecting any issues with her use of leave or method of

requesting leave.

**Statement No. 4 :**    The Plaintiff provided a lengthy response in an October 5, 2004 email and
stated that she was unhappy because of the "disingenuous promises and abandonment of support
to small businesses by Government officials" and "how you treat me and others." The Plaintiff
also complained about Ms. Ridgely's [sic] management style, lack of support and training,
"micromanaging,""limiting creativity," and lack of courtesy. She also stated that she was
frustrated at work and would plan an "exit strategy."

**Response: There are material issues of fact regarding this contention.**  Defendant mis-

characterizes the statements of Martin that she would plan an "exit strategy," by leaving out a

portion of Martin's October 5, 2004 response.  In her response, Martin explains that she was

looking for somewhere to go on detail because "in [her] midyear review [Ridgley] recommended

that [Martin] pursue a detail in another office like the Office of Women's health."  DX 5 (Martin

email 10/5/04) at 3.  She went on to explain that she would "accommodate" Ridgley's wishes

because Ridgley "wished [her] to leave [Ridgley's'] office as soon as possible" and was going to

"make life uncomfortable" for Martin until she did so.  *Id.*

**Statement No. 5 :**    In March 2005, Ms. Ridgely [sic] warned the Plaintiff about inappropriate
behavior, standards of conduct, leave and performance concerns.

**Response: Immaterial**.  Whether Ridgley warned Martin about her conduct is not material to

Martin's discrimination case because DHHS is not alleging that Martin was terminated for

performance reasons or because of Martin's conduct or behavior.  Additionally, Martin was never

given a performance evaluation for 2005 reflecting any issues with her performance or behavior.

**Statement No. 6:**    The Plaintiff made initial contact with the EEO office on January 14, 2005. She filed her first EEO complaint (OSH- 014-05) on March 24, 2005. The Plaintiff filed her second complaint (OSH-010-06) on April 24, 2006. The responsible management official for both claims was Debbie Ridgely. [sic]

**Response: There are material issues of fact regarding this contention.**  In listing off the

dates that Martin filed her EEO complaints, DHHS fails to acknowledge that Martin attempted to

file her first EEO complaint in 2004, contemporaneously with her initial contact with the EEO

office, but because of the inaction of DHHS, was prevented from filing a formal complaint until

March 24, 2005, over a year later.  PX 3 (Request for Hearing and March 24, 2005 EEO

Complaint). Additionally, the defendant fails to acknowledge that Martin attempted to file a third

complaint on July 6, 2006 when she e-mailed David Shorts, the EEO manager, seeking to lodge

another EEO complaint against Ridgley.  PX 8 (Email from Martin to Shorts, July 6, 2006).

However, the Department's office simply ignored her request and never even assigned her an

EEO counselor. See PX 1 (Martin Affidavit, June 12, 2007) at 2-3; PX 5 (Martin Affidavit,

August 22, 2007) at 1.

 **Statement No. 7:**    During her initial meeting with the EEO counselor, the Plaintiff stated that "she was discriminated against based on reprisal (prior EEO activity) when on November 18, 2005, she was sent threatening and hostile emails from" Ms. Ridgely. [sic] She also claimed that authoritative responsibilities taken away from her. Counselor's Report 12/23/05.

 **Response: There are material issues of fact regarding this contention.**  Defendant has

misrepresented the facts.  The _first_ time that the plaintiff met with an EEO counselor was in

response to her first EEO Complaint, which was formally filed on January 14, 2005.  During her

initial meeting with the EEO counselor for this complaint, the Plaintiff stated that "because of her

race (African-American) and sex (female) she has been discriminated against.  In addition, she

also claims retaliation for exercising her statutory right to Family Leave and a hostile work

environment. She further claims that management treats her differently from the other

employees." Martin went on to detail the ways that she was treated differently from other

employees based on (1) Performance Evaluation; (2) Due Process Mandate; (3) Leave Usage; (4)

Communication segregation; (5) Responsiveness; (6) Management Support; (7) Work

Assignments; and (8) Legislation Concerns. When Martin talked with an EEO counselor after

filing her second EEO complaint, she stated that "she was discriminated against based on reprisal

(prior EEO activity) when on November 18, 2005, she was sent threatening and hostile emails

from" Ms. Ridgley, and that authoritative responsibilities were taken away from her. DX 10

(Counselor's Report 12/23/05) at 4.

