## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**ARTHURETTA L. HOLMES-MARTIN,**        )
                                        )
              **Plaintiff,**            )
     **v.**                             )          **Civil Action No. 07-2128 (RMU)**
                                        )
**MICHAEL O. LEAVITT, Secretary of the U.S.** )
**Department of Health and Human Services,**  )
                                        )
              **Defendant.**            )
_____)

## DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO HIS MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant has moved the Court to dismiss and/or for summary judgment on the entirety of Plaintiff's federal court complaint. Plaintiff had a long-standing preexisting condition of depression unrelated to the Department of Health and Human Services (HHS) that began when she worked for the Internal Revenue Service from 1994-1998. See DOL Decision, Sept. 27, 2007, Def.'s Mem. Ex. 44 at 3. According to her physician, plaintiff could not do her job at HHS because of her medical conditions. Def.'s Mem. Ex. 36. Plaintiff has stipulated that, for medical reasons, she was unable to do her job -- the very definition of a legitimate business reason for termination. Def.'s Mem. Ex. 45 & 46. Subsequently, the United States Department of Labor denied the Plaintiff's claim for worker's compensation on the ground that the Plaintiff had not established that her medical injuries occurred on the job. Def.'s Mem. Ex. 44. This is the heart of Defendant's dispositive motion; Plaintiff's opposition does not challenge these dispositive facts.

Nor does Plaintiff contest that there is no similarly situated employee who was also medically unable to perform her duties and was not removed. Title VII does not promise an

employee – or a supervisor – a work environment free from stress.  Burton v. Batista, 339 F. Supp.2d 97, 111 (D.D.C. 2004).  There is nothing on the face of the complaint or in the Plaintiff's opposition that raises an inference that the Plaintiff will be able to prove that she was, in fact, the victim of intentional discrimination.

Nonetheless, Plaintiff asks this Court to deny Defendant's dispositive motion based on the following arguments: (1) the complaint should not be dismissed because it sufficiently states a cause of action; (2) summary judgment cannot be granted on the hostile work environment claim; (3) the alleged removal of substantive duties is an adverse personnel action; (4) summary judgment is inappropriate in cases where plaintiff offers evidence disputing employer's claim that there was no reasonable accommodation; and (5) a reasonable jury could find that the Plaintiff was stripped of her duties and terminated because of discrimination.  Pl.'s Opp. at  2.

As addressed more fully below, Plaintiff either fails to state a legally cognizable claim or fails to prove discrimination on all of her allegations of discrimination.  Plaintiff's claims that she was stripped of duties does not involve an adverse personnel action (nor did plaintiff plead facts in her complaint supporting her claims of removal of duties). Summary judgment is appropriate on the plaintiff's reassignment of work claim because there is no genuine dispute and there is no factual support for such claim.  Plaintiff's assertions notwithstanding, a basic and fundamental part of being a manager is the prerogative to assign work to employees.  The alleged changes in Plaintiff's duties were not accompanied by changes to the terms, conditions or privileges of her employment and therefore do not amount to an adverse personnel action. Here, Plaintiff retained her position and all of the duties in her position description (until she and her physician concluded that she was medically unable to perform her duties); she retained her

title as Deputy Director; she experienced no loss in pay; and she retained all her benefits.  Infra

SectionVI.  Moreover, Plaintiff has not established a causal connection between her assignments

and her race or protected activity.  With respect to the removal, Plaintiff admits that she was

physically unable to perform her duties.  Further, Plaintiff's removal was a year and three months

after her last EEO complaint was filed and causal connection as the courts have defined it is

lacking, notwithstanding plaintiff's attempt to narrow this time frame relying on two letters that

were not sent to or copied to the management officials.  Accordingly, a reasonable jury could not

find that the Plaintiff was stripped of her duties and terminated because of discrimination or

retaliation.

Plaintiff's federal court complaint does not contain a hostile work environment count.

Thus, the Court need not consider a large part of plaintiff's opposition.  Pl.'s Opp. at 17.  Even if

the federal court complaint did contain a hostile work environment count, it would fail because:

(1) plaintiff has not alleged or set forth facts that would establish such a claim; (2) the list of

minor incidents and encounters over the six-year employment under the supervision of Ms.

Ridgely that Plaintiff presents in her opposition is not severe and pervasive – a necessary

element of a hostile work environment claim; and (3) plaintiff has not established a link between

these incidents and her race or retaliation.  Defendant has addressed these matters in this reply in

an abundance of caution and to show the futility of Plaintiff's position.

Plaintiff's federal court complaint does not contain a Rehabilitation Act count (i.e. failure

to accommodate a disability).  Thus, the Court need not consider another large part of plaintiff's

opposition.  Pl.'s Opp. at 21-26.  Even if the federal court complaint did contain a Rehabilitation

Act count, it would fail because: (1)  plaintiff has not alleged or set forth facts that would

establish such a claim; (2) such a claim is precluded due to plaintiff's filing for disability

retirement at the United States Office of Personnel Management; (3) Plaintiff is not a "qualified

individual with a Disability" as defined by the Rehabilitation Act because she could not come to

work; and (4) Plaintiff is not entitled to her preference in work arrangements as an

"accommodation" for a disability -- such as transfer to a new supervisor or indefinite medical

leave/absence from work.

Although Plaintiff tries to manufacture factual issues in a transparent attempt to defeat

defendant's motion for summary judgment, the factual issues raised by Plaintiff are not genuine

or material.   Thus, pages 3 through 11 of Plaintiff's opposition do not preclude dismissal and/or

summary judgment in favor of defendant.  In her opposition at 2, Plaintiff claims:

> [t]here are issues of fact regarding whether (1) DHHS stripped Martin of most of
> her job responsibilities; (2) DHHS terminated Martin without considering
> whether it could accommodate her mental needs; (3) DHHS's claim that it was
> undue hardship to leave Martin's position unfilled while she finished her
> treatment was pretextual; (4) whether Ridgely treated Martin differently from a
> white coworker because of race discrimination; and (5) whether Ridgely treated
> Martin differently in retaliation for filing EEO complaints.

Defendant addresses all of these assertions as well in this reply (at <u>infra</u> pages 21-25) in an

abundance of caution, to show the futility of Plaintiff's position and/or to demonstrate that there

is no genuine issue of material fact.

## I. **<u>Plaintiff's Complaint Does Not Sufficiently State a Cause of Action</u>**

As provided in the Defendant's Memorandum at 12-13, Plaintiff cannot survive a motion

to dismiss a complaint of employment discrimination by simply pleading discrimination.  The

complaint must set forth sufficient factual allegations to support her claims for relief.  <u>Bell</u>

<u>Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from <u>Conley v.</u>

Gibson, 355 U.S. 21, 47 (1957)).  As argued more thoroughly below, Plaintiff's claim in this

case that she was stripped of duties does not involve an adverse personnel action. With respect to

the removal, Plaintiff admits that she was physically unable to perform her duties.  She fails to

assert sufficient facts to support that she was removed for discriminatory reasons.  In fact,

Plaintiff admits that she was unable to perform her duties.

When considering a Fed. R. Civ. P. 12(b)(6) motion, "the court must treat the complaint's

factual allegations-including mixed questions of law and fact-as true and draw all reasonable

inferences therefrom in the plaintiff's favor." Runkle v. Gonzales, 391 F. Supp.2d 210, 220-21

(D.D.C. 2005) (citing Macharia v. United States, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); Holy

Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 165 (D.C. Cir. 2003); Browning v.

Clinton, 292 F.3d 235, 242 (D.C. Cir 2002)). However, "the court need not accept as true

inferences unsupported by facts set out in the complaint or legal conclusions cast as factual

allegations. Id. at 221 (citing Warren, 353 F.3d at 39; Browning,292 F.3d at 242).  The

Plaintiff's complaint is insufficient because it fails to assert sufficient and supported facts.


II.     **Plaintiff's Two-Count Complaint Does Not Contain a Hostile Work Environment Claim**

    A.  **Plaintiff's Complaint Does Not Plead Hostile Work Environment**

Plaintiff argues that this Court should not grant summary judgment on the "hostile

work environment claim" because the Defendant's Motion did not move "this Court for

summary judgment on either [the Plaintiff's] hostile work environment claims based on race or

retaliation."  Pl.'s Opp. at 17.  This argument lacks merit for at least four reasons.  First,

Defendant, in fact, moved for summary judgment on all of the Plaintiff's claims, the entirety of

the two-count complaint (race and retaliation).  Def.'s Mem. at 2 & 32.  Second, Defendant

specifically moved for summary judgment on the removal of duties issue, the termination issue

and every other issue alleged that could possibly have comprised the hostile work environment

allegation at the administrative stage.  Def.'s Mem. at 22-32.  Plaintiff must exhaust her

administrative remedies, is bound by the parameters of her administrative complaint and cannot

now raise new matters. 42 U.S.C. § 2000e-1©; see Park v. Howard Univ., 71 F.3d 904, 907-08

(D.C. Cir 1995).

Third, there is no count in the complaint alleging hostile work environment and no facts

alleged that would establish such a claim.  When initially filing her two-count complaint in

federal court, Plaintiff had the responsibility and freedom to frame her issues.  Plaintiff chose to

plead two counts -- race discrimination and retaliation, she chose to abandon many bases, claims

and issues she had initially pursued in her administrative complaint.[1]  Defendant moved for

summary judgment on both counts pled.  Plaintiff was free to bring a third claim of hostile work

environment.  She did not make that choice.  Defendant should not have to guess at what

Plaintiff is pleading by looking to the characterizations made in her introduction or statement of

facts.  Fed. R. Civ. P. 10(b) requires separate counts for discrimination claims under various

theories.  See Russo-Lubrano v. Brooklyn Federal Savings Bank, 2007 WL 121431 (E.D.N.Y.

2007 (holding that hostile work environment claim and disparate treatment claim based on

gender "are distinct and should not be alleged in a single count under Rule 10(b) of the Federal

Rules of Civil Procedure") (citing Harris v. Radioshack Corp., 2002 WL 1907569 (S.D. Fla.

---

[1]  For example, Plaintiff's April 5, 2007 administrative complaint alleged "sex (female)"
and "color (black)" claims that Plaintiff abandoned and chose not to include in her federal court
complaint.  Def.'s Mem. Ex. 16 (admin. compl.); Complaint no. 07-2128 (RMU)(D.D.C.).

2002) (finding that "if Plaintiff desires to assert discrimination claims under various theories,

these claims must be asserted in separate counts in accordance with Fed. R. Civ. P. 10(b)) and

Gonzalez v. Police Comm'r Bratton, 2000 WL 1191558 (S.D.N.Y. 2000) (holding that a

disparate treatment claim is conceptually distinct from that of a hostile work environment claim

requiring different pleading and proof)).

        The Plaintiff states in Footnote 1 on page 15 of her Opposition that the multiple incidents

addressed by the Defendant that were part of the administrative complaint "form the basis of her

hostile work environment claim."  However, the Plaintiff did not present any facts that would

establish such a claim.  This Court has held that "[w]hile Title VII plaintiffs do not need to set

forth the prima facie case as to each count to survive a motion to dismiss for failure to state a

claim, they must present facts that would establish elements of each claim."  Runkle v. Gonzales,

391 F. Supp.2d 210, 221 (D.D.C. 2005)(RMU).

        The Supreme Court in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) held that

plaintiffs only need to satisfy simple requirements in satisfying the notice requirement of Fed. R.

Civ. P. 8(a).  The Second Circuit has held that the Swierkiewicz holding does not mean that

'[p]laintiffs bear no burden at the pleading stage."  Amron v. Morgan Stanley Inv. Advisors, Inc.,

464 F.3d 338, 343 (2nd Cir. 2006).  Bald assertions and conclusions of law will not suffice to

meet the pleading standard.  Amron, 464 F.3d at 344.  Specifically, in Title VII cases, a plaintiff

must provide notice of relevant facts underlying the discrimination claim and identify how race

played a factor in the discriminatory treatment.  Russo-Lubrano, 2007 WL 121431 at 4 (citing

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2nd Cir. 1988).  When this standard is not met, notice is

insufficient and a motion to dismiss should be granted.  Id.

7

Fourth, Defendant addressed each and every issue that was initially included in Plaintiff's hostile work environment allegation at the administrative stage, demonstrating that none of those matters rose to the level of severe and pervasive as required by <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65 (1986). Def.'s Mem. at 22-27; Def's Mem. Ex. 16 (administrative complaint). The specific elements of hostile work environment do not alter the analysis. Defendant addressed each and every issue that allegedly made up the hostile work environment claim to demonstrate that none of the allegations involved instances where the conditions of Plaintiff's employment were altered. <u>See</u> <u>Singletary v. District of Columbia</u>, 351 F.3d 519, 526 (D.C. Cir. 2003) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)).

**B.** **If This Court were to Allow Plaintiff to Maintain a Separate Hostile Work Environment Claim, It Would Fail**

Title VII prohibits employers from creating a discriminatorily hostile or abusive work environment. <u>Meritor</u>, 477 U.S. at 64. The D.C. Circuit and this Court have held that "such an environment exists when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Sullivan–Obst v. Powell</u>, 300 F. Supp.2d 85, 96 (D.D.C. 2004)(RMU) (quoting <u>Singletary</u>, 351 F.3d at 526). Moreover, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). In determining whether there is a discriminatory hostile work environment, the court examines the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's performance. <u>Id.</u> at 23.