**Statement No. 8:**      An informal resolution could not be reached during this stage. The agency
attempted to move toward the next step in processing the complaint. During this process, the
EEO Director sent two letters to the Plaintiff asking her to be more specific in her allegations so
that the complaint could be properly investigated. The Plaintiff never responded to this
correspondence. Subsequently, the processing of the complaint was placed on hold due to other
failed attempts to resolve the case and because the Plaintiff had three different representatives.

**Response: There are material issues of fact regarding this contention.** There is no record

that anyone at DHHS ever tried to resolve any of Ms. Martin's EEO complaints in any way. Nor

is there a record that management did anything to address any of the other complaints Martin

raised directly to them about the treatment she was subjected to by Ridgley and other officials.

For instance, in her first EEO complaint, Martin complained that many of her work assignments

had been reassigned. PX 3 (Request for Hearing and March 24, 2005 EEO Complaint) at 11-12.

The diminishment of Ms. Martin's responsibilities became so severe that eventually Ms. Martin

had nothing to do seventy-five to eighty percent of the workday. PX 1 (Martin affidavit, June 12,

2007) at 2. When Martin informed Ridgley of this, she was either ignored or given a menial task,

12

such as forwarding emails. *Id.* Martin also complained that she had been unable to get responses from management to her concerns. PX 3 at 11. No one tried to resolve this issue by providing Martin with the information that she requested. For instance, with regard to Ms. Martin's request for a waiver of an overpayment claim, Ridgley and DHHS management delayed taking any action on her requests for assistance for over 18 months; meanwhile, the Department withdrew money from Ms. Martin's paychecks. PX 1 (Martin Affidavit, June 12, 2008) at 2-4. In fact, despite her repeated requests for assistance from Ridgley, Weisman, the Secretary, the EEO office, the EAP, and Human Resources, Martin was continuously subjected to a hostile work environment that eventually caused her significant physical and mental harm. Furthermore, regardless of why Martin's EEO case was "placed on hold," the office never produced a complete Report of Investigation (ROI). See DX 15 (Order to Produce ROI). In fact, because of their failure to produce an ROI, DHHS received an Order from the United States Equal Opportunity Commission on August 24, 2006 directing DHHS to produce an ROI within 15 days or be subject to possible penalties. *Id.* Even more than three years after the discrimination took place, no one at DHHS had bothered to look into Ms. Martin's complaint and nor did she have an Administrative Judge assigned to her case despite her request for a hearing regarding her claim. *See* PX 3 at 1; DX 31 (Clyde Martin letter, July 10, 2006).

As for Martin's second EEO Complaint, the EEO office merely processed paper this time, conducting no real investigation (other than to record briefly that Ridgley summarily denied Ms. Martin's allegations). PX 6. In fact, although the basis for Martin's complaint were threatening and hostile emails, no documents were reviewed by the investigator. *Id.* at 8. Again, there is no ROI regarding this EEO complaint. When Martin tried to file a third complaint on July 6, 2006,

13

the Department's office simply ignored her request and never even assigned her an EEO

counselor. PX 9 (Email from Martin to Shorts, July 6, 2006); *see also* PX 1 (Martin Affidavit,

June 12, 2007) at 2-3; PX 5 (Martin Affidavit, August 22, 2007) at 1.

**Statement No. 11 :**    The Plaintiff's specific complaint was that Ms. Ridgely [sic] made this
statement without providing an explanation. The Plaintiff stated in her affidavit, " I filed a
complaint because Ms. Ridgely [sic] refused to define what she meant by my not being a team
player."

**Response: There are material issues of fact regarding this contention.**  Defendant attempts

to minimize the Plaintiff's numerous allegations against the Department by stating that Martin's

"specific complaint" against DHHS was that "Ridgley refused to define what she meant by not

being a team player." Martin's first EEO complaint, which was filed on March 24, 2005, details

the discrimination that she faced at DHHS in a number of different areas, only one of which was

her performance evaluation.  PX 3 (Request for Hearing and March 24, 2005 EEO Complaint) at

10.  It is clear from the Complaint that Martin believed that Ridgley was discriminating against

her for her race and creating a hostile work environment for her.  The Complaint details the ways

that Martin she was treated differently from other employees based on (1) Performance

Evaluation; (2) Due Process Mandate; (3) Leave Usage; (4) Communication segregation; (5)

Responsiveness; (6) Management Support; (7) Work Assignments; and (8) Legislation Concerns.