8

What this Court stated in <u>Sullivan-Obst</u> is particularly apt here:

> In considering the totality of the circumstances, however, the court is mindful that everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

300 F. Supp.2d at 96 (citing <u>Bryant v. Brownlee</u>, 265 F. Supp.2d 52, 63 (D.D.C. 2003)).

To establish a claim of hostile work environment based on race, a plaintiff must demonstrate the following: (1) that she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of *respondeat superior* liability. <u>Richard v. Bell Atlantic Corp.</u>, 209 F. Supp.2d 23, 34 (D.D.C. 2002) (quoting <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1081 (3rd Cir. 1996)).

In <u>Richard</u>, this Court found that the plaintiff failed to establish a hostile work environment, finding that even assuming that all of the plaintiff's claims were true, the conduct complained "of, i.e. rude comments, unjust criticism, and stressful working conditions, amount to 'ordinary tribulations of the workplace' that [is] insufficient as a matter of law for a hostile environment case." <u>Richard</u>, 209 F. Supp.2d at 35 (citing <u>Barbour v. Browner</u>, 181 F.3d 1342, 1348-49 (D.C. Cir. 1999)). As in the instant case, the plaintiff in <u>Richard</u> based "the majority of these allegations of a hostile work environment solely on her own allegations and provides the court with very little supporting evidence to strengthen her position." <u>Id.</u>

The Plaintiff included a laundry list of incidents and minor encounters that occurred over

the course of her six-year employment under Ms. Ridgely's supervision in an attempt to

establish a hostile work environment claim. However, all that the Plaintiff establishes is that like

many employees, she experienced "ordinary tribulations of the workplace." Richard, 209 F.

Supp.2d at 35. In addition, outside of identifying her protected class, the Plaintiff offers

absolutely no evidence of "a linkage of correlation to the claimed ground of discrimination."

Sullivan-Obst, 300 F. Supp.2d at 96. Furthermore, the Plaintiff's factual assertions are only

supported by her own affidavit, containing her self-serving conclusions and unsubstantiated

assertions, insufficient evidence to defeat summary judgment. Little v. Liquid Air Corp., 37

F.3d 1069, 1075 (5th Cir. 1994) (holding that plaintiff cannot satisfy burden of demonstrating

genuine issue of fact with "conclusory allegations", "unsubstantiated assertions", "or by only a

'scintilla' of evidence"). Nonetheless, the Defendant addresses the incidents and conduct below,

demonstrating that while many are not factually accurate, even if accepted as true, (1) these

allegations are not severe and pervasive and (2) there is no link to Plaintiff's race or retaliation.

The factual assertions from Plaintiff's opposition are indented in bold and the paragraph in the

Supplemental Ridgely Affidavit that responds to the allegation follows:

>**Pl's Alleg: "Ridgely would not meet with Martin unless she had an appointment, but she allowed Randall open-door access... thereby creating the impression Martin was not trusted to attend these meetings by herself."** Pl.'s Opp. at 5; Def.'s Reply Ex. 1 at 4.

>**Pl's Alleg: "In the Fall of 2004, Ridgely discontinued almost all person-to-person contact with Martin, despite the close proximity of their offices. Instead of talking to her, Ridgely began relying almost solely on email."** Pl.'s Opp. at 5; Def.'s Reply Ex. 1 at 5.

>**Pl's Alleg: "Ridgely also diminished Martin's responsibilities...she was either ignored or given a menial task, such as forwarding emails."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 5

>**Pl's Alleg: "To add insult to injury, Ridgely made a point of asking Ms. Martin about what she was working on in staff meeting. When Martin responded that she had no work, Ridgely ridiculed her in front of her colleagues."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 5

*Pl's Alleg:* **"Ridgely actually states that, 'Ms. Martin actually embarrassed herself by stating that she had no work to report', thus implying that Ms. Martin brought shame..."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 6

*Pl's Alleg:* **"Ridgely found other ways to isolate Martin. She ordered the SBA procurement center representative to stop communicating with Ms. Martin. Because Martin was responsible for procurement within her office, Ridgely's order impeded Ms. Martin's ability to perform her job."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 6.

*Pl's Alleg:* **"She also excluded Martin from all meetings other than the weekly staff meeting."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 6.

*Pl's Alleg:* **"Later Ridgely changed the locks on Ms. Martin's door at the office and prevented her access to her voice mail and e-mail."** Pl.'s Opp. at 6; Def.'s Reply Ex. 1 at 6; see also Ex. 2, August 8, 2007 email re: disabling Plaintiff's email.

*Pl's Alleg:* **"Ridgely also manipulated Ms. Martin's performance evaluations for Fiscal Years 2005 and 2006...That year she received no mid-year or annual performance evaluation."** Pl.'s Opp. at 6-7; Def.'s Reply Ex. 1 at 7.

*Pl's Alleg:* **"Then in FY 2006, Ridgely established unrealistic goals...Ridgely refused to provide the name."** Pl.'s Opp. at 7; Def.'s Reply Ex. 1 at 7.

Although the supervisor and Plaintiff present varying versions of these incidents, even if Plaintiff's version were accepted as true the conduct hardly amounts to severe and/or pervasive. Furthermore, if this Court were to accept that the environment was hostile, there is no evidence to support the assertion that the treatment was discriminatory.

### III.  The Alleged Removal of Duties

#### A.  The Complaint Does Not Adequately Plead Facts Supporting Removal of Duties

Plaintiff made one general statement in the Statement of Facts of the complaint concerning the reassignment of Plaintiff's duties.  Plaintiff stated the following: "During this period, Ms. Ridgely began treating Ms. Holmes-Martin with extreme hostility, isolating her from her colleagues, assigning work central to her position as the Deputy Director of the Office of Small and Disadvantaged Business Utilization to others, and subjecting her to public ridicule." Compl. ¶ 10.  Nowhere else in the complaint does Plaintiff allege or plead the specific facts to prove her claim as required, failing to provide Defendant with the notice necessary to determine whether this allegation involved an adverse personnel action.  Defendant should not have to search through the administrative file or background material to determine what specific factual allegations the Plaintiff makes in support of her claim.

#### B.  The Alleged Removal of Duties is Not An Adverse Personnel Action and is Not Actionable for Plaintiff's Discrimination Claim

It was not until Plaintiff filed her Opposition that she finally alleged some facts to support the allegation that Defendant removed duties because of Plaintiff's race and/or in retaliation for prior EEO activity.  However, even assuming the facts as alleged by Plaintiff are true, Plaintiff fails to establish an adverse personnel action.  Minor changes in work-related duties or opportunities do not qualify as actionable injuries unless accompanied by adverse changes in the terms, conditions, or privileges of employment.  Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002).   Further this court has held that, "[n]ot everything that makes an employee unhappy is a judicially actionable adverse action."  Runkles v. Gonzales, 391 F. Supp.2d 210, 221 (D.D.C. 2005)(RMU) (citing Burton v. Batista, 339 F. Supp.2d 97, 110

12

(D.D.C. 2004). In the same case, this Court went on to say that "purely subjective injuries, such as dissatisfaction with a reassignment or public humiliation or loss of reputation, do not constitute adverse actions." Id. (citing Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 1999)). Assigning work is a basic management prerogative.

In Baloch v. Norton, 355 F. Supp.2d 246 (D.D.C. 2005)(RMU), this Court held that "to determine whether an adverse personnel action occurred, the court asks whether 'a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.'" Baloch, 355 F. Supp.2d at 256 (citing Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999)). In Baloch, as in this case, the plaintiff claimed that the removal of duties through reassignment to a new employee was an adverse personnel action. This Court found that "[t]he plaintiff does not allege that he saw a reduction in benefits, work hours, or job-title as a result of [the supervisor] hiring [a new employee]. Rather, the plaintiff claims that he lost many of the duties he had enjoyed for over ten years to [the new hires]." Id. This Court held that the Baloch plaintiff failed to show an adverse personnel action, citing the D.C. Circuit decision in Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1556-57 (D.C. Cir. 1997):

> When an employer makes a hiring decision "[s]hort of finding that the employer's stated reason was indeed a pretext...the court must respect the employer's unfettered discretion to choose among qualified candidates." The same stand holds true when an employer decides which of several qualified employees will work on a particular assignment. Perhaps in recognition of the judicial micro management of business practices that would result if we ruled otherwise, other circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour change.

Baloch, 355 F. Supp.2d at 256 (emphasis added). This Court went on to say that an adverse personnel action may occur when the change of work-related duties amount to "significantly

13

diminished material responsibilities." Id. (citing Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996). This Court further explained "significantly diminished material responsibilities" includes "termination of employment, demotion evidenced by a decrease in wage or salary, less distinguished title, material loss of benefits, or other indices that might be unique to a particular situation." Kocsis, 97 F.3d at 886. Even after alleging that he lost two core functions of his position, this Court in Baloch still found that such actions did not amount to an adverse personnel action. Here, as demonstrated below, Plaintiff maintained all of her core functions as outlined in her position description. See infra Section VII ("There Are No Issues of Material Fact").

### C. Plaintiff's Retaliation Claim Is Not Materially Adverse

In Burlington Northern v. White, 126 S.Ct. 2405 (2006), the Supreme Court stated, in pertinent part, that the "[t]he anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . .[thus,] a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which. . .means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2414-15, citing Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)(quoting Washington v. Illinois Dept. of Revenue, 420 F.3d 458, 662 (7th Cir. 2005)(emphasis added). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington Northern, 126 S.Ct. at 2415.

14

**IV.**    **There is No Reasonable Accommodation Claim**

    **A.**    **In Her Two-Count Complaint, Plaintiff Has Not Pleaded a Violation of the Rehabilitation Act**

In Plaintiff's Opposition, under the heading styled "A Jury Could Reasonably Conclude that Defendant's Claim that It Fired Martin Because She Was Unable to Perform her Duties is Pretextual," the Plaintiff states that "summary judgment is inappropriate in cases where the plaintiff offers evidence disputing the employer's claim that there was no reasonable accommodation that would have permitted the plaintiff to accomplish her required tasks."  Pl.'s Opp. at 22 (citing Breen v. Department of Transp., 282 F.3d 839, 843 (D.C. Cir. 2002)). However, there is no mention of reasonable accommodation, violation of the Rehabilitation Act, disability discrimination or jurisdiction under the Rehabilitation Act anywhere in the Plaintiff's federal court complaint.  It is beyond belief that the Plaintiff now alleges -- for the first time – that she has a claim of failure to reasonably accommodate a disability.  It is equally shocking that the Plaintiff states in the same section of her opposition that it "is false" that the Plaintiff was unable to perform the duties of her position.  See Pl.'s Opp. at 21.  This is in complete contradiction to Plaintiff's Complaint ¶ 14 which provided that the alleged harassment "caused [the Plaintiff] to become medically disabled from performing her job duties."  In addition, as discussed more thoroughly below the Plaintiff certified in her application to the Office of Personnel Management that she was medically unable to perform the duties of her position. Def.'s Mem. Exs. 45 & 46.

    **B.**    **In Any Event, A Rehabilitation Act Claim Would be Precluded Because Plaintiff Filed for Disability Retirement at OPM**

However, if this Court allows such a Rehabilitation Act claim, Plaintiff is precluded from

bringing such claim because she has filed for disability retirement at the Office of Personnel Management (OPM), which was granted. Def. Mem. Ex. 46.  Several courts have held that an employee's claiming total disability in order to receive disability payments precludes that employee's ADA claim.  See August v. Offices Unlimited, Inc., 981 F.2d 576 (1st Cir. 1992) (finding that under analogous portions of Massachusetts's anti-handicap discrimination statute that the plaintiff, who applied for and received long-term disability claiming he was totally disabled, was estopped from later contending that he was a qualified handicapped individual with a disability); Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768, 771 (8th Cir. 1987) (affirming dismissal of plaintiff's Rehabilitation Act claims where plaintiff claimed on insurance forms that she was totally disabled);  Harden v. Delta Air Lines, 900 F. Supp. 493 (S.D. Ga.1995) (granting summary judgment); McNemar v. The Disney Stores, Inc., 1995 WL 390051 (E.D. Pa.1995) (granting summary judgment); Kennedy v. Applause, Inc., 1994 WL 740765, 1994 (C.D. Cal. Dec. 7, 1994) (granting summary judgment); Reigel v. Kaiser Found. Health Plan, 859 F. Supp. 963 (E.D.N.C. 1994) (granting summary judgment).

### C.  If Not Precluded, a Rehabilitation Act Claim Would Fail Because Plaintiff Could Not Come to Work and is Not a "Qualified Individual With a Disability" as Defined by the Act

In any event, Plaintiff would not be able to show that she is a "qualified individual with a disability.  The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). Section 501 of the Act further mandates that employers take affirmative steps to provide for qualified persons with disabilities. 29 U.S.C. § 791(b); see Carr v. Reno, 23 F.3d 525, 528 (D.C. Cir. 1994). EEOC regulations interpreting Section 501 require

16

agencies to make reasonable accommodations for persons with disabilities unless such accommodations would impose undue hardship on the agency. 29 C.F.R. § 1630.9(a).

To be entitled to a reasonable accommodation, a person must be a "qualified individual with a disability" within the meaning of the Rehabilitation Act. An individual with a disability is a person who has, has a record of, or is regarded as having a physical or mental impairment which substantially limits one or more of that person's major life activities, i.e. working. See 29 C.F.R. § 1630.2(g). A qualified individual with a disability is a person who, with or without reasonable accommodation, can perform the essential functions of the position in question. 29 C.F.R. § 1630.2(m).