When Martin talked with an EEO counselor after filing her second EEO complaint, she stated

that "she was discriminated against based on reprisal (prior EEO activity) when on November 18,

2005, she was sent threatening and hostile emails from" Ms. Ridgley, and that authoritative

responsibilities were taken away from her. DX 10 (Counselor's Report 12/23/05) at 4.

14

**Statement No. 13:**     The agency notified the Plaintiff of this error on November 12, 2004. The agency requested reimbursement of this overpayment of $245.05 on January 3, 2005.

**Response: Immaterial**.   It is not material that Martin was sent a notice to repay the $245.00 to the agency for the overpayment. Martin was paid the extra money because of an administrative error.  DX 19.  When Martin requested a waiver of the overpayment, Ridgley and DHHS management delayed for over 18 months while the Department withdrew money from Ms. Martin's paychecks.  DX 20 (Request for Waiver of Overpayment, January 20, 2004); PX 1 (Martin Affidavit, June 12, 2008) at 2-4.

**Statement No. 15:**     On January 11, 2006, the waiver request was denied by the Agency. Denial of Waiver of Overpayment (Exhibit 21)

**Response:  Immaterial.**  It is not material that the waiver request was denied by the Agency. Ridgley was involved in the decision to deny the waiver of overpayment.  DX 20 (Request for Approval/ Denial of Overpayment); PX 1 (Martin Affidavit, June 12, 2007) at 5.  When Ridgley received the request from Human Resources regarding Martin's overpayment, she signed off on the statement even though it accused Martin of "not acting in good faith not repaying this money."  The denial of Martin's waiver request is only relevant to this case in that it is evidence of Ridgley's hostility towards Martin.

**Statement No. 19:**     On June 1, 2005, Marc Weisman, the ethics official responsible for reviewing such requests asked for additional information from the Plaintiff in order to make a conflict of interest determination.

**Response:  There are material issues of fact regarding this contention.**  The memorandum from Marc Weisman to Martin written on June 29, 2005 makes it clear that management's actions delayed response to Ms. Martin's request for outside activities that would have

authorized her to go to Senegal. DX 24. Weisman wrote this memo requesting documentation

from Martin even though the trip had already taken place. *Id.* In the memo, Marc specifically

states, "I acknowledge your supervisor's travel status may have hampered timely review of your

520 and now that it may be after the fact it is not required." *Id.*

**Statement No. 20:**    On June 3, 2005, the Plaintiff challenged Mr. Weisman's authority to
review her request.

**Response: There are material issues of fact regarding this contention.** The June 3, 2005

email from Martin does not challenge Weisman's authority to request information about her trip

to Senegal. Instead, this email requests that Naomi Miske clarify Weisman's position at HHS

after the reorganization of the office and his role in giving her assignments. DX 23. This request

for information was in response to the June 3, 2005 email to Martin from Miske which stated

that, "Mr. Weisman has told me that he will be sending you a note shortly to you and to Clarence

advising you of your respective duties in Ms. Ridgley's absence."


**Statement No. 21:**    As of June 29, 2005, the Plaintiff had failed to submit the information
requested to make a conflict of interest determination.

**Response:  Immaterial.** By June 29th, the trip to Senegal had already taken place. DX 23.

Weisman acknowledges this in his memorandum to Martin and also states that, "I acknowledge

your supervisor's travel status may have hampered timely review of your 520 and now that it may

be after the fact it is not required." *Id.*


**Statement No. 24:**    While the Plaintiff was on LWOP as requested under FMLA, "a single
task (the report for the Small Business Regulatory Enforcement Fairness Act) was reassigned to
another co-worker. The Plaintiff's duties which covered the 8(a), Small Disadvantaged Business,

Subcontracting, the new Electronic Subcontract Reporting System and the Small Business
Manual remained the same and were never reassigned." Ridgely [sic] Aff. (Exhibit 2, p. 4).