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Scarborough v. Natsios, 190 F. Supp.2d 5, 19 (D.D.C. 2002) (quoting Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). If the Plaintiff presents evidence that she is a qualified individual with a disability, then the burden shifts to the Defendant to show either that no reasonable accommodation of the Plaintiff's disability is possible or that such an accommodation would impose an undue hardship on the operation of the agency. Carter v. Bennett, 651 F. Supp. 1299, 1300-01 (D.D.C. 1987), aff'd, 840 F.2d 63 (D.C. Cir. 1988).

The Rehabilitation Act covers requests for only those accommodations that are "reasonable"; unreasonable accommodations are not protected by the Act. See Garcia-Ayala v.

Lederle Parenterals, Inc., 212 F.3d 638, 650 (1st Cir. 2000).  A court must look to the facts

surrounding a request for accommodation to determine whether it is reasonable. Waggoner v.

Olin Corp., 169 F.3d 481, 485 (7th Cir. 1999).

      Plaintiff is not a qualified individual with a disability because the Plaintiff could not

come to work.  The Federal Circuit has found that "an agency is inherently entitled to require an

employee to be present during scheduled work times." Law v. United States Postal Serv., 852

F.2d 1278, 1279 (Fed. Cir. 1988); cf. Carr, 23 F.3d at 530-31 (rejecting request for a "work when

able" accommodation as not reasonable because it wouldn't allow Plaintiff to perform the

essential function of her job).   Courts have also held that a minimum requirement for a qualified

disabled employee is to maintain a regular work schedule.  Matzo v. Postmaster General, 685 F.

Supp. 260-63 (D.D.C. 1987); Wimbley v. Bolger, 642 F. Supp. 481, 485 (W.D. Tenn. 1986).

      Additionally, the agency was not required to provide Plaintiff her preferred

accommodation.  Dorchy v. Washington Metro. Area Transit Auth., 45 F. Supp.2d 5, 13 (D.D.C.

1999) (holding that the agency is not obligated to provide the reasonable accommodation

preferred by the employee).  As stated in Pl.'s Opp. at 22, the requested accommodation was to

be transferred to a different supervisor and to allow her to indefinitely continue her absence from

work to seek treatment.  The EEOC has provided in its Enforcement Guidance that an agency

does not have to provide an employee with a new supervisor as a reasonable accommodation.

See EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship under the

Americans with Disabilities Act, (Rev. Oct. 17, 2002), at question 33

(http://www.eeoc.gov/policy/docs/ accommodation.html).

      Moreover, the D.C. Circuit has held that requests for indefinite medical leave as an

accommodation are unreasonable as a matter of law, under the Rehabilitation Act; this is particularly true where a plaintiff had already missed a significant amount of work prior to her request, had shown no signs of improvement, and medical documentation that she submitted was totally silent on the extent of her disability, her prognosis, or the need for a workplace accommodation. Scarborough, 190 F. Supp.2d at 26 (quoting Sampson v. Citibank, 53 F. Supp.2d 13, 18 (D.D.C. 1999); see also Waggoner, 169 F.3d at 485; Hudson v. MCI Telecommunications, Corp., 87 F.3d 1167, 1169 (10th Cir. 1996). Another federal court has held that in the absence of a request for a definite period, and in the absence of any evidence that a definite period available to plaintiff would have cured her problem, the court cannot find that plaintiff has satisfied her burden of requesting a reasonable accommodation. Rogers v. CH2M Hill, Inc., 18 F. Supp.2d 1328, 1341 (M.D. Ala.1998).

Plaintiff has also argued that Defendant should have accommodated her medical inability to perform her duties by placing her on administrative leave to complete her treatment. Pl.'s Opp. at 22. This argument is flawed. An accommodation as required under the Rehabilitation Act is to remove a barrier from the employee's work environment to enable the employee to perform the duties of her position. 29 C.F.R. § 1630(o)(1)(ii). Placing an employee on administrative leave indefinitely does not remove a barrier to allow the employee to perform her duties. To the contrary, it provides the exact opposite, a means for the employee not to perform her duties. This is not an accommodation required by the Rehabilitation Act. Cf. Robertson v. Neuromedical Center, 161 F.3d 292, 295 (5th Cir. 1998)(the ADA does not require an employer to reassign existing employees or hire new employees to perform [plaintiff's] duties). As such, the agency did not violate the Rehabilitation Act and summary judgment would be warranted on

19

any claim of disability discrimination.

**V.      Plaintiff Presents No Evidence to Raise an Inference of Discrimination**

      In order to survive summary judgment, a "the nonmoving party must present specific

facts that would enable a reasonable jury to find in its favor." Gardner v. District of Columbia,

448 F. Supp.2d 70, 73 (D.D.C. 2006)(RMU) (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C.

Cir. 1999)).  In presenting the specific facts, the nonmoving party may not rely solely on

allegations or conclusory statements. Green, 164 F.3d at 675.  First, Plaintiff presents absolutely

no evidence to support her factual assertions or claims outside of her own allegations provided in

her affidavit.  Second, outside of identifying her protected class, Plaintiff offers no evidence that

any of the complained of conduct or actions were motivated by race or demonstrates that race

played a factor in the treatment.  Third, and most important, even if a jury would accept her

factual assertions as true, it would not be enough to infer discrimination.

**VI.     Plaintiff's Retaliation Claim Fails Because There is No Causal Connection**

      Plaintiff argues that there is evidence of a causal connection between her protected

activity and her removal. Pl.'s Opp. at 18-20.  Plaintiff asserts that the letter submitted by her

husband to the agency inquiring about the status of Plaintiff's EEO complaint on November 14,

2006 and the proposed removal on January 12, 2007 are close enough (two months) to establish

temporal proximity.  Pl.'s Opp. at 19.  However, the November 14, 2006 letter was to Rachel

Chance with a "cc" to Michael Leavitt. Def.'s Mem. Ex. 37.  Plaintiff presents no evidence that

Ms. Ridgely, anyone in her office or anyone in the EEO office received this letter.  Second, in

order to satisfy the retaliation elements, the protected activity must be in close proximity to a

materially adverse action. Gardner v. District of Columbia, 448 F. Supp.2d 70, 74 (D.D.C.

2006)(RMU). A proposed action is not a materially adverse action. <u>Gustave-Schmidt v. Chao</u>,

226 F. Supp.2d 191, 201 (D.D.C. 2002).

Additionally, Plaintiff asserts that her counsel's letter to an EEO investigator seven days

before the decision to remove was issued also establishes temporal proximity.  Again, Plaintiff

must establish that responsible management officials had knowledge of the protected activity.

<u>Cones v. Shalala</u>, 199 F.3d 512, 521 (D.C. Cir. 2000).  Plaintiff provides no evidence that the

letter to the EEO investigator was sent to or seen by Ms. Garvin, the deciding official, or by Ms.

Ridgely, for that matter.  In fact, the letter was addressed to the contract investigator, who is not

a government employee, with a "cc" to Plaintiff.  Pl.'s Ex. 14.  There is absolutely no evidence

that Defendant management officials saw this letter.  As such, Plaintiff provides no evidence that

Defendant had knowledge of this protected activity.  One cannot retaliate for activity of which

they are unaware. Hence, as argued in Defendant's Motion, Plaintiff fails to establish a causal

connection between the removal and the protected EEO activity.  Def.'s Mem. at 30-31.

## VII.  <u>There Are No Genuine Issues of Material Fact</u>

Despite Plaintiff's attempt to manufacture a factual dispute, there are no genuine issues

of material facts.  In fact, the Plaintiff does not assert that there are "genuine" issues of

"material" facts.  In her opposition, the Plaintiff states:

> [t]here are issues of fact regarding whether (1) DHHS stripped Martin of most of
> her job responsibilities; (2) DHHS terminated Martin without considering
> whether it could accommodate her mental needs; (3) DHHS's claim that it was
> undue hardship to leave Martin's position unfilled while she finished her
> treatment was pretextual; (4) whether Ridgely treated Martin differently from a
> white coworker because of race discrimination; and (5) whether Ridgely treated
> Martin differently in retaliation for filing EEO complaints.

First, items 2 and 3 relate to a claim of failure to accommodate under the Rehabilitation Act,

which as discussed above are not asserted in plaintiff's complaint and are not at issue in this case. The remaining items relate to stripping Plaintiff of her duties and being treated differently from a white coworker. Plaintiff offered none of these supportive facts in her complaint. Although Plaintiff finally alleged specific facts concerning this allegation in her Opposition, Plaintiff offers no support for these factual assertions outside of her self-serving affidavit. See Pl.'s Opp. at 3-5. Plaintiff offered one email from Curtis Bryant dated June 7, 2007. However, this email only reiterates what Mr. Bryant stated in his affidavit at the administrative stage: the Plaintiff's work was reassigned to other staff members while she was on extended leave. Def.'s Reply Ex. 3, Bryant Affidavit at 2. Otherwise, all of the other factual assertions are Plaintiff's own opinion and/or unsupported conclusions.

Plaintiff cannot create a genuine issue of material fact to avoid summary judgment simply by making unsupported statements or asserting her own naked opinions. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Plaintiff cannot simply manufacture genuine issues of material fact with "conclusory allegations" or "unsubstantiated assertions." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

As discussed below, the record establishes that outside of her work being handled by her coworkers when she was on extended leave, Plaintiff's duties were not reassigned and the white coworker, Special Assistant, Clarence Randall, was doing completely different work. Def.'s Reply Ex. 5. While Plaintiff seeks to make it appear that these facts are in dispute, the undisputed record proves otherwise. Further, even if the facts were in dispute, they are not material. As thoroughly argued above, even if Plaintiff's allegations were accepted as true, this Court still could not find that the reassignment of these duties amounted to an adverse personnel

22

action or that such acts amount to or contributed to a hostile work environment. Nonetheless, Defendant addresses these unsupported allegations below.

Plaintiff's position description (PD) lists Plaintiff's duties and responsibilities. Def.'s Reply; Ex. 4, Position Description. As delineated in the PD, Ms. Ridgely, has characterized Plaintiff's primary responsibilities as follows: the 8(a) program, Small Disadvantaged Business, subcontracting, the new Electronic Subcontract Reporting System and Small Business Manual. In addition, Plaintiff was asked to take on some additional responsibilities because a coworker retired. Those responsibilities included the Service-Disabled Veteran-Owned Business program and the Women's Business Program. These duties were given to Plaintiff with the understanding that they would be reassigned once a new person was hired. Def.'s Reply Ex. 1 at. 2. The only duty that was reassigned from Plaintiff was the report for the Small Business Regulatory Enforcement Fairness Act. This duty was reassigned to another coworker while Plaintiff was on extended leave. Id.

Plaintiff claims that Mr. Randall was reassigned the majority of her duties when he began working in the office. Pl.'s Opp. at 3. Again, Plaintiff offers no support for this allegation outside of her own assertion. However, Ms. Ridgely has stated that this was not the case. Def.'s Reply Ex. 1 at 2. Mr. Randall has also stated that he was not assigned those duties. Def.'s Reply Ex. 5. Ms. Ridgely and Mr. Randall both confirm that Mr. Randall "took on completely new duties that the OSDBU office had never handled before the consolidation of the Small Business function. The new duties consisted of budget, [human resources] and coordinating and rolling out the consolidation." Def.'s Mem. Ex. 2 at 4; see also Def.'s Reply Ex. 5. Moreover, in support of this fact, two coworkers confirm that they were only aware of duties temporarily

being reassigned away from the Plaintiff when she was on extended leave. Def.'s Reply Ex. 6, Owens-Scarboro Aff. at 2 & Def.'s Reply Ex. 3 at 2.

Also, in Plaintiff's Opposition, Plaintiff makes additional specific unsupported assertions concerning her allegation that her duties were reassigned. It is unnecessary for this Court to examine these allegations because they are her own assertions and conclusions and, even if true, would not amount to an adverse personnel action. Nonetheless, Defendant will individually address them below; plaintiff's allegation is indented in bold and the paragraph in the Supplemental Ridgely Affidavit that responds to the allegation follows:

**Pl's Alleg: "Ridgely constantly assigned Randall procurement duties, which were Martin's responsibility, to the point where Martin's coworkers inquired about whether she had been fired."** Pl.'s Opp. at 3; Def.'s Reply Ex. 1 at 2.

**Pl's Alleg: "Randall was assigned to work as the NAWPAW conference coordinator and put on the Strategic Plan project, each of which was formerly Martin's responsibility."** Pl.'s Opp. at 3; Def.'s Reply Ex. 1 at 2.; <u>see also</u> Ex. 7, March 11, 2005 and May 6, 2005 Memoranda of Warning (in which Ms. Ridgely admonishes Plaintiff for removing herself from assigned work).

**Pl's Alleg: "...the Climate Assessment project, the Newsletter, the Veteran's Business Program, and the Vendor Outreach Sessions were all taken from Ms. Martin and reassigned to other staff."** Pl.'s Opp. at 3-4., Def.'s Reply Ex. 1 at 3.

**Pl's Alleg: "Ridgely so micro-managed Martin's management ...she was severely limited in what she could do to assist the businesses she did continue working with."** Pl.'s Opp. at 4; Def.'s Reply Ex. 1 at 3.

**Pl's Alleg: "When Martin came up with project ideas and recommendations, Ridgely regularly reassigned these to other staff members as well..."** Pl.'s Opp. at 4; Def.'s Reply Ex. 1 at 3.