**Response: There are material issues of fact regarding this contention**. In 2004, Ridgley

assigned practically all of Ms. Martin's responsibilities to Clarence Randall. *Id; see also* PX 3

(Request for Hearing and March 24, 2005 EEO complaint) at 11. While Martin had to make

appointments to see Ridgley, Randall had open-door access. PX 1 at 4. Randall attended all

meetings with Ridgley, while Martin was often left behind. *Id.* In fact, Randall was required to

go to all meetings that Martin attended, giving Martin the impression she was not trusted to

attend these meetings herself. *Id.* at 2. When Martin inquired about Randall's role at DHHS, she

was told that he was there to handle budget and personnel issues. *Id.* However, Ridgley

constantly assigned Randall procurement duties, which were Martin's responsibility, to the point

where Martin's coworkers inquired about whether she had been fired. *Id.* From the time that

Randall came on board until Ms. Martin left on sick leave, Martin was relegated to clerical work

while Randall took over many of her former responsibilities. *Id.*; PX 3 (Request for hearing and

March 24, 2005 EEO Complaint) at 11-12. Randall was assigned to work as the NAWPAW

conference coordinator and put on the Strategic Plan project, each of which was formerly

Martin's responsibility. PX 5 (Martin Affidavit, August 22, 2007) at 3. Ridgley gave her deputy

only menial tasks, yet set unrealistic deadlines for their completion. PX 1 (Martin Affidavit, June

12, 2007) at 4. When lower level employees did not want to do specific tasks, Ridgley made Ms.

Martin do them. *Id.* at 2. Ridgley refused to treat Martin as her Deputy Director and instead

consistently assigned Martin tasks equal to or less than lower-graded staff members and placed

her on committees subordinate to small business specialists. *Id.* For the assignments that Martin

17

did retain, Ridgley micro-managed every aspect of Martin's work, but then complained that Martin was incapable of doing work without explicit step-by-step instructions. PX 5 at 5.

Other of Ms. Martin's responsibilities were reassigned to lower-ranked staff of DHHS. *Id.* For instance, the Climate Assessment project was reassigned to Annette-Owens Scarboro, the Newsletter was reassigned to Linda Purnell, and the Veteran's Business Program and the Vendor Outreach Sessions were both reassigned to Debra Peters. *Id*; *see also* PX 2 (Email response from Curtis Bryant, June 7, 2007) (stating "some tasks were supported by member's of the Director's immediate staff; Ms. Debra Peters, Procurement Analyst, HHS Service Disabled Veteran-Owned Small Business Advocate, and Ms. Teneshia G. Alston, Small Business Analyst-Agency Coordinator, Electronic Subcontracting Reporting Systems (eSRS)").

Additionally, there were certain programs that Ridgley left "officially" in Martin's name, although the only real task that was possible for Ms. Martin to do was talk to businesses and direct them to the monthly outreach sessions. PX 5 (Martin Affidavit, August 22, 2007). These included the Women's Business Program, the 8(a) program, the Service Disabled Business Program, and the Disadvantaged Business Program. *Id.* Ms. Martin was no longer given the task of reviewing the HHS 653, the Small Business Review Form, making her unable to evaluate or identify procurement opportunities for small businesses. *Id.* at 2. As Martin did not have access to the agency's procurements, acquisition strategy, or future requirements, she was severely limited in what she could do to assist the business she did continue working with. *Id.* at 4.

When Martin came up with ideas or recommendations for the office, Ridgley regularly reassigned these to other staff members. *Id.* at 2. For instance, Martin attempted to arrange matchmaking sessions with program offices, however, when she arranged a match making

session between the Veterans' Businesses and the Information Technology office, Ridgley

reassigned the program to Debra Peters. *Id.* Martin recommended the HHS newsletter, which

was then assigned to Lisa Purnell. Martin recommended the Small Business Climate Assessment

through an employee suggestion. *Id.* It was reassigned to a lower staff employee. *Id.* When she

recommended the development of a small business desk manual, Ridgley micro-managed every

aspect of the manual until Martin's role was diminished to mere clerical tasks. *Id.* Martin

recommended the Strategic Plan development, and shortly thereafter, it was reassigned so that

Martin was completely shut out of the initiative. *Id.* Finally, Martin had worked hard to build on

the Disabled Veteran-Owned Business program and develop strategies to improve contracts

awarded to Veterans' Businesses. *Id.* As soon as the project became a success, Ridgley

reassigned it to another staff member. *Id.*


**Statement No. 25:**    The Plaintiff was asked to "take on the Women's Business Program as well as the Service-Disabled Veteran-Owned Business program for the Department, when another employee retired. Those two duties were transferred back in June 2006, when the position was finally back-filled."