**Pl's Alleg: "Martin recommended the creation of an HHS newsletter..Ridgely micro-managed every aspect of the manual until Martin's role was diminished to mere clerical tasks."** Pl.'s Opp. at 4-5; Def.'s Reply Ex. 1 at 4.

**Pl's Alleg: "Martin recommended a Strategic Plan development, but shortly after she began working on it...As soon as the project became a success, Ridgely reassigned it to**

*another staff member."* Pl's Opp. at 4; Def.'s Reply Ex. 1 at 4.

It is clear that none of these allegations pertaining to "stripping of duties," even if accepted as true, would amount to an adverse personnel action. Plaintiff retained her position and all of the duties in her PD (until she and her physician concluded that she was medically unable to perform her duties); she retained her title as Deputy Director; she experienced no loss in pay; and she retained all her benefits.

### Conclusion

Based on all the foregoing, defendant respectfully requests that the Court grant his motion to dismiss or, in the alternative, for summary judgment.

Respectfully submitted,

\_\_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

\_\_/s/_____

| | |
|---|---|
| OF COUNSEL: | WYNEVA JOHNSON, D.C. BAR # 278515 |
| Monica Davy | Assistant United States Attorney |
| Senior Attorney | 555 4th Street, NW, E-4106 |
| Office of the General Counsel | Washington, D.C. 20530 |
| Department of Health | (202) 514-7224 |
| and Human Services | |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARTHURETTA L. HOLMES-MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )Civil Action No.: 07-2128 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| Department of Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

## DEFENDANT'S REPLY EXHIBIT LIST

**Exhibit 1**   Ridgely Supplemental Affidavit
**Exhibit 2**   August 8, 2007 Electronic Mail to Ridgely re: Disabling Plaintiff's Email
**Exhibit 3**   Curtis Bryant Affidavit
**Exhibit 4**   Plaintiff's Position Description
**Exhibit 5**   Clarence Randall Electronic Mail re: Randall's Duties
**Exhibit 6**   Owens-Scarboro Affidavit
**Exhibit 7**   Memoranda of Warning, March 11 and May 6, 2005

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARTHURETTA L. HOLMES-MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 07-2128 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| Department of Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Affidavit of Debbie Ridgely**

I, Debbie Ridgely, affirm under the penalties of perjury that the following statements are true to the best of my knowledge, information, and belief.

**Plaintiff alleges:** Page 3 of Plaintiff's Opposition, Martin's Supervisor Strips her of her Duties and Gives them to a White Male. Ms. Ridgley (sp) created a position in her office for Clarence Randall, a Caucasian male. Ms. Ridgely made Mr. Randall a GS-15 Special Assistant. Ms. Ridgely assigned Ms. Martin's substantive duties to Mr. Randall.

**Supervisor Response:** Mr. Randall came to the office on a detail from CMS where he was a GS-15 Senior Advisor. As part of the reorganization, Mr. Randall was transferred into an existing GS-15 position. Mr. Randall's duties covered the roll-out and transformation of the newly aligned OSDBU office, budget and personnel issues. Ms. Martin's substantive duties remained with Ms. Martin and were not assigned to Mr. Randall.

**Plaintiff alleges:** Page 3 of Plaintiff's Opposition, When Martin returned to work, Ridgley told Randall to help Martin get another job.

**Supervisor Response:** Ms. Martin specifically inquired about a position at the Centers for Medicare and Medicaid Services (CMS) and then asked if the "CMS guy" could help her. Martin was seeking a position in health policy. After the inquiry, I asked Mr. Randall if he could assist Ms. Martin with her pursuit of a position at CMS.

**Plaintiff alleges:** Page 3 of Plaintiff's Opposition, Ridgely constantly assigned Randall procurement duties, which were Martin's responsibility, to the point where Martin's coworkers

inquired about whether or not she had been fired. Indeed, Martin, a GS-14 manager, was relegated to clerical work while Randall took over many of her former responsibilities.

**Supervisor Response:** As stated before, Martin's duties were not reassigned. Martin had responsibility for the 8(a) program, the SDB program, the subcontracting program, she was the agency coordinator for the new electronic subcontract reporting system (e-SRS) and she served as the agency Ombudsman. In addition, she was responsible for the Small Business Manual. Mr. Randall does not have an acquisition background and was never assigned these duties.

**Plaintiff alleges:** Page 3 of Plaintiff's Opposition, Randall was assigned to work as the NAPAW conference coordinator and put on the Strategic Plan project, each of which was formerly Martin's responsibility.

**Supervisor Response:** Ms. Martin raised a legal question about the NAPAW conference so I asked Ms. Martin to pursue her question with the Office of General Counsel. Ms. Martin advised me that she was not going to do that and removed herself from this assignment At this juncture, I asked Mr. Randall to step in and pursue the legal question with our Office of General Council. Ms. Martin was asked to set forth a draft Strategic Plan for our office. The plan would have been shared at an upcoming off-site training seminar in October 2005. Ms. Martin informed me that she no longer wanted to work on or complete this assignment and our off-site contractor should complete the plan. Again, Ms. Martin removed herself from an assigned project.

**Plaintiff alleges:** Page 3 of Plaintiff's Opposition, Ridgely gave Martin only menial tasks, and set unrealistic deadlines for their completion. When lower level employees did not want to do specific tasks, Ridgely made Ms. Martin do them. Ridgely refused to treat Martin as her Deputy Director and instead consistently assigned Martin tasks equal to or less than lower-graded staff members and placed her on committees subordinate to small business specialists.

**Supervisor Response:** Ms. Martin's maintained her senior-level duties and she was actually assigned new duties when an OSDBU employee retired in August 2005. Ms. Martin was asked to assume the duties for the Women's Business Program as well as, the Service-Disabled Veteran-Owned Business Program. These duties were assigned with the understanding, that they would be transferred back when we could backfill the vacant position. The OSDBU office is very highly graded; out of 17 positions, we have one GS-11. Everyone else is a GS-13, GS-14 or GS-15. Committee work encompassed working with staff at the same grade, or one grade higher or one grade lower.

**Plaintiff alleges:** Page 3 – 4 of Plaintiff's Opposition, Martin's responsibilities were systematically reassigned to lower-ranked staff of DHHS. For instance, the Climate Assessment project, the Newsletter, the Veteran's Business Program and the Vendor Outreach Sessions were all taken from Ms. Martin and reassigned to other staff.

**Supervisor's Response:** The Climate Assessment project, the newsletter and the Vendor Outreach Sessions were never assigned to Ms. Martin. All staff was expected to attend the monthly Vendor Outreach Sessions. However, Ms. Martin advised me that she was not going to

participate as she deemed this to be a duplication of effort, if she and I both attended. As cited above, the Veteran's Program was assigned to Ms. Martin, with the understanding that she would handle the program until we hired a person to backfill a vacant position. Once the position was backfilled (May 2006), I was able to realign the office duties.

**Plaintiff alleges:** Page 4 of Plaintiff's Opposition, Ridgely so micro-managed Martin's management of the Women's Business Program, the 8(a) program, the Service Disabled Business Program and the Disadvantaged Business program, that Martin was relegated to steering businesses to the monthly vendor outreach sessions. Ms. Martin was no longer given the task of reviewing the Small Business Review Forms, which meant she could no longer evaluate or even identify procurement opportunities for small businesses. Since Martin did not have access to the agency's procurements, acquisition strategy, or future requirements, she was severely limited in what she could do to assist the businesses she did continue working with.

**Supervisor's Response:** Ms. Martin was the POC for the Department on all of these programs and was expected to take the lead to determine strategies to improve these areas. The agency procurements have always been posted on the OSDBU website, so any large business, any small business and any internal HHS employee could readily identify and review upcoming procurement opportunities. Martin had full access to the upcoming requirements within the Department that were posted on our website. In addition, FedBizOpps (an on-line publication) lists new requirements on a daily basis that Martin had complete access to. Martin had the ability and the resources to help any vendor pursue opportunities within the Department but she actively chose not to do that.

**Plaintiff alleges:** Page 4 of Plaintiff's Opposition, When Martin came up with project ideas and recommendations, Ridgely regularly reassigned these to other staff members as well. For instance, Martin attempted to arrange matchmaking sessions with program offices, however, when she arranged a matchmaking session between the Veteran's Businesses and the Information Technology Office, Ridgely reassigned the program.

**Supervisor's Response:** The OSDBU office works as a team. We often brainstormed collectively on different ideas and assignments were distributed among the staff. The manager has the right to determine assignments based on current workload and levels of expertise. The Veteran's program was reassigned when the vacant position was backfilled.

**Plaintiff alleges:** Page 4-5 of Plaintiff's Opposition, Martin recommended the creation of an HHS newsletter, which Ridgely reassigned to a lower-ranked staff member. Martin suggested the Small Business Climate Assessment which was also reassigned. When she recommended the development of a small business desk manual, Ridgely micro-managed every aspect of the manual until Martin's role was diminished to mere clerical tasks.

**Supervisor's Response:** Martin introduced me to the contractor that had conducted a Climate Assessment for HUD in 2001. She and I met with the contractor in 2001 and I thought it was a great idea but our office did not have the funds to engage a contractor. This same contractor also developed a newsletter for HUD. After the OSDBU office was realigned and we received

funding, we finally entered into a contract with this vendor to conduct a climate assessment in FY 2006. Based on the numerous duties that Martin was responsible for at the time, I initially assigned the Climate Assessment to another GS-14 in the office. Martin was never assigned this project. Likewise, the newsletter was initially assigned and could be handled by another employee who had direct experience in designing and laying out newsletters, which Martin did not have. The Small Business Manual was developed and given to us by the Department of Treasury. Martin's assignment was to update and "tweak" it for HHS. Martin worked on this manual for over 4 years yet failed to deliver a final product before she left in June 2006. Moreover, the edited work, product produced by Ms. Martin contained numerous clerical errors. Martin claimed she did not know how to correct the errors. I advised her to use the "Spell Check" function in Word. Martin advised me that Spell Check did not work on her computer and asked me to correct all of her grammatical and spelling errors. Spell check is functional on all computers; hence I advised Martin to work this out.

**Plaintiff alleges:** Page 5 of Plaintiff's Opposition, Martin recommended a Strategic Plan development, but shortly after she began working on it, Ridgely reassigned it and completely shut Martin out of the initiative. Finally, Martin has worked hard to build a Veteran's business program and develop strategies to improve contracts awarded to Veteran Businesses. As soon as the project became a success, Ridgely reassigned it to another staff member.

**Supervisor's Response:** Martin was assigned to work on the Strategic Plan and it was to be shared at the off-site training session. Martin advised me that the off-site contractor was better able to handle the strategic plan and she actively removed herself from the project. Again, Martin was assigned the Veteran's Business Program until a backfill was hired. Once a new person came on board, duties within the Immediate Office were reallocated. The Service-Disabled Veteran Owned Program may not be considered a success at most of our Operating Divisions. To date, only three (3) Operating Divisions have met or exceeded the 3% goal for Service-Disabled Veteran-Owned businesses.

**Plaintiff alleges:** Page 5 of Plaintiff's Opposition, Reassignment of her duties was not the only manner is which Ridgely treated Randall more favorable than Martin. For example, Ridgely would not meet with Martin unless she had an appointment, but she allowed Randall open-door access. She took Randall with her to attend meetings outside of the office, leaving Martin behind. And when she did allow Martin to attend routine meetings, Ridgely required that Randall go with her, thereby creating the impression Martin was not trusted to attend these meetings by herself.

**Supervisor's Response:** My office policy is "open door" and all staff had/have equal access. Martin could have entered at any time to discuss issues with me. Instead Martin chose to send me an incredible amount of e-mails. When I had to attend meetings, Martin would send me upwards of a dozen e-mails in a 2-hour timeframe, asking for specific details on how she was to perform each and every program she was assigned. Given her grade and educational level, this was highly unusual. Mr. Randall attended meetings that covered the roll-out of the new office structure, personnel and budget issues.

**Plaintiff alleges:** Page 5 of Plaintiff's Opposition, In the Fall of 2004, Ridgely discontinued almost all person-to-person contact with Martin, despite the close proximity of their offices. Instead of talking to her, Ridgely began relying almost solely on email. On the rare occasion that Ridgely would provide oral direction, she would later change her mind and criticize the way Martin completed the assignment.

**Supervisor Response:** As stated previously, Ms. Martin had full access but chose to communicate via e-mail rather than verbally. Communication is a two-way street and Ms. Martin chose to generate incredible amounts of email correspondence rather than just walking around the corner and talking to me.

**Plaintiff alleges:** Page 5 of Plaintiff's Opposition, the emails from Ridgely to Martin became part of Ridgely's campaign of harassment against Ms. Martin; Ridgely sent Martin a series of hostile and threatening emails at work.

**Supervisor Response:** In the absence of specific allegations and examples, I cannot respond beyond the fact that I did not send hostile or threatening emails. The generic statement is false. Again, it was Ms. Martin that generated the incredible numbers of e-mail messages on an hourly basis, day after day, week after week.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, Ridgely also diminished Martin's responsibilities to the point that Ms. Martin had nothing to do seventy-five to eighty percent of the workday. When informed Ridgely of this, she was either ignored or given a menial task, such as forwarding emails.