**Response: There are material issues of fact regarding this contention.** *See* Response to

Statement No. 24.

**Statement No. 26:**    In a letter dated June 16, 2006, the Plaintiff's psychologist, Dr. Frances M. Holland, advised that the Plaintiff had been under her treatment for "*several years*" (italics added for emphasis) and that "[t]reatment was necessary due in part to episodes of Major Depression and Generalized Anxiety Disorder induced by extended stressful conditions, particularly in her work situation." She added, "[t]his exacerbation of symptoms, in turn, has necessitated increasing her medication in order to allow even minimal functioning. It is my understanding that she is using an increased amount of sick leave and leave without pay when anxiety and depression render her incapable of functioning." She asked that the Plaintiff be "given a medical leave of absence immediately. The duration of this leave should be not less than 30-45 days." On June 19, 2006, the Plaintiff went on medical leave.

**Response:  There are material issues of fact regarding this contention.**  Defendant

emphasizes that Plaintiff had been in treatment for several years in order to make it appear that

Martin's medical condition was not caused by the treatment she was subjected to at DHHS.

However, the medical evidence supports the conclusion that Martin's severe symptoms of

depression and anxiety were caused by the discrimination and retaliation of Ridgley and the

inaction of DHHS officials in responding to her complaints.  Because of the severity of Martin's

symptoms, Dr. Frances Holland, a licensed clinical psychologist, wrote to Ridgley,

recommending that Ms. Martin take an extended leave of absence due to episodes of Major

Depression and Generalized Anxiety Disorder.  PX 10 (Letter from Dr. Holland, June 16, 2006).

In that letter, Dr. Holland informed Ridgley of the cause of her illness – the hostile work

environment:

> Ms. Martin is experiencing a tremendous amount of stress in her current
> work position.  She reports consistently that she feels ostracized, alienated,
> marginalized, and demeaned.  While Ms. Martin has developed coping skills
> to endure a tremendous amount of work place stress, I believe what has made
> the current situation intolerable is her feeling of hopelessness.  She believes
> that she has no venue either within or outside the agency that will address her
> concerns.

*Id.*  Dr. Holland expanded on this by adding:

> [S]he has informed me that she is constantly subjected to manipulation of the
> work environment such as withholding needed information, setting
> unreasonable deadlines, excluding her from critical meetings, not responding
> to her requests for assistance and information, receiving trivial demands and
> virtually isolating her, i.e., communicating with her via email only.

*Id.*

**Statement No. 28:**     On June 21, 2006, Rachel Chance, Human Resources Specialist, notified
the Plaintiff of her entitlement to leave under the Family Medical Leave Act (FMLA) and
notified the Plaintiff that she was forwarding the medical note from Dr. Frances Holland to the

Federal Occupational Health (FOH) consultant for medical review for her request for extended leave. She also requested that the Plaintiff provide a medical release form so that FOH could review her medical records to determine the extent to which the agency needed to provide accommodations.

**Response: There are material issues of fact regarding this contention.** The plaintiff disputes that Martin's medical records were needed in order to determine the extent to which the agency needed to provide accommodations. The agency had received a number of letters from Martin's doctors explaining her condition. *See e.g.* PX 10 (Letter from Dr. Holland, June 16, 2006); PX 11 (Letter from Dr. Holland, July 26, 2006); PX 12 (Letter from Dr. Holland, November 7, 2006). The defendant was also aware that Martin had been diagnosed with Depression and General Anxiety Disorder. PX 13 (Records from Dr. Tucker). Additionally, while the defendant claims that the medical records were necessary, the Decision to Remove belies this claim. The June 22, 2007 "Decision to Remove" DHHS specifically states, that, although they requested access to Ms. Martin's medical records from her husband Clyde Martin and he refused to give them authorization, "subsequently, additional medical information has been provided; however, the inability of our contract physician to properly review the medical information requires me to solely rely on the information from your medical provider." PX 15 (Decision to Remove) at 1. This statement is evidence that DHHS had the medical information they needed in order to make a determination about what accommodations were needed to assist Martin without access to her medical records.