**Supervisor Response:** Martin's duties and responsibilities were not diminished; they were actually increased. When an employee retired suddenly in August 2005, Martin was assigned additional duties. She was assigned the Women's Business Program and the Service-Disabled Veteran Owned Program, with the understanding that she would handle these programs until we could backfill the vacant position. Martin actively chose to diminish her work effort. Martin did not inform me that she had nothing to do for seventy-five to eighty percent of her time. Martin now admits that she did not work for eighty percent of her work day but continued to collect her pay check from the Federal Government for one hundred percent of the time.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, to add insult to injury, Ridgely made a point of asking Ms. Martin about what she was working on in staff meeting. When Martin responded that she had no work, Ridgely ridiculed her in front of her colleagues.

**Supervisor Response:** All employees were expected to discuss and share their current projects during the weekly staff meetings in the immediate office, as well as during the monthly staff meetings with the entire staff. Despite the fact that attendance by all staff was mandatory, Ms. Martin's attendance at these meetings was sporadic at best. In addition, her participation was also inconsistent. One week, Martin would talk at length about what she was working on and the next week state, "I have nothing to report". Likewise, during the monthly sessions, sometimes Martin would share and report and other times she simply did not participate. She was always

asked to participate by the other staff members who conducted the meetings but her participation was erratic and unpredictable.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, Ridgely actually states that, "Ms. Martin actually embarrassed herself by stating that she had no work to report", thus implying that Ms. Martin brought shame on herself instead of acknowledging that she had systematically removed Ms. Martin from her previous assignments until she had barely any work to do.

**Supervisor Response:** As detailed above, Ms. Martin chose "when and when she was not" going to attend meetings and "when and when she was not" going to participate. Also, as stated above, Ms. Martin's duties and responsibilities were not removed or reassigned.......she actually was assigned additional duties and responsibilities. Martin removed herself from numerous assignments and consciously chose not to work on her assigned projects.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, Ridgely found other ways to isolate Martin. She ordered the SBA procurement center representative to stop communicating with Ms. Martin. Because Martin was responsible for procurement within her office, Ridgely's order impeded Ms. Martin's ability to perform her job.

**Supervisor Response:** I never asked the SBA Procurement Center Representative (PCR) to do this. The PCR works for the Small Business Administration and is free to contact and interact with whomever they need to interact with at HHS. The supervisor actually sat down with both parties and counseled them on the need to maintain an effective working relationship. Two-way communication is a key element in the success of any business affiliation.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, she also excluded Martin from all meetings other than the weekly staff meeting.

**Supervisor Response:** Martin was expected to attend and participate in all meetings that related to her assigned duties and responsibilities. Martin actively chose when she was and was not going to attend and participate in meetings in her assigned project areas.

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, later Ridgely changed the locks on Ms. Martin's door at the office and prevented her access to her voicemail and e-mail.

**Supervisor Response:** The lock on Ms. Martin's office door has never been changed. Access to the voicemail is through the Government phone system and was password protected by Ms. Martin. The voicemail account was deactivated in August 2007, well after Ms. Martin was terminated. In addition, access to the Government e-mail account was through the web and also password protected by Ms. Martin. Her e-mail account was also deactivated in August 2007, after Martin was terminated. (See attached e-mail dated August 8, 2007, documenting this fact.)

**Plaintiff alleges:** Page 6 of Plaintiff's Opposition, Ridgely also manipulated Ms. Martin's performance evaluations for Fiscal Years 2005 and 2006. For FY 2005, Ridgely failed to provide Ms. Martin with a performance plan until August 30, 2005, then requested Ms. Martin

backdate her performance plan and sign it a year after the fact. That year she received no mid-year or annual performance evaluation.

**Supervisor Response:** In FY 2005, most employees within the Office of the Secretary received their Performance Plans in August due to on-going negotiations with the Union. Everyone was asked to sign their plan by August 30, 2005. Ms. Martin refused to sign her plan. No one had a performance plan in place for the mid-year assessment (March 2005) and when offered the opportunity, Ms. Martin chose not to sign her performance plan for the annual appraisal.

**Plaintiff alleges:** Page 7 of Plaintiff's Opposition, then in FY 2006, Ridgely established unrealistic goals, and refused to discuss the proposed performance plan with Ms. Martin. Frustrated, Ms. Martin requested the name of Ridgely's supervisor, so that she could talk to him or her. Ridgely refused to provide the name.

**Supervisor Response:** Martin's plan contained elements appropriate to her grade and position. The plan was drafted in accordance with Departmental policy and included "flow-down" elements from Senior Management. Martin was specifically advised and encouraged to meet with HR to have her concerns addressed. Ms. Martin was also fully aware of my supervisor's name, the Deputy Secretary of the Department.

**Plaintiff alleges:** Page 7 of Plaintiff's Opposition, In response to Ridgely's abuse, Ms. Martin sought assistance and intervention of various officials at DHHS - all to no avail. As an early example, Ms. Martin consulted an Employee Assistance Program (EAP) counselor after Ridgely gave her a letter of reprimand. The counselor told Ms. Martin that she had no right to EAP services for issues relating to employment matters.

**Supervisor's Response:** Letters of reprimand were sent to Martin on March 11, 2005 and again on May 6, 2005. EAP rights were specifically outlined in both letters and Martin was encouraged to take advantage of the program. I have no knowledge of what the EAP counselor advised Ms. Martin.

**Plaintiff alleges:** Page 7-8 of Plaintiff's Opposition, Ms. Martin pursued the possibility of filing EEO complaints against Ridgely in order to put an end to the discriminatory treatment. The EEO office, however repeatedly delayed or ignored Ms. Martin's requests for help. Ms. Martin first contacted the EEO office on January 14, 2004. The EEO put Ms. Martin off for over a year, she was prevented from filing a formal complaint until March 24, 2005. Though it appears that the EEO office interviewed Ms. Martin and Ridgely, the office never produced a complete Report of Investigation (ROI) despite the EEOC Order requiring them to produce an ROI within 15 days or be subject to possible penalties. Even more than three years after the discrimination took place, no one at DHHS had bothered to look into Ms. Martin's complaint, nor did she have an Administrative Judge assigned to her case despite her request for a hearing regarding her claim.

**Supervisor Response:** A HHS EEO investigator interviewed me about the first complaint in August 2005 and an EEO staff member interviewed me about the second complaint in January 2006. I have no further direct knowledge about any of the other statements.

**Plaintiff alleges:** Page 8 of Plaintiff's Opposition, Because Ridgely continued to retaliate against her and continued sending hostile and threatening emails, Ms. Martin again complained to the Department's EEO office. Ms. Martin specifically requested a transfer so she would no longer have to work for Ridgely. The EEO office merely processed paper this time, conducting no real investigation (other than to record briefly that Ridgely summarily denied Ms. Martin's allegation). In fact, although the basis for Martin's complaint were threatening and hostile emails, no documents were reviewed by the investigator. Again, there is no ROI regarding this EEO complaint. Ms. Martin filed this complaint with the EEOC on April 24, 2006.

**Supervisor's Response:** The supervisor did not retaliate nor did the supervisor send threatening or hostile emails to Ms. Martin. Ms. Martin did request a transfer to another office on July 29, 2005 and informed me that if she did not have a response from me by August 5, 2005, she would report to the other office on September 1, 2005. Ms. Martin and I conducted a face-to-face discussion about her request on July 29th. and unfortunately, I had just learned that another employee on the immediate staff was going to have to go out on extended medical leave. I explained to Ms. Martin that her request to work in another office could not be accommodated at this point in time. I also responded to Ms. Martin in writing by August 4, 2005. I have no further direct knowledge about any of the other statements.

**Plaintiff alleges:** Page 8 of Plaintiff's Opposition, Finally on July 6, 2006, Ms. Martin e-mailed David Shorts, the EEO Director, seeking to lodge another EEO complaint against Ridgely. This time, the Department's office simply ignored her request and never even assigned her an EEO counselor. After Ms. Martin's repeated attempts in getting her complaints heard were unsuccessful, Mr. Martin's husband, Mr. Clyde Martin, wrote a letter to Secretary Leavitt on July 10, 2006, about the mistreatment of his wife and inaction by DHHS officials. Once again, Ms. Martin received no response from the Department.

**Supervisor Response:** I have no direct knowledge about any of these statements.

**Plaintiff alleges:** Page 8 – 10 of Plaintiff's Opposition, Eventually, Ms. Martin began to feel entirely hopeless and unable to perform her work under Ridgely. Through this mistreatment, she suffered from sleep problems, insomnia, forgetfulness, mood swings, mental lapses, hives and acne cysts. However, she suppressed many of the problems in order to appear strong at work. Ms. Martin increased her use of sick leave and had to take leave without pay. Over time, as Ridgely's harassment worsened and it became increasingly clear to Ms. Martin that the Department would take no action to address the situation, her symptoms grew more severe and ultimately led to the point where Ms. Martin could no longer function as Ms. Ridgely's deputy. Ultimately, Dr. Frances Holland, a licensed clinical psychologist, wrote to Ridgely, recommending that Ms. Martin take an extended leave of absence due to episodes of Major Depression and Generalized Anxiety Disorder. In that letter, Dr. Holland informed Ridgely of the cause of her illness – the hostile work environment. I am concerned she has reached her breaking point and recommending a leave of at least 30-45 days.

**Supervisor Response:** The supervisor never harassed or was hostile towards Ms. Martin in any way. Ms. Martin's duties and job responsibilities increased during the timeframe and Ms. Martin was expected to perform them. Ms. Martin used leave frequently the entire time I was her supervisor. There was rarely a pay period that Ms. Martin did not request some type of leave, many times on an unscheduled basis. This was a pattern of practice, during my tenure as her supervisor, from December of 2000 through June 2006. I had no direct knowledge about any of these other statements until I received the letter from Dr. Holland on June 20, 2006, the same day Ms. Martin left on extended leave.

**Plaintiff alleges:** Page 10 of Plaintiff's Opposition, Dr. Holland followed up with another letter on July 26, 2006, informing Ridgely that while Ms. Martin exhibited some improvement, "any discussions of her work situation during psychotherapy sessions consistently induces visible agitation, restlessness, acceleration of speech patterns and on several occasions, inconsistent speech content. Accordingly, Dr. Holland recommended an extension of the sick leave.

**Supervisor Response:** I have no direct knowledge of any of these statements. The supervisor did approve the request for additional leave.

**Plaintiff alleges:** Page 10 of Plaintiff's Opposition, on November 7, 2006, Dr. Holland again updated DHHS on Ms. Martin's condition. She informed DHHS that Ms. Martin still suffered from "pronounced symptoms" whenever her work situation is discussed. Dr. Holland concluded, "in my professional opinion, it would be detrimental to Ms. Martin's mental and physical health for her to return to her professional work in the Department of Health and Human Services at this time."

**Supervisor Response:** It was only after the Human Resources Specialist; Ms. Rachel Chance, advised Mr. Martin that his wife was expected to report for duty on November 13, 2006, that the Department received the November 7, 2006, letter about Ms. Martin's condition from her Doctor. The Department had received no information on Ms. Martin's condition for almost four (4) months.

**Plaintiff alleges:** Page 10 of Plaintiff's Opposition, However, despite the severity of Ms. Martin's condition after the continuous harassment and discrimination she faced at DHHS, her treating physician certified on May 3, 2007 that, "it maybe possible for Ms. Martin to return to a position within DHHS in a part time capacity in 6-8 months; i.e., late September or early October if her current level of progress continues."

**Supervisor Response:** The supervisor denies the harassment and discrimination charges that have been alleged. Ms. Martin has never produced any evidence to support her allegations. (Refer to the Department of Labor's denial of her Worker's Compensation claim, dated September 28, 2007 and Department of Labor's denial of her request for reconsideration dated March 5, 2008.) In addition, 6-8 months from May 2007 equates to November or January of 2008, which she may be able to return to work in a part time capacity. As stated in the termination letter, the Department needed someone in a full time capacity to handle the position which has been vacant since June 2006.

**Plaintiff alleges:** Page 11 of Plaintiff's Opposition, Ms. Martin's depression and anxiety disorder grew so severe that they completely debilitated her from performing her job under Ridgely. Having received no other redress from the Department, and now unable to work due to the effects of the hostile work environment, she filed a claim for worker's compensation due to her severe emotional injuries. Ms. Martin provided DHHS with this claim on November 15, 2006. However, Ridgely unconscionably delayed the processing of Ms. Martin's claim – and its submission to the Department of Labor – by waiting until January 8, 2007 to fill out and sign the supervisory portion of Ms. Martin's application.

**Supervisor Response:** Once the supervisor received claim, the supervisor immediately began to respond to Ms. Martin's twenty-two separate allegations. The supervisor gathered 18 months of e-mails between Ms. Martin and herself to clearly demonstrate that all of the allegations were false. As referenced above, the Department of Labor (DOL) stated that Ms. Martin was not able to produce any evidence to support her twenty-two separate allegations. The DOL decision states, "Incidents alleged by you (as listed previously) have not been proven by you to have actually occurred, as you perceived. The items, which the Office finds did not occur, are so listed because they are unsubstantiated. You did not submit any evidence from witnesses, coworkers, or any independent body involved with these matters that supported your claim. There is no indication that your supervisor or management discriminated against you harassed you or erred in the administration of your personnel matters." As such, DOL denied Martin's claim for worker's compensation and found that no discrimination occurred.

**Plaintiff alleges:** Page 11 of Plaintiff's Opposition, Ms. Martin's treating physician certified on May 3, 2007 that she could return to work, under another supervisor, in October 2007. Rather than allowing Ms. Martin to finish her treatment and return in a few months, Ridgely proposed her termination. Ridgely premised her decision on Ms. Martin's "inability" to perform her duties, without considering any proposed accommodation. She also stated that she needed someone to perform the duties of her position on a full-time basis, although this was not the case when Ms. Martin was able to work as Ridgely left her without work for eighty percent of her work day. In the notice of proposed removal, Ridgely references several of Ms. Martin's efforts to engage in protected activity. Indeed, Ridgely proposed Ms. Martin's removal just two months after receiving a complaint of discrimination from Mr. Martin.