**Statement No. 29:**    In a letter dated July 10, 2006, the Plaintiff's husband, Clyde Martin, wrote a letter to Ms. Chance, stating that they would "not authorize access to her medical records." On July 26, 2006, the Plaintiff signed power of attorney to her husband. Plaintiff Power of Attorney

21

**Response: There are material issues of fact regarding this contention..** *See* Response to Statement No. 28.

**Statement No. 30:**    On July 11, 2006, Christopher Holland, MD, FOH, consultant, documented that he spoke to Dr. Frances Holland, the Plaintiff's psychologist, who advised that the Plaintiff was "at a breaking point," but confirmed the diagnosis (of depression and generalized anxiety) and the need for medical leave.

**Response: Immaterial.** The fact that Christopher Holland confirmed Martin's diagnosis and

her need for medical leave is only relevant in that it supports the plaintiff's claims that the

defendant had the medical information it needed without gaining full access to all of Martin's

medical records. *See also* Response to Statement No. 28.

**Statement No. 32:**    In late October 2006, the Plaintiff's husband was notified by Ms. Chance that the Plaintiff had been absent for 479 hours of LWOP and 103 days from work, and that "her continuing absence is placing a considerable strain on the staff and their daily operations. An employee that is available for duty on a regular full-time position is needed in her position." The Plaintiff was also notified that LWOP will not be granted indefinitely and the Plaintiff needed to report to duty November 13, 2006. This notice provided that the Plaintiff "was required to report to her office on November 13, 2006, ready, willing and able to resume the duties of her position."

**Response: There are material issues of fact regarding this contention**. While plaintiff does

not dispute that she was sent the October 2006 letter, she does dispute that the contents of the

letter are true. The plaintiff has put forth substantial evidence that her duties and responsibilities

were diminished within the Department until she had practically no work to do up to eighty

percent of the work day. *See e.g.* PX 1 (Martin affidavit, June 12, 2007) at 2. After her duties

were reassigned to Mr. Randall and the lower-ranked staff of the Department, Martin spent most

of her time in her cubicle doing clerical tasks such as forwarding emails. PX 5 (Martin Affidavit,

August 22, 2007) at 4. Since Martin was not performing her job duties, her absence could not

have placed a "considerable strain" on the staff and their daily operations.

22

**Statement No. 35:**    On November 14, 2006, the Plaintiff's husband filed Claim forms CA-2, CA-7, and CA-20 for Compensation for Worker's Compensation and the forms and cover letter were forwarded to Renee Davis, Worker's Compensation Specialist. For cause, the Plaintiff's husband reported that the Plaintiff's injury was caused by her being asked questions about her leave use, her receipt of two letters of reprimand and defamed character, and that the Plaintiff's filed several union and EEO complaints. He further stated that "by January 2006 Arthuretta began to show very strong symptoms of stress and was seen by numerous medical personnel."

**Response:  There are material issues of fact regarding this contention**.  In the section of the

workmen's compensation application that asked to "give a detailed chronological description of

particular employment factors which you believe caused your condition," Clyde Martin listed a

number of items not included by the defendant.  Specifically, he explained that Arthuretta's

claim had been caused by: (1) Ridgley reassigning her work to other staff members; (2) Ridgley's

hiring of Clarence Randall at a higher grade to take over her duties; (3) Martin's exclusion from

meetings other than weekly staff meetings; (4) Ridgley's purposeful embarrassment of Martin at

the staff meetings; (5) Ridgley changing the office locks, and blocking her access to email and

voicemail without notice; (6) sending Martin work related emails at home during sick leave; (7)

DHHS's failure to assist Martin in her repeated requests for assistance in filing for a waiver of an

overpayment; (8) Ridgley's insistence that Martin back date her performance plan for FY 2005;

(9) Ridgley's failure to give Martin a midyear or annual performance in FY 2005; (10) Ridgley's

preparation fo a performance plan for 2006 that was unrealistic and her refusal to review it with

Martin despite Martin explaining her concerns; (11) Ridgley refusing to tell Martin the name of

her second-level supervisor; (12) the HHS EEO Director's refusal to process any of Martin's

EEO complaints including failing to assign an EEO counselor and failing to investigate her

complaints; (13) Marc Weisman's failure to process Martin's request for outside activities for

her trip to Africa; and (14) Marc Weisman's refusal to process her request to approve a

publication she wrote and her request to have a small business which affected her ability to have

the work published and future activities with the American Society of Public Administrators,

Conference of Minority Employees.  DX 37 (Clyde Martin Worker's Comp. Letter) at 7-8.