**Supervisor Response:** The supervisor had no knowledge of nor was the supervisor privy to the letter from the Doctor dated May 3, 2007. Again, Martin had assigned duties and responsibilities on a full time basis. Martin now admits that she did not work for eighty percent of her work day but continued to collect her pay check from the Federal Government for one hundred percent of the time. As referenced above, Martin was not able to produce any evidence to support her twenty-two separate allegations under her claim filed with the Department of Labor. In addition, Martin's request for reconsideration from DOL was also denied on March 5, 2008. The letter from DOL states, "The Office noted that management processed an overpayment on you for overpaid wages, and also that you received two letters of reprimand. However, there were was not evidence of abuse or error when the Agency took such actions. Therefore, the facts demonstrate that there was no compensable factor of employment under the Federal Employees

Compensation Act. Based on the evidence of record, it is determined that there is insufficient evidence to modify the Office's decision of September 28, 2007."

I have read the above affidavit, consisting of 11 pages, and it is true and complete to the best of my knowledge, information and belief. I understand that the information I have given is not to be confidential and that it may be shown to the interested parties.

*Debbie Ridgely*    04/09/2008
Debbie Ridgely         Date

# EXHIBIT 2

## Ridgely, Debbie H. (HHS/ASAM)

| | |
|---|---|
| **From:** | Davis, Alesha [Alesha.Davis@unisys.com] on behalf of ~ITSC-AcctMaint [ITSC-AcctMaint@unisys.com] |
| **Sent:** | Wednesday, August 08, 2007 1:12 PM |
| **To:** | Ridgely, Debbie H. (HHS/ASAM) |
| **Subject:** | On behalf of IM30018872062 |

Hello,
This message is to inform you that per your request, the following account has been disabled and hidden, to be deleted in 30 days:
Arthuretta Martin
Thanks,

---

**Alesha Davis ¦ SSR2 ¦ GOIS**

Unisys    480 N 2200 W  | Salt lake City UT  840116  | 1-866-699-ITSC



THIS COMMUNICATION MAY CONTAIN CONFIDENTIAL AND/OR OTHERWISE PROPRIETARY MATERIAL and
is thus for use only by the intended recipient. If you received this in error, please contact the sender and delete the e-
mail and its attachments from all computers.

# EXHIBIT 3

Affidavit

Atlanta, Georgia

County of __Dekalb__

I, Curtis L. Bryant, do hereby make the following statement freely and voluntarily to James E. Hubbard who has identified himself to me as a Contract EEO Investigator retained by JDG Associates, Inc., to investigate an allegation of employment discrimination filed against the U.S. Department of Health and Human Services, (DHHS), Washington, D.C., by Ms. Arthuretta Leonal Holmes-Martin. Knowing this statement may be used in evidence, I understand this statement is not confidential and may be shown to any interested parties (those with a right to know). I hereby solemnly swear or affirm:

**Question 1: State your full name, your position title and grade, your organization and its location, your sex, race, color and state if you have prior EEO activity.**

Answer: Curtis L. Bryant, Small Business Specialist, GS-14, supporting the Centers for Disease Control and Prevention (CDC) in Atlanta, Georgia. I am male, African-American, Black, with no prior EEO activity.

**Question 2: How many years of federal service do you have and how many of those years have been served with DHHS?**

Answer: 25 years of federal service of which 13 years have been with DHHS.

**Question 3: Do you know Ms. Arthuretta Martin, Complainant, and Ms. Deborah Ridgely, Complainant's Supervisor, and if so, how did you come to know them?**

Answer: Yes, I know Ms. Martin and Ms. Ridgely. I know them as the Deputy Director and Director respectively of the HHS Office of Small and Disadvantaged Business Utilization (OSDBU), the office I am assigned to.

**Question 4. If you are familiar with any of the seven issues related to Ms. Martin's complaint accepted by the agency for investigation and forwarded to you for response, respond to each of those issues separately proving whatever information you feel is relevant to this investigation?**

Answer: I have no knowledge of issues 1, 2, 3, 4, 5 and 7. For issue number 6 regarding management's alienation of Complainant from her co-workers and the reassignment of her tasks to others in the office, to my knowledge, Ms. Martin retained the ability and latitude to interact with the staff members from the position of Deputy

Page _1_ of _3_ Pages

Exhibit __11__
Page _1_ of _4_

(Initials)

Director of the OSDBU. During her absence, some tasks were supported by members of the Director's immediate staff, Ms. Debra Peters, Procurement Analyst, HHS Service-Disabled Veteran-Owned Small Business Advocate and Ms. Teneshia G. Alston, Small Business Analyst – Agency Coordinator, Electronic Subcontracting Reporting System (ESRS).

**Comment: I am one of several Small Business Specialists that are physically co-located with the HHS agencies that we support. Most of the Small Business Specialists are in the metro Washington, D.C, area but not in the OSDBU office space in the HHS headquarters. I am physically located in Atlanta, GA.**

I have reviewed this statement consisting of 3 pages and hereby solemnly swear _CLB_ affirm ___ that it is true and complete to the best of my knowledge and belief. I understand the information I have given will not be held confidential and may be shown to interested parties as well as made a permanent part of the record.

_Quintin L Bryant_                          _18 June 2007_
(Signature of Deponent)                     (Date)

Signed before me at (Street and City) _____

On this _18th_ day of _June_ , 2007

_James G. Halbert_
(Signature of Investigator/Witness)

Page _3_ of _3_ Pages

Exhibit ___11___
Page _3_ of _4_

_CLB_
(Initials)

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
(OTHER THAN COMPLAINANT)
FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to DHHS activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Failure on the part DHHS employees to furnish the information may result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Failure by present or prospective government contractors to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____    _____
Signature of Interviewer    Signature of Witness (person providing statement)

Date: _18 June 2007_

Place: _Dept. of Health + Human Services_
_Atlanta, GA 30341_

Exhibit __11__
Page _4_ of _4_

# EXHIBIT 4

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

1. Agency Position No. **99-139(8)**

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| [X] Redescription  [ ] New | [ ] Hdqtrs.  [ ] Field | Washington, DC | Washington, DC | |
| [ ] Reestablishment  [ ] Other | | | | |

7. Fair Labor Standards Act: [X] Exempt  [ ] Nonexempt

8. Financial Statements Required: [ ] Executive Personnel Financial Disclosure  [ ] Employment and Financial Interests

9. Subject to IA Action: [X] Yes  [ ] No

Explanation *(Show any positions replaced)*

Replaces GS-1102-14
PDH 88-6414(8)
Procurement Analyst

10. Position Status: [X] Competitive  [ ] Excepted *(Specify in Remarks)*  [ ] SES (Gen.)  [ ] SES (CR)

11. Position is: [ ] Supervisory  [ ] Managerial  [X] Neither

12. Sensitivity: [X] 1—Non-Sensitive  [ ] 3—Critical Sensitive  [ ] 2—Noncritical Sensitive  [ ] 4—Special Sensitive

13. Competitive Level Code **0100**

14. Agency Use **GAM-9004**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Procurement Analyst | GS | 1102 | 14 | CR | 5/25/99 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | Deputy Director, Office of Small and | GS | 1102 | 14 | | |

16. Organizational Title of Position *(if different from official title)* Disadvantaged Bus. Utilization

17. Name of Employee *(if vacant, specify)* Holmes-Martins

18. Department, Agency, or Establishment
Department of Health & Human Services

a. First Subdivision
Office of the Secretary

b. Second Subdivision
HHS Management and Budget Office

c. Third Subdivision
Office of Grants and Acquisition Management

d. Fourth Subdivision
Office of Small and Disadvantaged Bus. Utilizatio

e. Fifth Subdivision

19. Employee Review—This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor
Verl Zanders
Director, OSDBU

Signature   Verl Zanders   Date 4/26/99

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*

Signature   Date

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action

Signature   Date 5/25/99

22. Position Classification Standards Used in Classifying/Grading Position
GS-1102 Series

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks   *BUS: 0017*

No Known Promotion Potential

25. Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265    Previous Edition Usable    5008-108

OF 8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

76

## I.    INTRODUCTION

This position is located in the Office of Small and
Disadvantaged Business Utilization, Office of Grants and
Acquisition Management, Office of the Assistant Secretary for
Management and Budget, Office of the Secretary, Department of
Health and Human Services.    The Office of Small and
Disadvantaged Business Utilization was established by Public
Law 95-507 in 1979, amending the Small Business Act and the
Small Business Investment Act of 1958.    This Amendment
required all Federal agencies to establish an Office of Small
and Disadvantaged Business Utilization.    The Office was
established in the Department of Health and Human Services in
1979, and is responsible for the overall management of the
Department's preferential procurement programs.    These
programs include the Section 8(a) Program, Women's Business
Progam, Small and Disadvantaged Business Program, the HUBZone
Small Business Concern Program, and the Small Business
Innovation Research Program.

Subject to general policy guidance from the Director, Office
of Small and Disadvantaged Business Utilization, the incumbent
of this position functions as the Office's expert and senior
procurement analyst for the Department's preferential
procurement programs.    This position serves as the liaison and
maintains working relationships with the Small Business
Administration, the OMB, GSA, and other Federal agencies to
coordinate and assist in the development of policies in
acquisition and resolve issues arising from the preferential
procurement programs.

## II    MAJOR DUTIES AND RESPONSIBILITIES

Participates with the Director and higher officials in the
development and evaluation of the Department-wide preferential
procurement programs plans, contributing ideas and
recommendations as an recognized authority in this area.

Plans, coordinates, and conducts staff studies and special
projects.    Develops and recommends Department-wide policies
and procedures, inspects and evaluates program efforts and
accomplishments.    Serves as a project leader for special
studies and program evaluations requiring contacts with other
elements of the Department to assess the effectiveness of the
Department's participation in the preferential procurement
programs, as required by Public Laws, regulations, and
Executive Orders.    Participates as a departmental
representative in study groups with SBA, GSA, Commerce and
other Federal agencies to evaluate government-wide programs.
Recommends change to more effectively meet program objectives.

Furnishes technical advice and assistance to departmental
officials on the interpretation and application of
departmental and government-wide preferential procurement

-2-

program's polices and procedures, etc., in the resolution of unique, controversial, and unprecedented problems and questions.

Serves as one of the key points of contact for the Departmental Office of Small and Disadvantaged Business Utilization in response to Public Laws, Executive Orders, and the Federal Acquisition Procurement Regulations.

Plans and establishes Department-wide policy recommendations for the Department's preferential procurement programs.

Serves as departmental key contact for the small business community, counseling and advising small, small and disadvantaged, women-owned, and HUBZone small business concerns and other nonprofit and profit organizations on how to do business with HHS.

Monitors and coordinates all matters concerning the placement of contracts by Departmental Contracting Officers with the Small Business Administration under Section 8(a) of the Small Business Act.

Conducts program reviews and evaluations at all Departmental Operating Divisions. Conducts day-to-day liaison in the implementation of the program.

Reviews and analyzes proposed, temporary and final issuances of the Federal Acquisition Regulations and the Health and Human Services Acquisition Regulations, to determine the impact upon the policies of the preferential procurement programs, and evaluates agency progress toward accomplishment of business goals.

Represents the Department in Federal, State, and locally sponsored conferences, seminars, and forums on small business programs matter.

Plans and conducts briefings with acquisition, management and program officials at the Departmental Operating Divisions for the purpose of securing positive action in carrying out the spirit and intent of the Administration's preferential procurement program's policies and procedures.

Prepares appropriate statements and data for the preferential procurement programs for use by the Deputy Assistant Secretary for Grants and Acquisition, the Assistant Secretary for Management and Budget, the Deputy Secretary, or the Secretary, in appearances before any Congressional Committee at which it is anticipated such matters may be discussed.

-3-

Reviews proposed revisions of the Federal Acquisition Regulations or the HHS Acquisition Regulations which would have an impact upon the departmental preferential procurement programs.

Serves as the focal point for all complaints or inquiries from the small business community on matters involving the Department, and resolves the problem.

Assures that there is made available to purchasing activities of the Department, information as to commodities and services that might be produced and furnished by small business concerns, and that all other actions are taken which will give such concerns an equitable opportunity to participate in the available acquisitions of the Department.

In the absence of the Director, Office of Small and Disadvantaged Business Utilization, the incumbent will assume certain delegated duties and responsibilities of that position as designated.

Factor 1, Knowledge Required by the Position - Level 1-8-1550 Points

Total knowledge and understanding of Federal and departmental acquisition laws and regulations, policies, e.g. Small Business Act of 1958. Executive Order 11625, and Public Laws 95-507 and 100-656, Federal Acquisition Streamline Act, including techniques of contracting operations, detailed procedures of departmental contracting requirements, and familiarity with the practices of business and industry sufficient to develop polices and carry out the functions of the preferential procurement programs.

Analytical skill sufficient to evaluate reports, regulations, and other relevant material as a basis for developing and implementing departmental guides or procedures. Skill in written and oral communications sufficient to prepare written guidance and to explain the interpretation and application of departmental and government-wide policies and procedures.