**Statement No. 36:**    Mr. Martin did not provide the agency access to other medical
documentation.

**Response: There are material issues of fact regarding this contention**.  The June 22, 2007

"Decision to Remove" DHHS specifically states, that, although they requested access to Ms.

Martin's medical records  from her husband Clyde Martin and he refused to give them

authorization,  "subsequently, additional medical information has been provided; however, the

inability of our contract physician to properly review the medical information requires me to

solely rely on the information from your medical provider." PX 15 (Decision to Remove) at 1.

This statement is evidence that DHHS had the medical information they needed in order to make

a determination about what accommodations were needed to assist Martin without access to her

medical records.

**Statement No. 37:**    In November 2006, Ms. Ridgely [sic] responded in detail to the allegations
contained in the Plaintiff's worker's compensation claim by reiterating that the Plaintiff's leave
was "sporadic" and that the Plaintiff received two letters of reprimand in March and May of
2005, she was advised of the Employee Assistance Program, and she denied allegations of
mistreatment and office environment stressors.

**Response:  Immaterial**.  The responses to Martin's allegations in the worker's compensation

claim are irrelevant to Martin's discrimination claim.  The analysis for whether an individual is

qualified to receive worker's compensation differs from the requirements of a discrimination and

retaliation suit brought under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff

was not terminated because of her use of leave.

**Statement No. 41:**    On January 12, 2007, Ms. Ridgely [sic] proposed the Plaintiff's removal
for medical inability to perform the duties of her position, based on the Plaintiff's extended
medical absences.

**Response: There are material issues of fact regarding this contention.** Ridgley proposed

Martin's removal from her position at DHHS because of her race and in retaliation for filing

EEO complaints against Ridgley and DHHS. After Martin returned from FMLA, Ridgley

assigned practically all of Ms. Martin's responsibilities to Clarence Randall. PX 1 at 2; *see also*

PX 3 (Request for Hearing and March 24, 2005 EEO complaint) at 11. Mr. Randall, a

Caucasian male, who previously worked for the Centers for Disease Control; was brought into

DHHS as a GS-15 "Special Assistant," a position that had been created for him. PX 1 (Martin

Affidavit, June 12, 2007) at 1; *see also* PX 2 (email response from Clarence Randall, June 7,

2007). The position of Special Assistant was not advertised and was given to him without

competition. PX 1 (Martin Affidavit, June 12, 2007) at 2-3,7; PX 2. In fact, when Ms. Martin

returned to work after being out on FMLA after her son's illness, Ridgley told Randall to assist

Martin in getting another job. PX 4 (Martin Affidavit, July 31, 2007) at 6.

The evidence of retaliation is also significant. Martin was terminated on June 22, 2007.

She engaged in protected activity a week prior to her termination, when on June 15, 2007, just

seven days before Martin was terminated, Plaintiff's counsel wrote a letter to James L. Hubbard

regarding Martin's EEO Complaint which accompanied additional documentation for him to

review. PX 16 (Letter from Nicholas Lewis to Hubbard, June 15, 2007). Furthermore,

defendant's stated reason for her termination was that it "appeared" she would not be able to

come back to work in the foreseeable future and that she was "medically unable" to do the job.

However, defendant was aware that Martin could come back to work part time because her

treating physician certified on May 3, 2007 that, "it may be possible for Ms. Martin to return to a

position within DHHS in a part time capacity in 6-8 months; i.e. late September or early October

if her current level of progress continues." DX 40 (Frances Holland Letter, May 3, 2007).