Factor 2, Supervisory Controls - Level 2-5 - 650 Points

The incumbent works under the administrative and policy direction of the Director, Office of Small and Disadvantaged Business Utilization. The incumbent has wide latitude for the exercise of independent action and judgment. The volume and variety of the actions usually preclude supervisory participation and demand that incumbent resolve difficult, sensitive, and novel situations on the basis of personal

-4-

judgment and ability. Consults with and keeps the supervisor
informed of progress, of potentially controversial matters,
and of far-reaching implications of the work. Performance is
generally reviewed for adherence to policy and for assurance
that broad program objectives are fulfilled.

The employee determines the approaches and methods necessary
to carry out the assignment, including the design of overall
plans and strategies for the projects, in order to meet
mission or program goals, requirements, and time frames.
The employee independently carries out the work, including
continual coordination of the various elements involved, and
independently negotiates.

**Factor 3, Guidelines - Level 3-5 - 650 Points**

Guidelines include Federal and Departmental Acquisition
Regulations; office policies and directives on Small Business
Programs as contained in various Public Laws, regulations, and
Executive Orders. Many of these guidelines are broadly stated
and nonspecific which require keen interpretation. The
incumbent must exercise initiative, resourcefulness, and
experienced judgement in interpreting and applying such guides
that do exist and in developing applications to specific areas
of work. The incumbent actually assists in the formulate new
Department acquisition guidelines and sets department-wide and
to some degree government-wide standards in these areas.
Sound judgment must be exercised where guidelines are lacking
or where precedents are not available.

**Factor 4, Complexity - Level 4-5 - 325 Points**

The incumbent is responsible for the review, analysis, and
recommendation of acquisition procedures or policy revisions
covering a variety of acquisition issues for the Department.
Responsibilities includes the initiation, development, and
recommendation of procedures for the guidance and control of
contracting activities throughout the Department.

Assignments involve a wide range of duties, employing a broad
range of fact-finding and analytical techniques requiring
decisions in interpreting varied and complex factual
situations and legal issues in the context of the requirement
of laws, regulations or policies.

Assignments are difficult because of their broad scope
(national program impact), the number of possible approaches
and the need to decide on an approach that meets all legal and
regulatory requirements and the objectives of the current
program activities with respect to Department and office
policy guidelines. The incumbent must refine general

-5-

objectives into precise policies, directives, and procedures that are applicable to the work being performed. The incumbent must analyze new policies to determine the extent of their influence upon other policies and procedures and whether such effects have an adverse impact on the overall regulatory and policy objectives of the Departmental small business program.

**Factor 5, Scope and Effect Level 5-5 - 325 Points**

Ensure that the Department's Small Business Programs are implemented in accordance with existing legislative authorities, Presidential Executive Orders, and directives from the Secretary and Deputy Secretary of HHS.

The work products contributes to meeting Congressional and departmental small business programs objectives which are to assure that small business firms participate equitably in departmental acquisition and grant programs, and receive a fair share of acquisition and grant awards.

**Factor 6, Personal Contacts Level 6-4 - 110 Points**

Contacts are with all levels within the Agency, and with other agencies, Congressional members and key staff, senior corporate level officials of major corporations, President/CEOs of small corporations, key representatives from national organizations, key officials from other Federal agencies, principal executives of universities and non-profit organizations, and key official from State and local governments. The employee represents the Department on standing top-level Interagency Committees and work groups dealing with the resolutions of difficult problems concerning small businesses. The employee must exercise tact and diplomacy in communicating effectively with all contacts.

**Factor 7, Purpose of Contacts - 7-4 - 220 Points**

Contacts outside the Agency are to serve as principal liaison and the primary point of contact regarding small business activities. Internal contacts are to develop programmatic initiatives and resolve problems affecting program implementation.

Persons contacted typically have diverse viewpoints, goals, or objectives, requiring the incumbent to achieve a common understanding of the problem and a satisfactory solution by convincing them, arriving at compromise, or developing suitable alternatives.

-6-

**Factor 8, Physical Demands - Level 8-1 - 5 Points**

The work is sedentary in nature.

**Factor 9, Work Environment - Level 9-1 - 5 Points**

Work is performed primarily in an office setting.
Occasional travel may be required for fact-finding, activity
review, and determination of program performance.

TOTAL POINTS 3940

EXHIBIT 5

## James and Theresa Hubbard

**From:**     "Randall, Clarence (HHS/ASAM)" <clarence.randall@hhs.gov>
**To:**        <hubbard10@verizon.net>
**Sent:**      Thursday, June 07, 2007 1:29 PM
**Subject:**   background

Good afternoon Mr. Hubbard.

In response to your questions regarding my position here at the Department of Health & Human Services, I am a career employee presently serving as Senior Advisor to the Director, Office of Small and Disadvantaged Business Utilization (OSDBU). Formerly, I was at one of the Department's Operating Divisions (Centers for Medicare and Medicaid Services) where I was the Director of Business Operations holding responsibility for budget, HR and policy related matters. I came to the Small Business Program in October of 2004 under an inner agency agreement between CMS and the Department. OSDBU was under going a re-organization and my assignment and direction focused on budget and HR matters. As part of the overall re-organization of the Small Business function, I was permanently realigned to OSDBU in May of 2005 where my duties continue to involve business operations matters including budget, HR and related concerns.

I trust this information is helpful and certainly please feel free to call me with any questions.

Clarence B Randall Jr.
Senior Advisor
OSDBU
200 Independence Ave S.W.
Washington D.C. 20001
202-690-8544 (O)
202-260-4872 (F)
email: clarence.randall@hhs.gov
Office: www.hhs.gov.osdbu

Exhibit __13__
Page __1__ of __1__

# EXHIBIT 6

Affidavit

Bethesda, Maryland

Montgomery County Maryland

I, Annette Victoria Owens-Scarboro, do hereby make the following statement freely and voluntarily to James E. Hubbard who has identified himself to me as a Contract EEO Investigator retained by JDG Associates, Inc., to investigate an allegation of employment discrimination filed against the U.S. Department of Health and Human Services, HHS Office of Small and Disadvantaged Business and Utilization, Office of the Secretary, DHHS, Washington, DC. Knowing this statement may be used in evidence, I understand this statement is not confidential and may be shown to any interested parties (those with a right to know). I hereby solemnly swear or affirm:

**Question 1: State your full name, your occupational specialty and grade, your office location, your sex, color and race and state if you have prior EEO activity.**

Answer: Annette Victoria Owens-Scarboro, Small Business Specialist (Team Leader), GS-14, OS/OSDBU – co-located at the National Institutes of Health, 6100 Executive Blvd., Suite 6D05, Bethesda, Maryland 20892. I am a 53 year old Black Female that has never had or participated in any prior EEO activity.

**Question 2: State your number of years of federal service and indicate how many of those years have been with DHHS.**

Answer: I have 34 years of federal service and have been employed by the Department of Health and Human Services (HHS), National Institutes of Health (NIH) my entire federal career.

**Question 3: State if you know Ms. Arthuretta Martin and Ms. Deborah Ridgely and how you came to know them.**

Answer: I know Ms. Martin as a co-worker located in the central HHS Small Business Office in Washington, DC. Ms. Martin was hired as the Deputy, Director for the HHS Small Business Program by the former Small Business Director (Mr. Verl Zanders). Ms. Debbie Ridgely is the current HHS OSDBU Director of the Small Business Program. On October 1, 2004, Ms. Ridgely became the immediate supervisor for all of the small business specialists in the OPDIVs at HHS. Prior to the execution of the consolidation memo signed by the former HHS Deputy Secretary (Claude Allen 10/1/04) the small business specialists reported to their individual operating division Head of Contracting Activity and/or Policy Directors under the umbrella of HHS.

**Question 4: If you are familiar with any of the seven issues in my e-mail to you that were accepted by the agency for investigation, please provide whatever**

Exhibit 12
Page 1 of 3

(Initials)

**information you have regarding those issues that you feel may be relevant to this investigation?**

Answer: Unfortunately, I cannot address in detail any of the issues presented by Ms. Martin in the aforementioned documentation for investigation in much detail for several reasons: I was and continue to be co-located at the NIH in Bethesda, MD and I only interacted with both ladies via email, telecom, during joint meetings, conferences, state and local business fairs, and/or at the HHS Monthly Vendor Outreach Sessions. The attached email from Ms. Martin is all I have that provided the duties assigned to her. I was unaware that Ms. Martin's duties were reassigned to other co-workers until it was apparent that Ms. Martin was going to be on extended leave from her duties for a few months. My duties changed after the OSDBU consolidated the small business offices in the OPDIVs and again when one of the three small business specialists at the NIH retired from the organization in January 2006.

I have reviewed this statement consisting of __3__ pages and hereby solemnly swear __X__ affirm ____ that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to interested parties as well as made a permanent part of the record.

_____            _6|27|07_
(Signature of Deponent)                    (Date)

Signed before me at (Street and City) _6100 Executive Blvd., Bethesda MD 6805_

On this __27th__ day of __June__, 2007.

_James E. Hubbard_
(Signature of Investigator/Witness)

Exhibit __12__
Page _2_ of _3_

(Initials)

## PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
### (OTHER THAN COMPLAINANT)
### FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **DHHS** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Failure on the part **DHHS** employees to furnish the information may result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Failure by present or prospective government contractors to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_Signature of Interviewer_

Signature of Witness (person providing statement)

Date: 6/27/07

Place: NIH, Bethesda, MD

Exhibit 12

Page 3 of 3

# EXHIBIT 7

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

March 11, 2005

Washington, D.C. 20201

To:    Arthuretta Martin
Deputy Director
Office of Small and Disadvantaged Business Utilization
Office of the Secretary

From: Debbie Ridgely
Director
Office of Small and Disadvantaged Business Utilization
Office of the Secretary

Subject: Issues of Concern

In recent months we have tried to forge a more productive working relationship and environment. We have had numerous discussions that have covered a series of concerns. I have put forth a good-faith effort to improve our working relationship and to build an environment more conducive to that goal. We have a small office so it is especially important that we work effectively with one another.

Over the past several weeks, I have observed what appears to be a challenging attitude in your behavior and approach to certain circumstances. I am concerned that we are not moving forward. The following incidents have occurred:

1. February 18, 2005: Opening presentation at the San Diego Conference. You were assigned to discuss the Subcontracting Program. You failed to carry out the assignment, as you and I discussed on several occasions prior to the conference.

2. February 22, 2005: You were assigned a task to provide guidance on the bundling regulations to the Senior Procurement Executive; i.e., support what the Department is trying to accomplish. You raised concern over performing the assignment; then said you did not have the background to perform the assignment. The feedback I received from the Senior Procurement Executive was that you were not able to answer the questions and referred them to the Small Business Administration's General Counsel. You are expected to be able to explain the bundling regulations in detail and be able to walk the acquisition and program office personnel through the necessary steps to justify bundling.

3. February 24, 2005: We had a scheduled phonecon with Ventura Group on our off-site training conference. You were provided a draft Statement of Work in advance of the phonecon. You failed to take part in the discussion and subsequently stated your disagreement with me regarding the methodology in which the task was being approached.

Exhibit _10 f_

Page_ 1_ of _10_

4. February 24, 2005: You informed me that you had no idea of the purpose of the San Diego conference and you had no idea of what was expected of you at the conference. As a GS-14, Deputy Director (Procurement Anaylst), possessing your background and expertise in this area, it causes me great concern that you were not aware of what is expected of you at a Small Business Conference. This is not the first conference this office has held and not the first SB conference you have attended. Your expectations and/or my expectations of you do not change. I expected you to be able to participate fully in the entire conference. When you do not have a specific assignment to make a presentation or moderate a workshop you are expected to attend the workshops, staff the exhibit table and be available to talk to the vendors. I have confidence that you will be able to represent the Department successfully in all matters that relate to the Small Business Office and am hopeful that the above will not occur again.

5. February 28, 2005: As you are aware and as previously addressed, the federal government was on an "Unscheduled Leave Policy" for this date due to the inclement weather. Although you do not have to get prior approval to use annual leave, you do need to notify me that you do not plan on reporting to work.

6. March 1, 2005: You advised me, via e-mail, that you spent the first afternoon of the San Diego conference preparing your presentation. The presentation you subsequently misplaced should have been prepared before the conference. You were expected to be in attendance at the conference. In this same email, you advised me that you attended the Straight from the CEO's workshop on Friday afternoon of the conference. I conducted that session and did not see you at either workshop being offered.

7. March 3, 2005: After the first phonecon with Ventura Group, I assigned you the task of working with Tambra to develop appropriate questions for the off-site training conference. You advised me that you believed that Ventura Group prefers to take the lead on developing the questions for the training conference. This is not acceptable, as you may not unilaterally remove yourself from assignments. Subsequently, you have decided to provide input on the assignment. When you are assigned a task, you are expected to see it through to completion. If circumstances arise that necessitate a reassignment, please come discuss the situation with me.

8. March 3, 2005: You have asked me for detailed specifics on how I want you to carry out every single project that you have been assigned. Based on your grade level and experience, you are expected to carry out

assignments with minimal supervision. I am confident that you can carry out these assignments with minimal supervision. I will certainly address any situation where a problem arises and/or it is a matter that has *significant* Department-wide implications, otherwise I expect you to be able to address those matters for which you are assigned, capably and efficiently.

9. March 3, 2005: You continue to question my management decisions, specifically; you have questioned my decision to include a senior staff person in a meeting. As the responsible supervisory authority, this decision will rest with me as well any assignments I choose to give to any members of my staff.