Additionally, defendant could have accommodated the plaintiff's disability.  The plaintiff could

have performed the duties of her job, as she has successfully done in the past (*See e.g. PX 8*

(Martin's Performance Appraisals) if the Department had provided her with a simple reasonable

accommodation, completion of her treatment plan by her psychotherapist, along with a transfer

away from Ridgley's supervision.  As Dr. Holland's letters indicate, Ms. Martin's condition has

improved over time, and she was expected to be able to return to work part time in September or

October of 2007. PX 12 (Letter from Dr. Holland, November 11, 2007).  Allowing Ms. Martin to

complete her therapy and then either permitting her to return to work with a new supervisor

would have addressed both the harassment and feelings of hopelessness that Ms. Martin

experienced.  Another accommodation that could have been made was to allow Martin to go on

detail, as Ridgley had suggested to Martin during  her 2004 Performance Evaluation.  See DX 17

(2004 Performance Evaluation); DX 5 (Plaintiff email, October 5, 2004) at 2 ("In my midyear

review you recommended that I pursue a detail in another office like the Office of Women's

Health.  I agreed with you and I planned to pursue that avenue").  When Martin sent in her

request to go on a six-month detail in the Office of Minority Health beginning in September of

2005, Ridgley denied the request.  DX 25 (Plaintiff Detail Request, July 29, 2005); DX 26

(Ridgley Response to Plaintiff Detail Request, August 4, 2005).  Since the plaintiff could have

26

been accommodated, the statement that Martin was unable to perform the duties of her position

is not true.

**Statement No. 43:**    In a decision letter on June 22, 2007, Linda Garvin, Principal Deputy
Assistant Secretary for Administration and Management (ASAM), HHS, decided to uphold the
proposed removal effective July 1, 2007. In her decision, Ms. Garvin considered that the Plaintiff
had not returned to work since June 19, 2006 due to a medical condition. She considered that the
Plaintiff's refusal to grant the agency permission to view her medical records limited the
agency's review of her medical condition, her ability to work and the agency's ability to
accommodate the Plaintiff. She considered that the Plaintiff's psychotherapist indicated that the
Plaintiff "may" return to work in six to eight months and that there was no indication that the
Plaintiff could return to full duty or to return to work at all. She considered that the Plaintiff's
response to the proposal did not address the reasons proposed. She considered that the Office of
Small and Disadvantaged Business Utilization had been severely understaffed and needed the
Plaintiff's services. In reaching the decision to remove the Plaintiff, the deciding official based
the decision on evidence of excessive leave supported by the medical documentation available.
The deciding official considered that the Plaintiff's medical inability to perform duties, as
demonstrated by observed deficiencies in her attendance, adversely impacted the efficiency of the
federal service. In making this decision, the deciding official also determined that without
assurance of the Plaintiff's return to work after having been out of work for nearly a year without
a return to duty "in the near future," it was in the agency's best interests to remove the Plaintiff.

**Response:  There are material issues of fact regarding this contention**.  Martin was removed

from her position at DHHS because of her race and in retaliation for filing EEO complaints

against Ridgley and DHHS.  *See* Response to Statement No. 41.

**Statement No. 44:**    The Plaintiff's claim for worker's compensation was denied by the
Department of Labor on September 26, 2007. The Department of Labor stated that the Plaintiff's
claim was "denied because the evidence does not establish that you were injured in the
performance of duty as required for coverage under the Federal Employee's Compensation Act
(FECA)."

**Response:  Immaterial.**  Whether the plaintiff was approved for worker's compensation is not

relevant to her discrimination and retaliation claims against DHHS.  The requirements under the

Federal Employee's Compensation Act (FECA) are different from those in a discrimination and

retaliation suit brought under Title VII of the Civil Rights Act of 1964.

27

**Statement No. 45:**    The Plaintiff filed for disability retirement with the Office of Personnel Management (OPM) in August 2007.  In January 2008, OPM approved the Plaintiff's disability retirement application.

**Response:  Immaterial.**  The fact that the plaintiff filed for disability retirement is not relevant

to her claim of discrimination and retaliation under Title VII of the Civil Rights Act of 1964.

The requirements necessary to be approved for disability retirement are different from those in a

discrimination and retaliation suit brought under Title VII of the Civil Rights Act of 1964.

Respectfully submitted,

Richard L. Swick (EKR)

Richard L. Swick
D.C. Bar # 936930
Alana M. Hecht
D.C. Bar # 494097
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
Phone: 202-842-0300
Fax: 202-842-1418
Email: rlswick@swickandshapiro.com
*Attorneys for Plaintiff*

28