10. March 4, 2005: This matter brings me great concern. On this date, a Small Business Specialist has advised me that they feel you are creating a hostile work environment for them. Specifically, concerns surround e-mails you have sent on the Small Business Handbook that are not considered professional and have copied all parties. In addition, you have communicated verbally and via e-mails on the handling of late proposals and the recipient feels that the message was not conveyed with tact and diplomacy. I realize that this if the first time I am bringing this matter to your attention. Therefore, please address this matter with me as soon as possible, but no later than March 14, 2005.

This list is not all inclusive of everything that has occurred in the office. Please plan to meet with me on Friday, March 11, 2005 or on Monday, March 14, 2005, to discuss.

As your supervisor, I determine the assignments that you will be working on and any changes in those assignments must be discussed and approved by me first. I expect you to perform at the level of a GS-14, Deputy Director of the office. I expect you to conduct yourself in a professional manner. I expect you to perform as part of a team and as a team player. The successful operation of our office depends on the team concept of everyone working together for one purpose.

As always, the Employee Assistance Program is available to all employees and participation is voluntary and confidential unless you authorize release of information or advise me yourself of your participation or you sign a release form in EAP.

I encourage you to avail yourself of this program and to otherwise make every effort to improve your work, performance, conduct and attendance. You must understand, however, regardless of whether you take advantage of the program, you will be held accountable for your work, performance, conduct and attendance and any other service deficiency that may occur. If you use the program, a reasonable amount of time will be allowed for you to demonstrate improved work,

Exhibit _10f_
Page _3_ of _10_

performance, conduct and/or attendance and I sincerely believe you can accomplish this.

However, if after a reasonable length of time you have not achieved sufficient improvement, or if you do not use the EAP and do not adequately improve, or if you improve but the same or similar problems arise again, I will initiate appropriate corrective action, which may include reprimand, suspension from duty without pay, and /or removal from your position and from the Federal service, for any further service deficiency.

I am concerned for your continued effective contribution to the functioning of our staff.  I have every hope you will strive to improve your deficiencies, thereby restoring my confidence in you and your ability to perform your duties in a satisfactory manner so more severe action will not be necessary.  If you believe I may be able to help you in any way, please speak with me.

*Debbie Ridgely*

Debbie Ridgely


Receipt Acknowledgment

To acknowledge that you have received this notice, please sign in the space below.  Your signature does not mean that you agree or disagree with this notice and, by signing you will not forfeit any rights to which you are entitled.  Your failure to sign will not void the contents of this memorandum. Please return the signed original copy to me.

I acknowledge receipt of this memorandum:


_____          _____
Name of Employee                                             Date


*Employee refused to sign.*

*D Redgely 03/11/2005*

Exhibit _101_
Page _4_ of _10_

DEPARTMENT OF HEALTH & HUMAN SERVICES

**Memorandum**

*Hand Delivery*

Date:     May 6, 2005

From:     Debbie Ridgely
          Director
          Office of Small and Disadvantaged Business Utilization
          Office of the Secretary

Subject:  Memorandum of Warning

To:       Arthuretta Martin
          Deputy Director
          Office of Small and Disadvantaged Business Utilization
          Office of the Secretary


This is to caution you about your continued inappropriate behavior in the workplace and warn you that such behavior is unacceptable and will not be tolerated.

Specifically, over the past several months, I have observed what appears to be a confrontational approach in your behavior and I am concerned that we are not moving forward. In recent times, the following incidents have occurred:

1.  Unilaterally removing yourself from or transferring your assignments to others, after they have been assigned to you. Some examples are:

    - 03/03/2005 – assigned to develop questions for the survey to be conducted prior to our off-site training conference. You transferred the assignment back to the contractor.
    - 03/08/2005 – assigned the responsibility of assessing and summarizing comments from the OPDIVs on the SB Goal Improvement Plans. You transferred the assignment back to me.
    - 03/09/2005 – assigned to provide the SBA a copy of the FY 2003 SBPRA report and you passed the assignment onto a senior member in the Executive Secretary's office.
    - 03/10/05 – You asked to be removed as the POC for HHS on the e-SRS assignment.

Arthuretta L. Holmes Martin/Memorandum of Warning

Exhibit ___10 P___

Page _5_ of _10_

Page 2 – Arthuretta L. Holmes Martin/Memorandum of Warning

- 03/21/05 - Under the subject line of: "Opinion and Comments" you informed me that you would be on leave and you wanted another staff member to represent the office at the 5th. Annual Interagency Planning meeting on Service Disabled Veterans. Based on the subject line, I had no idea that you were out on leave or had planned to take leave.

2. Continually asking for detailed specifics on how I want you to carry out every single step of every assignment that is given. Based on your grade level and experience, you are expected to carry out assignments with minimal supervision. I am confident that you can carry out these assignments with minimal supervision. I will certainly address any situation where a problem arises and/or it is a matter that has *significant* Department-wide implications, otherwise I expect you to be able to address those matters for which you are assigned, capably and efficiently.

- 03/03/05, 03/09/05, 03/21/05, 03/24/05, 03/25/05, 03/28/05, 04/01/05, and 04/11/05 - Asked for detailed specifics on how I want you to carry out every single project that you have been assigned.

3. Continually challenging my management authority on decisions that are made. As the responsible supervisory authority, these decisions will rest with me, as well as, any assignments I choose to give to any members of my staff.

- 03/03/05 - you have questioned my decision to include a senior staff person in a meeting.
- 03/16/05 – in this same day, you requested twice of me clarification on the role of a senior staff member.
- 03/23/05 - You continue to question my management decisions, specifically; you have questioned my decision to include a senior staff person in a meeting on an office project (NatCom).

4. Failure to treat others with professional courtesy and respect.

- 03/09/05 - You informed me that you would be speaking at SAIC but provided no other details............topic, audience, etc. This is not acceptable.

- 03/09/05 - You received a request for budget information from a senior member of the OSDBU staff. You stated that you did not understand the request and that the request was premature.

- 03/09/05 - You sent an e-mail to all Small Business Specialists on e-SRS and the 294s and aired your own personal frustrations that did not need to be shared.

Exhibit _10 £_
Page _6_ of _10_

Page 3 – Arthuretta L. Holmes Martin/Memorandum of Warning

You called out one of our SBS on the e-SRS project and copied all of the other Small Business Specialists. This is not acceptable.

- 03/18/05 - You were assigned the task of assessing the comments that had been received from the OPDIVs on their plans for improving their SB goal achievements. You said that you could not quantify the comments and turned the raw data back to me to quantify.

- 03/21/05 - You were originally scheduled to speak at a WIPP conference in the afternoon. You notified me under the subject line of "Opinions and Comments" that you would be one leave. Based on the subject line, I had no idea that you would be on leave or had planned to take leave. I chased down the information that was requested and called WIPP at lunch. Only then, did I learn that the date for the presentation had been moved and that you were aware of it. You failed to inform me of the date change. This is not acceptable; you are expected to keep me informed.

- 03/23/05 -You sent me an e-mail and told me that you were attending a Women's History Month program and that you would be in the e-SRS meeting in the afternoon. You walked out of the office and I read this e-mail after the fact. This is not acceptable. We were both in the office that day; simply notify me verbally.

- 03/24/05 - You sent an e-mail to all of the Small Business Specialists and to the Heads of the Contracting Activities on the e-SRS project. You have stated that both the Senior Procurement Executive and myself need to clarify how the Department should proceed. This is not acceptable.

- 04/05/05 - At the off-site retreat you challenged the purpose of the session with the facilitator. You stated that the purpose was not clear to you. Prior to the session, the facilitator had sent out the full agenda to all participants. As the session moved on you challenged the methodology behind the survey that was conducted. You stated that you did not understand the methodology and you felt that the results were not valid. This was not conducive to a productive training session.

  During workgroup breakout sessions, you challenged the assignments that your group was given and a result, your group was not able to complete the assignment. This was disruptive and not conducive to a productive training session.

- During Day 2 (April 6) of the training session, you continued to challenge the assignments that were given the previous day and stated that you did not

Exhibit __10f__
Page __7__ of __10__

Page 4 – Arthuretta L. Holmes Martin/Memorandum of Warning

understand the purpose of the assignment. This was not conducive to a productive training session.

The above list is not all-inclusive of the concerns that I have with your conduct nor does it discuss all of the incidents that have occurred

The DHHS Standards of conduct are outlined in 45 CFR 73, Subpart C, Section 73.735-301, and specify the following guidance pertaining to communication within the office:

"An employee's conduct on the job is, in all respects, of concern to the Federal Government. Courtesy, consideration, and promptness in dealing with the public must be shown in carrying out official responsibilities and actions, which deny the dignity of individuals, or conduct, which is disrespectful to others, must be avoided. Employees must recognize that inattention to matters of common courtesy can adversely affect the quality of service the Department is responsible for providing. Where appropriate, courtesy to the public should be included in the standards for employee performance. Of equal importance is the requirement that courtesy be shown in day-by-day interaction with co-workers. Employees shall be polite to and considerate of other employees, and shall respect their needs and concerns in the work environment."

It is your responsibility to control your behavior at all times.

1. Specifically, your performance plan under <u>Element 3</u>: Contributes to the improvement of customer service for the Small Business Program and the vendor community. Supports the Agency's small business goals. Interacts with multiple customer organizations (both internal and external). Develops methods and procedures for dealing with customers, including educational and marketing materials about products and services. Actively learns about customer organizations and situations in order to be proactive in developing solutions to issues. Assists and encourages peers in their dealings with customers.

Your goal is to:

o Facilitate communication with customers regarding requests, work products, and services (internal/external). Refers customers to appropriate…guidance. Finds or solicits…problems. Addresses customer requests in a timely manner. *Demonstrates a positive manner in telephone and face-to-face contacts.*

o Designs work products with customer needs in mind. Obtains customer input to, and feedback on, work products as they are developed and finalized. Recognizes the need for customer involvement in work products to ensure project success. Regularly solicits feedback from customers to make changes and obtain guidance.

o *Works to add value to the customer organization for Small Business Services.*

Exhibit ___10ℓ___
Page __8__ of __10__

Page 5 – Arthuretta L. Holmes Martin/Memorandum of Warning

2. Your position description describes the behavior and responsibilities expected of the incumbent of your position, such as:

Introduction: "This position serves as the liaison and maintains working relationships with the Small Business Administration, the OMB, GSA, and other federal agencies..."

Major Duties and Responsibilities:

- o "Participates with the Director and higher officials..."
- o "Services as a project leader..."
- o "Serves as one of the key points of contact..."
- o "Serves as the departmental key contact..."
- o "Represents the Department..."
- o "Serves as a focal pint for all complaints or inquires from the small business community on matters involving the Department, and resolves the problem."

- o Factor 6, Personal Contacts – "Contacts are at all levels with the Agency, and with other agencies, Congressional members and key staff, senior corporate level officials of major corporations, President/CEOs of small corporations, key representatives from national organizations, key officials from other federal agencies, principal executives of universities and non-profit organizations, and key officials from state and local governments. The employee represents the Department on standing top-level Interagency committees and work groups dealing with the resolutions of difficult problems concerning small business. The employee must exercise tact and diplomacy in communicating effectively with all contacts."

- o Factor 7, Purpose of Contacts – "Persons contacted typically have diverse viewpoints, goals, or objectives, requiring the incumbent to achieve a common understanding of the problem and a satisfactory solution by convincing them, arriving at compromise, or developing suitable alternatives."

I am cautioning you based on the above listed specific reasons and details. This action is not considered a disciplinary action, but a warning that should further deficiencies in your conduct occur, it may result in a more severe corrective action, i.e., disciplinary/adverse action to include a written reprimand, a suspension from duty without pay, and/or removal from your position and from the Federal service.

As your supervisor, I determine the assignments that you will be working on and any changes in those assignments must be discussed and approved by me first. I expect you to perform at the level of a GS-14, Deputy Director of the office. I expect you to conduct yourself in a professional manner. I expect you to perform as part of a team and as a team player. The successful operation of our office depends on the team concept of everyone working together for one purpose. Other team members may be called upon to contribute. Projects are the overall responsibility of the office.

Exhibit _10f_
Page _9_ of _10_

Page 6 – Arthuretta L. Holmes Martin/Memorandum of Warning

As always, the Employee Assistance Program is available to all employees and participation is voluntary and confidential unless you authorize release of information or advise me yourself of your participation or you sign a release form in EAP. The EAP is located at 330 C Street, SW, Room 1250, Washington, DC 20201 and can be reached on 1-800-222-0364. I encourage you to avail yourself to these services if you feel a personal and/or other situation may be the cause of your conduct.

This memorandum will not be filed in your Official Personnel Folder, but I will retain a copy for future reference.

Since this has been a continuing problem, I felt I needed to take this action to impress upon you the importance of correcting your behavior. If you do so, nothing further needs to occur, and I believe this memorandum can provide a constructive base for improvement in your future conduct. I have every hope you will strive to improve your deficiencies, thereby restoring my confidence in you and your ability to perform your duties in a satisfactory manner so more severe action will not be necessary. If there is anything I may be able to do to help you avoid future situations of this nature, please speak with me.

Receipt Acknowledgment
To acknowledge that you have received this notice, please sign and date in the space below. Your signature does not mean that you agree or disagree with this notice and, by signing you will not forfeit any rights to which you are entitled. Your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum:

_____        _____
Arthuretta L. Holmes Martin                          Date

Attachment

*Employee refused to sign.*

*DRidgely 05/06/2005*

Exhibit _10_
Page _10_ of _10_